UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

GENETEC, Inc.,

Plaintiff

v.

PROS, Inc.,

Defendant.

Civil Action No. 20-cv-7959

**COMPLAINT**

## I. Introductory Statement

1. This is an action for damages resulting from the defendant's negligent or intentional misrepresentations in inducing the plaintiff to enter into a contract for commercial software or, in the alternative, for breach of that contract.

## II. The Parties

2. Plaintiff Genetec, Inc. ("Genetec") is a Canadian company with its principal place of business at 2280 Alfred-Nobel Blvd., Montreal, QC, H4S 2A4, Canada.

3. Defendant PROS, Inc. ("PROS"), is a Delaware corporation with its principal place of business at 3100 Main Street, Suite 900, Houston, Texas, 77002.

## III. Jurisdiction

4. The Court has jurisdiction over the claims asserted in this Complaint pursuant to 28 U.S.C. § 1332(a)(2) because plaintiff Genetec is a domiciliary of a foreign jurisdiction, Defendant PROS has substantial business operations in New

York, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

5. Moreover, the parties designated this Court to have jurisdiction over this dispute in a forum selection clause in the alleged contract at issue in this action.

## IV. Venue

6. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because the defendant is found within this district and a substantial part of the events giving rise to the claim occurred within this district.

## V. Facts Common to All Counts

7. Genetec sells software and hardware worldwide primarily for video surveillance, access control and license plate recognition. In 2019 Genetec sought quotes and demonstrations from several vendors of software intended to help streamline and integrate the process for providing quotes to existing and potential customers. PROS, among others, responded to Genetec's request and, after an exhaustive process of demonstrations and sales presentations by all the responding vendors, PROS was selected by Genetec. Genetec and PROS executed a Subscription and Services Agreement and Statements of Work which, together, constituted a contract (the "Contract") for PROS to provide its proprietary software quoting tool, Smart CPQ, to Genetec.

8. During the pre-sale due diligence phase of the contracting process PROS made numerous representations to Genetec, intended to induce Genetec to

enter into the Contract. Many of those representations turned out to be false. Among other misrepresentations, PROS provided a slide deck that claimed that it had numerous satisfied customers using the version of the software that it proposed providing to Genetec, and included a case study respecting an unnamed user of the software that allegedly had 6,000,000 customers in 25 countries. On September 18, 2019, PROS provided Genetec with a document indicating that Honeywell was a satisfied customer using the product that it proposed selling to Genetec. A PROS representative later admitted, in the spring of 2020, after numerous difficulties with the implementation of the software became evident, that PROS had only one customer using the version of the software that it was attempting to implement at Genetec, and a second that was projected to "go live" in June of 2020. Genetec would not have executed the Contract had it known that only one other customer was using the software that PROS intended to provide.

9. PROS also represented that the version of the software that it demonstrated during the pre-sale due diligence phase was the same version that would be implemented at Genetec, with the same features and functionality and the same user interface "look and feel." This representation was false, as the software version that PROS attempted to provide to Genetec lacked many of the features that had been demonstrated and represented to be available, and the user interface was significantly different, less intuitive, more difficult to navigate, and did not function as represented during the pre-sale demonstrations. Evidence that the product demonstrated pre-sale is different from the product that PROS attempted

to implement includes the fact that PROS provided, on October 17, 2019, a document that described the sync mechanism for processing data, expressly stating that the process involved two separate Customer Relationship Management ("CRM") entities: PROS Quote Content IN and PROS Quote Content OUT. The product PROS attempted to implement at Genetec does not include those entities and the sync mechanism is different. This indicates a materially different software architecture. It is simply not the same product as the one demonstrated and described pre-sale, and represented as being in use by multiple other customers.

10. Furthermore, the software PROS attempted to implement at Genetec could not be used on a mobile device using the Dynamics 365 app, as represented, but only through a browser, with decreased functionality.

11. PROS also represented that after the implementation work was complete (a process estimated at five months), Genetec would be able to modify and update the software to meet its evolving pricing and distribution models with little or no involvement from PROS. PROS representatives later conceded, after the Contract was executed, that Genetec would need to engage (and pay) PROS on a frequent and extensive basis in order to maintain and update the software to meet Genetec's evolving needs, and that Genetec would be unable to make most changes on its own.

12. Integrating a new quoting software product into Genetec's existing computer platform was understood by Genetec, and all parties responding to the RFP, to be a complex and time-consuming undertaking, requiring extensive

preparation and testing before the new software would "go live." This was one of the main focuses of the pre-sale due diligence period, and the implementation timeline became a part of the Contract that was executed with PROS. The primary initial step in the process was for Genetec to provide PROS with a "static" data set respecting Genetec's pricing, discounts, sales models, etc., so that PROS could make any necessary modifications to its software to accommodate any idiosyncrasies. Under the terms of the Contract, PROS estimated that it would take five months from receipt of the static data set to complete the implementation process. Genetec relied on this five-month estimate in awarding the Contract to PROS.

13. The implementation process itself would consist of multiple interim steps, including the training of Genetec personnel to operate and modify the software, familiarizing PROS employees with the specifics of Genetec's existing platform, making needed alterations and "hot fixes," and, most importantly, the testing of the software ("debugging") along the way so that when and if it "went live" the launch could be made with confidence.

14. Five months after Genetec provided the initial static data to begin this estimated five-month long process, PROS' efforts to integrate the quoting software had not yet resulted in a single successful "smoke test." A smoke test, in layman's terms, is the most basic test to see if the software works as intended under the most common of circumstances. Later, more specific "user acceptance" tests (which were scheduled and agreed upon under the Contract after passage of the smoke test) would have tested the functionality of the product under less common and more

demanding scenarios. For five straight weeks in May and June of 2020, PROS consistently failed to pass the initial smoke test, despite repeated efforts on the part of PROS to correct the problems. A test was scheduled, the software failed the test, PROS worked on the problems for a week, and the next week the test failed again.

15. At the end of this five-month period (in June of 2020) Genetec came to realize a number of things. One, there was simply no way that PROS could meet its deadline for going live, as the product had not yet passed its initial smoke test and many tests, which would take many weeks, remained to be conducted after that first benchmark. Two, the functionality of the product that PROS was attempting to provide was significantly different from, and less than, the functionality of the product that had been represented. Third, the user interface was significantly different from the product that was demonstrated. It was less intuitive and user-friendly, required more steps to get to "pages" that would be useful in generating quotes, and lacked many other features. And, finally, the inability of the PROS team assigned to the Genetec project to answer basic questions about the software architecture, history, abilities, and features, and their inability to get their product to pass a basic smoke test, created a lack of trust in the ability of PROS to address the multiple problems that needed to be addressed in order to successfully complete the integration.

16. During this period Genetec also learned, as set forth above, that the product that PROS was attempting to implement was simply not the same product that it had sold to prior customers and that it had demonstrated to Genetec during

the pre-sale period. In short, Genetec was made an unwitting “beta tester” of a new version of the software, there was no large installed base of satisfied customers using the product, the new version was significantly inferior to the version that was demonstrated and had not been adequately debugged, and the PROS personnel assigned to the Genetec project were not sufficiently familiar with the product or able to address the significant issues that had arisen during the implementation efforts. Genetec realized that significant misrepresentations had been made in order to induce it to purchase the software.

17. On July 10, 2020, Genetec formally notified PROS that it had been induced to enter into the Contract in reliance upon false representations and considered it null and void, citing PROS’ multiple misrepresentations and contractual breaches. The letter demanded that all funds paid to date by Genetec (approximately $300,000) be refunded, and reserved Genetec’s rights respecting claims for consequential damages, which amount to approximately $1,000,000.

18. PROS has failed and refused to comply with Genetec’s demand.

**FIRST CAUSE OF ACTION**
**MISREPRESENTATION**

19. Genetec repeats the allegations of the preceding paragraphs as though fully set forth herein.

20. Genetec entered into the Contract as a result of the negligent or intentional misrepresentations of PROS, upon which Genetec reasonably relied to its detriment

21. The Contract is consequently null and void, entitling Genetec to recover its actual and consequential damages.

**SECOND CAUSE OF ACTION**
**BREACH OF CONTRACT**

22. Genetec repeats the allegations of the preceding paragraphs as though fully set forth herein.

23. In the alternative, should the Contract be deemed valid, PROS is in material breach thereof, and such breaches are of sufficient materiality to deprive Genetec of the essential benefits of the bargain, voiding the Contract.

24. PROS' breaches have caused Genetec harm.

WHEREFORE, Plaintiff demands judgment on all Counts of the Complaint and requests that the Court enter judgment in Plaintiff's favor and against Defendant in the Complaint as follows:

1. On the First Cause of Action, declaring the Contract null and void and awarding Plaintiff damages in an amount to be determined at trial;

2. On the Second Cause of Action, declaring the contract null and void as a result of material breaches defeating the essential purpose of the contract, or finding Defendant in breach of the Contract, and awarding Plaintiff damages in an amount to be determined at trial; and

3. Awarding such other and further relief as the Court deems just and proper.

Dated: September 25, 2020
New York, New York

KIRSCH & NIEHAUS, PLLC

*s/ Paul R. Niehaus*
Paul R. Niehaus
150 E. 58th Street, 22nd Floor
New York, New York 10155
(212) 631-0223
paul.niehaus@kirschniehaus.com
*Attorneys for Plaintiff Genetec, Inc.*