# Holland & Knight

900 Third Avenue, 20th Floor | New York, NY 10022-4728 | T 212.751.3001 | F 212.751.3113
Holland & Knight LLP | www.hklaw.com

February 9, 2023

**VIA ECF**
Hon. Jennifer L. Rochon
United States District Judge, S.D.N.Y.
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street, Room 1920
New York, New York 10007

        Re:  *Genetec, Inc. v. PROS, Inc.*, **Case No. 1:20-cv-07959 (JLR)**

Dear Judge Rochon:

        We represent defendant PROS, Inc. ("PROS") in the above-referenced action. Pursuant to the Court Order entered on October 12, 2022 (ECF 58), PROS respectfully submits this letter requesting that the post-discovery status conference scheduled herein for March 30, 2023 (the "Conference") be converted into a pre-motion conference or, alternatively, in lieu of the Conference, PROS be permitted to file a motion for an order granting it summary judgment on its counterclaim for breach of contract against plaintiff Genetec, Inc. ("Genetec") and summarily dismissing Genetec's sole remaining claim for misrepresentation.

**I.**     **PROS Is Entitled to Summary Judgment on Its Breach of Contract Counterclaim**

        Under New York law, a party establishes its *prima facie* right to recover for breach of contract by proving, by preponderance of the evidence, the (1) existence of a contract (2) that was breached by the other party (3) causing it damages. *See Berman v. Sugo LLC*, 580 F. Supp. 2d 191, 202 (S.D.N.Y. 2008). Here, PROS' counterclaim for breach of contract is straightforward.

        PROS sells a suite of software products that enable companies to manage and sell their products more efficiently. PROS' software is sold under a software as a service ("SaaS")[1] business model.  At the end of 2019, Genetec solicited and negotiated with PROS to license PROS' proprietary configuration, pricing and quoting software, known as Smart CPQ. On December 24, 2019, the negotiations culminated in Genetec executing a Subscription and Services Agreement ("Subscription Agreement"), which incorporated a Subscription Order Form ("Subscription Order") and a Work Order ("Work Order"). Pursuant to the Subscription Order, Genetec purchased a three-year subscription to use Smart CPQ. Pursuant to the Work Order, Genetec separately purchased PROS' professional services for implementing and configuring Smart CPQ for Genetec and training Genetec's employees on Smart CPQ. Six months later, on June 4, 2020, Genetec executed a Change Order agreeing to additional fees for more professional services.[2]

        Amazingly, days after executing the Change Order, Genetec decided to stop paying PROS in contravention of the Contract and without, by its own admission, advising PROS or disputing PROS' invoices as required by Section 2.3 of the Subscription Agreement. Genetec then entered into negotiations

---

[1] Unlike a traditional software sale model whereby a vendor sells software for download, on CD or DVD, that is installed and managed locally on a company's server, a SaaS vendor, like PROS, sells a subscription to access its web-based software application, typically through a web-browser, which it maintains in the cloud.
[2] The Subscription Agreement, Subscription Order, Work Order and Change Order collectively constitute the parties' "Contract."

with another vendor, Experlogix, LLC, "to prevent having to go live with Pros." Genetec then, in furtherance of this scheme, unilaterally terminated the Contract and revoked PROS' access to Genetec's system on July 10, 2020. However, Genetec could only terminated the Contract for a material breach and, even then, PROS was entitled to written notice of the specific material breach and at least 30 days to cure it. Here, as discussed below, Genetec fails to cite a single material breach of the Contract but rather fabricates pre-contract representations in an attempt to void the Contract. Additionally, Genetec not only failed to provide PROS with an opportunity to cure but it also prevented PROS from doing so by revoking PROS' access. Accordingly, it is beyond dispute that Genetec breached the Contract. At the time of the breach, Genetec owed PROS $348,962.24 for the two years of subscription fees remaining under the Subscription Order and $165,821.99 for professional implementation and training services that were rendered and invoiced to Genetec pursuant to the Work Order, as modified by the Change Order. Accordingly, PROS has a *prima facie* breach of contract claim.

## II. PROS Is Entitled to Summary Dismissal of Genetec's Misrepresentation Claim

An intentional misrepresentation claim requires proof that a defendant made (1) a material misrepresentation (2) with knowledge of its falsity and (3) the intent to defraud plaintiff, and (4) plaintiff reasonably relied on the misrepresentation (5) to its determent. *Merrill Lynch & Co., Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 181 (2d Cir. 2007). Negligent misrepresentation requires proof that (1) a defendant had a duty, as a result of a special relationship, to give correct information; (2) it made a false representation that he or she should have known was incorrect; (3) defendant knew the plaintiff desired the information for a serious purpose; and (4) plaintiff reasonably relied on the information (5) to its detriment. *See Hydro Investors, Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 20 (2d Cir. 2000). Both intentional and negligent misrepresentation claims must be proven by "clear and convincing" evidence. *Allen v. Westpoint-Pepperell, Inc.*, 11 F. Supp. 2d 277, 284-85 (S.D.N.Y. 1997).

Here, Genetec's misrepresentation claim is limited to five pre-contract representations.[3] Three of the representations were in connection with PROS' September 18, 2019 presentation to Genetec, which it conducted on short notice at Genetec's request. Specifically, Genetec alleges that during the presentation PROS produced (1) one slide referencing an unnamed UK-based company as a satisfied customer using Smart CPQ and (2) another slide referencing Honeywell as a satisfied customer, and represented that (3) PROS "had over 900 successful implementations." The remaining two representations are excerpts from a 128-page document from PROS entitled "Help Topic - Integration - Microsoft CRM | Pros Smart Cpq 12.2," ("Helpful Topic Doc"). Specifically, Genetec alleges (4) page seven of this document showed Smart CPQ as having a different "sync mechanism" for inputting and exporting data than the one set forth in the Contract and (5) the document contained a single reference to Smart CPQ being accessible on the Microsoft Dynamics 365 mobile application ("Dynamics 365 App"). Notwithstanding that the Contract explicitly disclaims reliance on pre-contract representations made in marketing materials and pre-sale presentations, these purported representations fail on multiple levels to sustain a misrepresentation claim.

As an initial matter, Genetec grossly mischaracterized the slides provided at the September 18, 2019 presentation. The UK-company slide benignly gives an overview of that company, its challenges, and how Smart CPQ helped it. There is no mention of how the company configured its Smart CPQ or the version of Smart CPQ that it was using. The Honeywell slide, in its entirety, merely states that Honeywell has a "40% faster quote turnaround time" and it was shown for only a few seconds without any further discussion. The reference to "900+ implementations" when viewed in context is clearly about PROS as a whole and its implementation of all its products throughout its history, not simply its rollout of a particular version of Smart CPQ. After being confronted with the actual slides and the presentation recording, Genetec admitted

---

[3] *See* Memorandum Opinion & Order entered on September 21, 2021 (ECF 27) (dismissing Genetec's breach of contract claim and holding Genetec only sufficiently alleged 5 purported representations to support its sole remaining claim for misrepresentation).

that there is no basis to claim that these slides contain false information. Moreover, PROS demonstrated that the companies at issue—Sage (the UK-based company) and Honeywell—were PROS' customers at the time of the presentation. PROS further never represented to Genetec that the "sync mechanism" depicted in the Helpful Topic Doc would be the same sync mechanism used in Smart CPQ as configured for Genetec. In fact, the Helpful Topic Doc contains a clear disclaimer that "the exact synchronization process depends on the implementation designed according to your business requirements." PROS also never represented that the Smart CPQ being implemented at Genetec would be accessible directly from within the Dynamics 365 App. Thus, PROS never made a false representation to Genetec and any mistaken impression or assumption by Genetec regarding Smart CPQ does not transform PROS' statements into misrepresentations. *See Stamelman v. Fleishman-Hillard, Inc.*, 2004 WL 1719348, at *4 (S.D.N.Y. 2004).

The representations at issue are also not material. Genetec's testimony and internal communications reveal that at the time of the pre-contract negotiations Genetec did not believe PROS provided a case study of a customer that was comparable to Genetec. Thus, Genetec's attempt to retroactively increase the significance of the UK-based company and Honeywell slides is disingenuous at best. As part of its solicitation of PROS, Genetec sent PROS a detailed list of the items that were within the scope of the project. The list is devoid of any reference to the Dynamics 365 App. Similarly, Genetec never requested during pre-contract negotiations and the nearly 4-month post-contract solution design phase that Smart CPQ be accessible directly from within the Dynamics 365 App. Additionally, Genetec concedes that Smart CPQ can easily be accessed on mobile devices through a web browser. Genetec's representative responsible for the substantive negotiations of the Contract testified that he did not even review the Helpful Topic Doc prior to signing the Contract. Furthermore, Genetec produced no evidence that the purported change in the design of the Smart CPQ "sync mechanism" that Genetec received impacted its functionality or capability. And it did not. Finally, Genetec testified that it initially considered four vendors to provide pricing and quoting ("CPQ") software—Apttus, FPX, Experlogix and PROS. Genetec quickly ruled-out Apttus and FPX because, *inter alia*, they were significantly more expensive and not right for the project. It then determined that Experlogix was a "less capable alternative" with "significant shortcomings from a security perspective." Thus, Genetec's decision to retain PROS was not due to the purported representations at issue, but was instead based on PROS' superior product and price when compared to the alternatives.

Even if the representations at issue were false and material (and they are not), Genetec has proffered no evidence that PROS knew the representations were false when made. Although Genetec could rely on favorable inferences at the motion-to-dismiss stage, it must now provide clear and convincing evidence of PROS' intent to defraud—and it has utterly failed to do so. *See U.S. East Telecomms., Inc. v. US West Commc'ns Servs., Inc.*, 38 F.3d 1289, 1302 (2d Cir. 1994). Additionally, Genetec cannot rely on an alleged special relationship with PROS or claim that it reasonably relied on the purported representations at issue. Genetec is a sophisticated international company that sells, *inter alia*, software under a SaaS model and employees a cadre of software engineers and attorneys. Indeed, Genetec admittedly has many employees who hold Microsoft certifications demonstrating their proficiency and knowledge of Microsoft 365 Dynamics and its applications, and those employees built Genetec's prior in-house CPQ software. Accordingly, Genetec has no excuse for failing to verify, or include in the Contract, pre-contractual representations that were allegedly material. Moreover, if Genetec wanted more information about PROS' customers, it could have contacted those customers directly and/or sought more information from PROS, which would have answered Genetec's questions. *See UST Private Equity Invs. Fund v. Salomon Smith Barney*, 733 N.Y.S.2d 385, 386 (1st Dep't 2001) (holding a sophisticated plaintiff was required to use the means of verification that were available to it).

        Respectfully submitted,
        HOLLAND & KNIGHT LLP

        By: */s/ John M. Doherty*
            John M. Doherty