UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GENETEC, Inc.,<br><br>                          Plaintiff,<br><br>        v.<br><br>PROS, Inc.,<br><br>                         Defendant. | Case No. 1:20-cv-07959 (AJN)<br><br>**DECLARATION OF SUNIL JOHN IN SUPPORT OF DEFENDANT PROS, INC.'S MOTION FOR SUMMARY JUDGMENT** |

Pursuant to 28 U.S.C. § 1746, I, **Sunil John**, declare under penalty of perjury as follows:

1.      I am over 21 years of age and am competent to give testimony.

2.      I am the Chief Product Officer at PROS, Inc. ("Defendant" or "PROS") and in this capacity, I am authorized to submit this declaration on PROS' behalf in support of PROS' motion, pursuant to Rule 56 of the Federal Rules of Civil Procedure ("FRCP") and Rule 56.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York (the "Local Rules"), for an order: (1) granting PROS summary judgment on its counterclaim for breach of contract against plaintiff Genetec, Inc. ("Plaintiff" or "Genetec," and together with PROS, collectively, the "Parties"), (2) summarily dismissing Genetec's sole remaining claim for misrepresentation and (3) granting PROS such other and further relief as the Court deems just and proper (the "Motion").

3.      The facts set forth herein are based upon my personal knowledge and upon review of PROS' books and records that are kept in the ordinary course of PROS' business and are in PROS' possession and control.  PROS creates, receives and maintains records, including the business records annexed hereto, in the regular course of its business activities.  Based on my review of and familiarity with PROS' records, all of the business records exhibited hereto were

received, created or otherwise generated at or near the dates reflected on such documents.  All exhibits hereto are also true and correct copies of the corresponding documents in PROS' business records.

## I.      Overview of PROS

4.      PROS is a publicly traded company that is a leading provider of artificial intelligence-powered SaaS pricing, CPQ, revenue management, and digital marketing solutions. With over 30 years of industry expertise, PROS helps business-to-business and business-to-consumer companies across the globe, in a variety of industries, including airlines, manufacturing, distribution, and services, drive profitable growth.

### A.      Software-as-a-Service

5.      PROS sells and operates its software under what is known in the industry as a software-as-a-service ("SaaS") model.

6.      Under the SaaS model, software vendors, such as PROS or Microsoft, sell rights to access the software primarily through a subscription or usage fee, and the software vendor provisions the software on their own hardware and network infrastructure, applies all software upgrades related to the SaaS application, and usually guarantees the availability of the SaaS application under a service level agreement ("SLA").  Access to the software is usually provided through a web browser.  Prior to the SaaS model becoming the prevalent standard for software sales and delivery, software vendors, especially those focused on B2B enterprises, typically would sell their solutions with a one-time software perpetual license fee and annual maintenance fees and deliver their software as installation packages. These installation packages would be installed by the customer on their own hardware and network infrastructure using installation guides or professional service assistance. Because the installation package was installed on customer

hardware, this model of software sales and delivery is often called some variation of "on-prem" software and is the dominant contrast with the SaaS model.

7.      By purchasing the subscription rather than the software itself, a company avoids the significant upfront costs associated with hosting and maintaining software on its premises, such as buying computer servers, employing IT staff and paying licensing fees.

8.      Similarly, a company purchasing SaaS does not need to purchase new versions of the software because SaaS is constantly being updated and automatically released to ensure companies are running the latest version.

**B.      PROS' Suite of Software Solutions**

9.      PROS has a suite of software products that leverage artificial intelligence to provide real-time predictive insights that enable businesses to drive revenue and margin improvements and increase a corporation's efficiency, including, but not limited to, PROS Smart Price Optimization and Management, PROS Smart CPQ ("Smart CPQ"), PROS airline revenue optimization solutions, PROS airline distribution and retail solutions, and PROS digital offer marketing solutions.

10.      Smart CPQ is PROS' proprietary configuration, pricing and quoting ("CPQ") software.

11.      CPQ software, like Smart CPQ, enables companies to streamline and optimize the creation of quotes and orders for their products and services.

12.      CPQ software is comprised of multiple sub-components relating to the various business services that it orchestrates together, including, but not limited to, catalog services, configurator services, quoting services, pricing services, document generation services, designer services and integration services.  These business sub-services are further compromised of more

than 100 micro-services.  As is the case with all modern SaaS solutions based on a microservice architecture, these sub-services and micro-services are constantly being updated and improved, whether for technical, security, or functional benefits.

13.     While PROS may highlight a certain upgrade to one of the services that comprises Smart CPQ, such as improved quoting services that can handle a higher volume of data, Smart CPQ is PROS' sole CPQ software product.

14.     As is customary with SaaS, new customers are sold the current version of Smart CPQ generally available to the public at the time of their purchase to ensure they receive the latest and best version of the software.  Likewise, updated versions of Smart CPQ are automatically released to PROS' existing customers.

**C.     CPQ Software Complements a Company's Customer Relationship Management Software**

15.      CPQ software often works in tandem with a company's larger customer relationship management ("CRM") software platform, which is used to track and manage, among other things, sales, sales representatives' productivity, marketing, customer service and other interactions with customers and prospective customers.  Customers often have a direct contractual relationship with the CRM provider.

16.     The two leading providers of CRM software are Salesforce and Microsoft, whose CRM software is known as Microsoft's Dynamics 365 ("Dynamics").

17.     CRM software is similarly comprised of sub-services and micro-services that are constantly being updated, changed and improved.

**D.     PROS Is a Leading Provider of CPQ Software**

18.     PROS was originally founded in 1985.

19.     In 2008, PROS expanded into the quoting solution market.  Then, in 2014, PROS further expanded into the market by closing on its acquisition of Cameleon Software ("Cameleon"), a company that had been selling and implementing CPQ software since the late 1980s.

20.     Pursuant to the Cameleon acquisition, PROS acquired one hundred percent of Cameleon, including all of its intellectual property, employees and customers.  Indeed, PROS retained nearly all of the former Cameleon employees, retained and improved the physical office space in Toulouse, France, and many of the former Cameleon employees remain PROS employees today.

21.     After the Cameleon acquisition, PROS rebranded Cameleon's CPQ software as Smart CPQ and has continued to successfully implement and enhance it.

## II.     Genetec's Solicitation of PROS

22.     In response to Genetec's request, on September 18, 2019, PROS virtually conducted, *via* Microsoft Teams, an initial presentation for Genetec that provided a general overview of PROS and its different software solutions, while focusing on Smart CPQ (the "September 2019 Presentation").  A true and correct copy of the Microsoft PowerPoint slideshow that was presented at the September 2019 Presentation is annexed hereto as **Exhibit 1**.

23.     At an initial customer presentation, like the September 2019 Presentation, PROS uses a set of generic demonstrations that express the variety of ways that Smart CPQ can be configured because PROS only has limited information about the prospective client's operational needs and requirements.  To that end, such presentations are only meant to provide a high-level overview of the possible configurations of Smart CPQ and its major capabilities. Smart CPQ, like nearly all CPQ solutions, is typically configured to better satisfy a given customer's unique

business requirements through an implementation project.  To support configuration, Smart CPQ has been engineered with features and capabilities to allow configuration in a very specific way, in order to preserve the upgradeability of the core software without breaking any of the customized configurations.  Customers with knowledge and training on configuring Smart CPQ can perform the configuration on their own, but they can also choose to have trained PROS professionals configure the software.  When the latter approach is chosen by a customer, PROS and the customer will contract for PROS to perform professional services *via* a work order.  Notably, the specific configuration of Smart CPQ is not determined until PROS meets with the customer's representatives during the solution design phase of the implementation, after the work order is signed, and memorializes their specific requirements in a Solution Design Document that the customer signs-off on.

24.     As part of Genetec's discovery productions in this matter, it produced a video recording of the September 2019 Presentation bearing bates number GEN0009728 (the "Recording").

25.     Thereafter, PROS conducted several more pre-contract presentations for Genetec, including, but not limited to, presentations on October 11, 2019 and November 13, 2019, and provided Genetec with marketing materials and other information.

26.     Throughout the last two months of 2019, Genetec's project leads continued to solicit information from PROS, negotiate the terms and conditions of Genetec's proposed subscription to access Smart CPQ, negotiate the scope of work and training services to be provided by PROS, and push for concessions on prices.  Contemporaneously, Genetec's in-house counsel heavily negotiated the legal provisions in the proposed Subscription and Service Agreement (the

"SSA"), Subscription Order Form (the "Subscription Order") and Work Order (the "Work Order")

and exchanged multiple redlines of the same with PROS' in-house counsel.

27.     As part of its negotiations with PROS, Genetec provided PROS with a Microsoft

Excel spreadsheet listing Genetec's criteria and requirements for its CPQ project (the "Core

Requirements List").   Nowhere in this Core Requirement List does it mention the Dynamics

mobile application (the "Dynamics Mobile App").   True and correct copies of the Core

Requirements List with PROS' comments therein and the cover email from Besma Alani, a then

PROS employee, dated December 16, 2019, is annexed hereto as **Exhibits 2** and **3**, respectively.

## III.    The Terms and Conditions of the Parties' Contract

### A.    Genetec Enters Into the Contract with PROS

28.     After completing arms-length negotiations, Andrew Elvish ("Mr. Elvish"), Vice

President of Marketing for Genetec, executed the SSA, the Subscription Order, and the Work

Order on behalf of Genetec on December 24, 2019.  True and correct copies of the fully executed

SSA, Subscription Order and Work Order are annexed hereto as **Exhibits 4**, **5** and **6**, respectively.

29.     Approximately 6 months later, on June 4, 2020, Mr. Elvish, on behalf of Genetec,

executed Change Order 1.1 to the Work Order, which had an effective date of April 27, 2020 (the

"Change Order").  A true and correct copy of the Change Order is annexed hereto as **Exhibit 7**.

30.     Pursuant to Section 9.1 of the SSA, Genetec agreed that the SSA "together with all

Orders…" constitutes the Parties' "Agreement."  SSA, § 9.1.

31.     The Subscription Order, the Work Order and the Change Order each likewise

explicitly provide that they are "made part of the Agreement."  Subscription Order, p. 3; Work

Order, p. 2; Change Order, p. 2.

32.     Section 9.14 of the SSA further provides that "[t]his Agreement constitutes the entire agreement between the Parties pertaining to the subject matter hereof and all other prior or contemporaneous agreements, understandings, representations, warranties, and writings are superseded hereby…" SSA, § 9.14.

33.     The Subscription Order, the Work Order, and the Change Order each contain similar merger clauses:

> **THE PARTIES AGREE THAT THIS SUBSCRIPTION ORDER FORM IS AN "ORDER" AS DEFINED IN, AND IS SUBJECT TO, THE SUBSCRIPTION AND SERVICES AGREEMENT BETWEEN THE PARTIES REFERENCED ABOVE (THE "AGREEMENT"), AND UPON EXECUTION THIS SUBSCRIPTION ORDER FORM WILL BE MADE PART OF THE AGREEMENT. THE PARTIES AGREE TO BE BOUND BY THE TERMS AND CONDITIONS OF THE AGREEMENT. FURTHER, THE PARTIES AGREE THAT THE AGREEMENT (INCLUDING ALL EXECUTED ATTACHMENTS THERETO) IS THE COMPLETE AND EXCLUSIVE STATEMENT OF AGREEMENT BETWEEN THE PARTIES, WHICH SUPERSEDES ALL PROPOSALS OR PRIOR AGREEMENTS, ORAL OR WRITTEN, AND ALL OTHER PRIOR COMMUNICATIONS BETWEEN THE PARTIES RELATING TO THE SUBJECT MATTER HEREOF.**

Subscription Order, p. 3.

> **THE PARTIES AGREE THAT THIS WORK ORDER IS SUBJECT TO THE SUBSCRIPTION AND SERVICES AGREEMENT BETWEEN THE PARTIES REFERENCED ABOVE (THE "AGREEMENT"), AND UPON EXECUTION THIS WORK ORDER WILL BE MADE PART OF THE AGREEMENT. THE PARTIES AGREE TO BE BOUND BY THE TERMS AND CONDITIONS OF THE AGREEMENT. FURTHER, THE PARTIES AGREE THAT THE AGREEMENT (INCLUDING ALL EXECUTED ATTACHMENTS THERETO) IS THE COMPLETE AND EXCLUSIVE STATEMENT OF AGREEMENT BETWEEN THE PARTIES, WHICH SUPERSEDES ALL PROPOSALS OR PRIOR AGREEMENTS, ORAL OR WRITTEN, AND ALL OTHER COMMUNICATIONS BETWEEN THE**

8

**PARTIES RELATING TO THE SUBJECT MATTER HEREOF.**

Work Order, p. 2

> **THE PARTIES AGREE THAT THIS CHANGE ORDER IS SUBJECT TO THE AGREEMENT AND WORK ORDER BETWEEN THE PARTIES REFERENCED ABOVE, AND UPON EXECUTION THIS CHANGE ORDER WILL BE MADE PART OF THE AGREEMENT. THE PARTIES AGREE TO BE BOUND BY THE TERMS AND CONDITIONS OF THE AGREEMENT. FURTHER, THE PARTIES AGREE THAT THE AGREEMENT (INCLUDING ALL EXECUTED ATTACHMENTS THERETO) IS THE COMPLETE AND EXCLUSIVE STATEMENT OF AGREEMENT BETWEEN THE PARTIES, WHICH SUPERSEDES ALL PROPOSALS OR PRIOR AGREEMENTS, ORAL OR WRITTEN, AND ALL OTHER COMMUNICATIONS BETWEEN THE PARTIES RELATING TO THE SUBJECT MATTER HEREOF.**

Change Order, p. 2.

34.     As such, the SSA, the Subscription Order, the Work Order and the Change Order collectively constitute the Parties' "Contract."

**B.     Genetec's Smart CPQ Subscription**

35.     Pursuant to Section 1.1 of the SSA, "PROS grant[ed] to Genetec and its Users web-based access to the Application for use for Genetec's own internal business purposes during the Subscription Term in accordance with the Scope." SSA, § 1.1.

36.     "Application" is defined as "PROS software-as-a-service platform specified in the applicable Order, together with the accompanying Documentation made available by PROS to Genetec pursuant to the subscription." *Id.* at § 9.1(a).

37.     Pursuant to Section 9.1(e) of the SSA, the defined term "Documentation" explicitly excludes "any **marketing materials or demonstrations** of the Application." *Id.* at § 9.1(e) (emphasis added).

9

38.     The "applicable Order" setting forth the terms of Genetec's subscription is the Subscription Order, which provides that Genetec purchased a three-year subscription (the "Subscription Term") to access "PROS Smart CPQ."  Subscription Order, pp. 1-2.

39.     Genetec's annual subscription fee for the first year was $134,082.61 and $174,481.12 for each of the second and third years.  *Id.*

40.     The SLA attached to the Subscription Order, provides, among other things, that PROS customers, such as Genetec, can find "technical documentation, knowledge base solutions, discuss issues within [PROS'] forums, and review technical guides" on PROS' customer portal, "PROS Connect."  *Id.* at p. 5.

41.     Genetec received access to Smart CPQ and PROS Connect when it became PROS' customer on December 24, 2019.

**C.      Genetec's Purchase of PROS' Professional Services**

42.     Pursuant to Section 3.1 of the SSA, the professional services purchased by Genetec were set forth in the "applicable SOW," which as defined in Section 9.1(r), means the Work Order and the Change Order.  SSA, §§ 3.1, 9.1(r).

43.     Pursuant to the Work Order, Genetec purchased PROS' Professional Services to assist Genetec's employees with configuring and implementing Genetec's instance of Smart CPQ, which was estimated to cost $259,250.00, and provide Genetec's employees with training relating to Smart CPQ, which was estimated to cost $12,150.00 (the "Professional Services").  Work Order, p. 1.

44.     Smart CPQ is a configurable platform and the default configuration may require additional modifications to suit a given customer's unique business needs.  PROS operates a multi-tenant cloud environment whereby each customer, or tenant, of Smart CPQ has their own

10

"instance" of the software deployed in the cloud.  This allows for several benefits: 1) security and governance of each customer's data, 2) customization of a customer's solution to their unique business needs, using standard configuration parameters and features of Smart CPQ, that preserves upgradeability without breaking any of the customizations, and 3) maintenance of service level agreements on availability. PROS' professional services personnel, for a fee, are available to Smart CPQ customers to assist them with their configuration and implementation.  Implementation, for example, can involve tasks such as assisting a customer with the data flow between Smart CPQ and the customer's CRM.

45.     Pursuant to the Change Order, the Work Order's scope was expanded to include additional Professional Services estimated to cost $73,200.00.  Change Order, pp. 1-2.

46.     Exhibit A to the Work Order delineates the specific business and technical scope of the Professional Services and the deliverables to be provided by PROS.  *Id.* at pp. 3-8.

47.     In the "Business Scope" section of the Work Order, it provides, in relevant part, that:

> deliverables in this Work Order will be confined to current out-of-the-box capabilities of [Smart CPQ]. The estimates and scope documented in this Work Order are based on PROS interpretation of the workflows presented in a **November 13, 2019, demo**. **Genetec understands this Work Order may not explicitly address all aspects of requirements for what was represented in the demo.**

Word Order, p. 3 (emphasis added).

48.     Under the "Integration Understandings" section of the Work Order, the Parties agreed that "PROS is not responsible for programming or installing **any interfaces**, reporting tools, or **communication links** between [Smart CPQ] and legacy **or third-party systems**." *Id.* at p. 7 (emphasis added).

11

49.     Pursuant to the Work Order, the Parties agreed to participate in a planning or solution design phase to determine how to best configure Smart CPQ to meet Genetec's business requirements.  *Id.* at pp. 4-7.  At the completion of the solution design phase, Genetec would execute a Solution Design Document setting forth the exact configuration of Smart CPQ that Genetec would receive within the parameters of the Work Order's Business and Technical scope. *Id.*

50.     The Work Order, in relevant part, specifically provides:

> Each system will be comprised of a fixed package of base parts plus subsequently added related parts. **During the solution design phase, PROS will determine the feasibility of if systems may be implemented and managed within Smart CPQ**, either partially or in whole, as a configuration process in order to manage the interrelationship between parts. A system's base package and its additional parts may be added to a quote via a to-be-determined.
>
> . . .
>
> New subscriptions workflow: **Solution and feasibility to be determined by PROS during the solution design phase**.

*Id.* at p. 3 (emphasis added).

51.     Under the "Business Understandings" section, the Work Order provides, in relevant part, that:

> . . .
>
> - **[o]nly the specific configurable elements within Smart CPQ which are listed in this exhibit are within the scope of this Work Order**. Any other configurable elements are out-of-scope, even if their configuration within Smart CPQ is possible. If the Parties wish to add any elements at a later date, such elements must be added through the change control process or through a separate Work Order.
>
> - [m]aterial design changes, additional quote capabilities, or new requirements identified **post Solution Design** document delivery will result in a change order for additional Services fees.

*Id.* at 4 (emphasis added).

52.     Under the "Technical Scope" section, the Work Order further provides, in relevant part, that "[i]f during the **solution design phase** of the Project it is determined that the business scope requires parameters in excess of those described in this section, a change order will be required to address the additional configuration."  *Id.* at p. 5 (emphasis added).

### D.     Payment Terms

53.     Section 2.1 of the SSA provides that:

> Genetec will pay all fees for the subscription to the Application and Professional Services as set forth herein or on the applicable Order(s) and/or SOW(s), except for those disputed in good faith by Genetec which shall become payable solely after the resolution of such dispute by the Parties. **Payment obligations are irrevocable and non-cancellable, and any fees paid are nonrefundable, except as set forth in Sections 5.4 and 8.3.**

SSA, § 2.1 (emphasis added).

54.     Section 2.2 provides that "PROS will invoice Genetec for Professional Services fees as set forth in the applicable SOW."  *Id.* at § 2.2.  Additionally, the Work Order and the Change Order each provide that the estimated fees therein may vary, and PROS will provide Genetec with monthly invoices for fees actually incurred by PROS.  Work Order, p. 1; Change Order, p. 1.

55.     Section 2.3, entitled "Payment," provides that:

> [e]xcept for any invoiced amounts disputed in good faith by Genetec, invoices are payable upon receipt and are past due if not paid within sixty (60) days from the date of invoice. **Genetec will pay any reasonable legal fees or other costs incurred by PROS to collect any such undisputed delinquent amounts**. **Genetec may not withhold (except as a result of a reasonable and good faith dispute of invoiced amounts communicated to PROS in writing prior to the due date) or offset fees due to PROS for any reason**.

SSA, § 2.3 (emphasis added).

56.     Accordingly, Genetec was not entitled to withhold payment of PROS' invoices for Professional Services unless it communicated to PROS in writing prior to the due date of the applicable invoice a reasonable and good faith basis to dispute the amounts therein.  *Id.*

**E.     Termination Terms**

57.     The SSA does not contain a termination for convenience clause or any similar clause providing Genetec with the right to terminate the Contract at its sole discretion.

58.     Section 8.1 of the SSA provides:

> [a]n Order or SOW issued hereunder will terminate if either Party (i) fails to perform any of its **material obligations** thereunder **and (ii) fails to cure such breach within thirty (30) days after written notice from the non-breaching Party** (or if such breach cannot be corrected through the exercise of reasonable diligence within such thirty (30)-day period, if the breaching Party does not commence to correct such failure within such thirty (30)-day period and thereafter diligently prosecute same to completion). **Such written notice shall specify in detail the alleged material breach. For the avoidance of doubt, any Order or SOW issued hereunder and not terminated pursuant to this Section 8.1 shall remain in full force and shall continue for the term stated therein** (unless otherwise terminated in accordance with this Agreement).

SSA, § 8.1 (emphasis added).

59.     The Subscription Order adopts the termination terms set forth in Section 8 of the SSA.  Specifically, it provides that:

> [n]otwithstanding anything to the contrary in this Order or the Agreement, Genetec has the right to terminate the subscription for the Application documented by this Order **in accordance with Section 8 of the Agreement** if such Application is subject to a **Material Persistent Failure**; provided that Genetec must exercise such right within 30 calendar days after such Material Persistent Failure occurs. As used herein, "Material Persistent Failure" means the Monthly Uptime (as defined in the Service Level Agreement) is

> below 98% for three consecutive months or for four months within
> any 12-month period. …

Subscription Order, p. 2 (emphasis added).

60.     While the Work Order, which only applies to the Professional Services and not to the subscription to Smart CPQ, has a termination for convenience clause, it requires 30 days written notice and the payment of all Professional Services rendered through the termination date. Specifically, it provides:

> Genetec may terminate this Work Order for convenience by **providing thirty (30) days advance written notice to PROS**. If so terminated, PROS will cease to perform all Professional Services under this Work Order and **will immediately invoice Genetec for all unbilled Professional Services performed through the effective date of termination**. Where Professional Services are billed on a fixed fee basis, such invoicing will include a prorated portion of the Professional Service fee representative of the unbilled work performed by PROS through the effective date of termination.

Work Order, p. 2 (emphasis added).

## IV.     Genetec Signs-Off on the Solution Design Document

61.     In accordance with the Work Order, PROS conducted seven days of workshops from February 21, 2020 through February 27, 2020 at Genetec's headquarters to understand Genetec's specific requirements and configure Smart CPQ to meet those requirements, which the Parties documented in the proposed Solution Design Document.

62.     Thereafter, PROS continued to review and revise the proposed Solution Design Document based on Genetec's feedback and comments.

63.     On April 3, 2020, Michelle Daigle ("Ms. Daigle"), Genetec's project manager for the PROS project, on behalf of Genetec, signed-off on the Solution Design Document (the "Solution Design Document" or "SDD").  A true and correct copy of the April 3, 2020 email from

Ms. Daigle is annexed hereto as **Exhibit 8** and a true and correct copy of the signed-off on Solution Design Document is annexed hereto as **Exhibit 9**.

64.     Pursuant to the Solution Design Document, "after sign-off, any changes requested to [the] design may be subject to a change order at the discretion of the [PROS'] Project Lead or Delivery Executive."  SDD, p. 3.

65.     After April 3, 2020, PROS began configuring and implementing Smart CPQ for Genetec in accordance with the Solution Design Document.

66.     Two months into this implementation process, on June 4, 2020, Genetec executed the Change Order pursuant to which it reaffirmed its satisfaction with PROS' work and requested additional Professional Services.  Change Order, p. 1.

67.     Prior to executing the Change Order, on May 14, 2020, Mr. Elvish emailed Bill Norris at PROS to tell him how satisfied Genetec was with PROS and only providing minimal comments to the Change Order.  A true and correct copy of Mr. Elvish's May 14, 2020 email is annexed hereto as **Exhibit 10**.

68.     On June 5, 2020, Ms. Daigle emailed Laurie Bonds, PROS' project manager, similarly complimenting all of PROS' hard work.  Specifically, she wrote: "[t]hank you so very much to you and the team, and I'm grateful that Tosh continues to put in all the extra hours to get us there."  A true and correct copy of Ms. Daigle's June 5, 2020 email is annexed hereto as **Exhibit 11**.

## V.     **Genetec Unilaterally Terminates the Contract Without Prior Notice**

69.     On July 10, 2020, Genetec, through its counsel, sent PROS a letter unilaterally terminating the Contract because of purported "implementation problems" and stating that it had

"determined to go with another vendor" (the "July 10, 2020 Letter").  A true and correct copy of the July 10, 2020 Letter is annexed hereto as **Exhibit 12**.

70.     On or about July 10, 2020, Genetec also revoked PROS' access to Genetec's network and Microsoft environment, including access to Genetec's CRM, which prevented PROS from implementing Smart CPQ solutions to resolve Genetec's purported "implementation problems."

71.     Prior to the July 10, 2020 Letter, Genetec never sent PROS a written notice of material breach of the Contract or expressed its intent to terminate the Contract.  Indeed, annexed hereto as **Exhibits 13** and **14**, are true and correct copies of emails from Ms. Daigle to the PROS team on July 6, 2020 and July 8, 2020 conducting business as normal.

72.     On July 20, 2020, PROS, through counsel, responded to Genetec's July 10, 2020 Letter stating that all of Genetec's purported problems had been resolved or will be resolved in short order in the next version of Smart CPQ scheduled for release on July 24, 2020.  A true and correct copy of PROS' letter is annexed hereto as **Exhibit 15**.

73.     In its July 20, 2020 letter, PROS also formally demanded, pursuant to Section 8.1 of the SSA, that Genetec restore PROS' access to Genetec's system to enable PROS to perform its obligations under the Contract.

74.     However, Genetec continued to deny PROS access to Genetec's system and then filed this litigation.

**VI.     The Amount Due And Owing Under the Contract**

75.     As of the date hereof, there remains due and outstanding under the Contract $697,924.48, which represents $348,962.24 in outstanding subscription fees for the second and

third years under the Subscription Order and $165,821.99 for Professional Services rendered prior

to Genetec's illegal termination of the Contract, plus interest and attorneys' fees and costs.

76.     The following is a breakdown of the Professional Services invoices that PROS duly

provided to Genetec, which Genetec failed to pay:

> a.   invoice number 34661 in the amount of $43,420.34, dated April 30, 2020, for Professional Services rendered between April 1, 2020 and April 30, 2020;
>
> b.   invoice number 34826 in the amount of $47,390.68, dated May 31, 2020, for Professional Services rendered between May 1, 2020 and May 31, 2020;
>
> c.   invoice number 34995 in the amount of $60,292.22, dated June 30, 2020, for Professional Services rendered between March 20, 2020 and June 30, 2020; and
>
> d.   invoice number 35136 in the amount of $14,718.75, dated July 31, 2020, for Professional Services rendered between July 1, 2020 and July 10, 2020.

These invoices are collectively defined as the "Outstanding Invoices" and annexed hereto as

**Exhibit 16**.

77.     PROS never received a written notice from Genetec specifically challenging the

amount of any of the Outstanding Invoices or asserting the work billed therein was not performed.

## VII.   PROS Is Entitled to the Summary Dismissal of Genetec's Misrepresentation Claim

### A.     The September 2019 Presentation Contained No Material Misrepresentation

78.     Three of the five representations underlying Genetec's misrepresentation claim

allegedly occurred during the September 2019 Presentation.  Specifically, Genetec alleges that as

part of that presentation PROS showed (i) a slide referencing that PROS "had over 900 successful

implementations of the product it was seeking to sell to Genetec," (ii) a slide referencing an

unnamed UK-based company as a satisfied customer of "the software that [PROS] proposed

providing to Genetec," and (iii) a slide referencing Honeywell as a satisfied customer "using the

product that [PROS] proposed selling to Genetec."  Genetec then alleges that it learned in June

2020 that "PROS had only one customer using the software that it was attempting to implement at

Genetec (which, upon information and belief, was not Honeywell), and a second customer that was projected to 'go live' in June of 2020."

    **i.**    **The "About PROS" Slide Contains No Materially False Statements**

  79.    At the beginning of the September 2019 Presentation, the PROS representative gave a brief overview of PROS.

  80.    The statement that PROS has "900+ implementations" was made as part of this introductory segment of the presentation and in connection with the below slide:



*See* Exhibit 1, p. 8.

  81.    As the title of the slide indicates, this slide is "About PROS", the company as a whole, and sets forth that PROS has "900+ Implementations" of its software without distinguishing between the various software solutions that it offers, including, but not limited to, Smart CPQ, or referencing any specific versions of software or past integrations thereof.  It goes on to state that PROS has "1,000+ professionals", a "95%+ renewal rate", "customers in 55+ countries", and "99%+ achieved application SLA."

  82.    During the presentation, the slide was shown for less than a minute and the PROS representative's sole statement relating to it was as follows:

> So, my final slide is basically just kind of rounding it out, talking a little bit **about PROS** again, in terms of we have over 900 implementations, 95 percent renewal rate. We are a **publicly traded**

> **company**, **well over a thousand professionals in the organization**. We're spread out over 55 different countries and, I think, from a security standpoint, we are ISO 27001 certified…

*See* Transcript Excerpt of Minute Markers 05:50 to 06:34 of the Recording annexed to the Declaration of John M. Doherty in Support of the Motion (the "Doherty Dec.") as Exhibit I (emphasis added).

83.     Furthermore, the "About PROS" slide was the final slide of the introductory segment of the presentation.   Immediately before showing the slide to Genetec, the PROS representative said the following:

> Yeah, so - **just kind of jumping into who PROS is**…We've been around and in this space for over 30 years. …
>
> Part of what I wanted to jump into, just as a **30 thousand foot overview** of the solution is that there is a lot more that we can do as you guys move forward and this sort of digital transformation posture…so, again - **primarily we'll be talking about CPQ today, but I wanted to make you aware of some of the other aspects of the platform**. …
>
> You can - sort of - this kind of represents our baseline of **different products**, obviously. Over there to the right, we've got Smart CPQ which is primarily what we're gonna be talking about today. You can sort of bifurcate those - the solutions - out into two areas, mainly. We've got strategy on the left side and execution on the right side. So, our control and guidance products are more on the Strategy side. Control would be more for price list management, business [[???]] management, things of that nature. And then our guidance product typically works hand in hand with our CPQ as well in terms of pricing segmentation and things of that nature. So, that's just a **broad overview of our whole solution set**. …

*See* Transcript Excerpt of Minute Markers 02:48 to 05:46 of the Recording annexed as Exhibit J to the Doherty Dec. (emphasis added).

#211831933_v5

84.     After this slide was shown and the introductory segment of the presentation was completed, Genetec's employees did not ask any follow-up questions.

ii.     **The Un-Named UK-Based Company Slide Contains No Materially False Statements**

85.     Below is a copy of the slide regarding the unnamed UK-based company:



*See* Exhibit 1, p. 35.

86.     The slide gives a general overview of the unnamed company, its challenges, PROS' solutions for those challenges, and results therefrom.

87.     There are no references in the slide to the version of Smart CPQ being used by the unnamed company.  Additionally, the slide does not state that the unnamed company accessed Smart CPQ from within the Dynamics Mobile App.

88.     During the presentation, the slide was on the screen for approximately one minute and the PROS' representative's only statement in connection with the slide was as follows:

> So yeah. This a, just bringing it all together. Right, this is a case study, where, very similar fragmented product lines, bad implementation, outdated catalogues, and then bad proposals. So, we unified everything into a single platform and we did use CRM, Dynamics, for this customer too. Centralized the product catalogue and then the result was it aligned all the product offerings across all the sales channels, which is what you guys would have when you have this ecommerce version or what have you, the internal version. Most importantly, reduced proposal time and then improved the

time to market for new products, which is something that you guys were also concerned about. But, yeah, questions and answers, please, by all means. What can I answer for you.

*See* Transcript Excerpt of Minute Markers 01:47:17 to 01:48:18 of the Recording annexed as Exhibit K to the Doherty Dec.

89.     As shown by the transcript excerpt, PROS never represented that the Smart CPQ being implemented at Genetec would be accessible directly from within the Dynamics Mobile App.  PROS further never discussed the version of Smart CPQ used by the unnamed company or represented that Genetec would receive the exact same version.

90.     Additionally, Sage Software ("Sage"), the unnamed UK-based company discussed, in this slide was a PROS customer at the time of the presentation and remains a PROS' customer.

###     iii.       The Honeywell Slide Contains No Materially False Statements

91.     Below is a copy of the slide regarding Honeywell:



*See* Exhibit 1, p. 25.

92.     As shown above, the slide, in its entirety, merely states that Honeywell has a "40% faster quote turnaround time."

93.     The slide contains no references to Smart CPQ, let alone the version of Smart CPQ being used by Honeywell.  Additionally, the slide contains no references to the Dynamics Mobile App.

94.    During the presentation, the slide was shown for approximately one minute and twelve seconds and the PROS representative's sole statement in connection with the slide was as follows:

> Okay. A good example is Honeywell, right? Honeywell, they were struggling with their quoting process. And they got us on board, with CPQ, and they had errors. That was one of the biggest problems they had, was - that was slowing them down. That, and their approval process. And ever since they implemented and placed a Smart CPQ, resulted in a 40% faster quote turnaround time for them.

*See* Transcript Excerpt of Minute Markers 01:10:26 to 01:11:38 of the Recording annexed as Exhibit L to the Doherty Dec.

95.    As shown in the transcript excerpt, PROS never discussed the version of Smart CPQ used by Honeywell or represented that Genetec would receive the exact same version.  PROS further never represented that the Smart CPQ being implemented at Honeywell was accessible directly from within the Dynamics Mobile App.

96.    PROS has produced contractual agreements establishing that Honeywell was its customer at the time of the presentation, and it remains its customer.  True and correct copies of the Honeywell contracts are annexed hereto as **Exhibit 17**.

**B.    The Oct. 2019 Doc. Contains No Material Misrepresentations**

97.    The other two remaining alleged misrepresentations are excerpts from a 128-page document from PROS entitled "Help Topic - Integration - Microsoft CRM | Pros Smart Cpq 12.2," (the "Oct. 2019 Doc.") that was sent to Genetec on October 17, 2019.  Specifically, Genetec alleges (1) page seven of this document showed Smart CPQ as having a different "sync mechanism" for inputting and exporting data than the sync mechanism in the Smart CPQ that it received and (2) contained a single reference to Smart CPQ being accessible from within the Microsoft Dynamics Mobile App.  A true and correct copy of the Oct. 2019 Doc. is annexed hereto as **Exhibit 18**.

#211831933_v5

98.     The Oct. 2019 Doc. is one of multiple instructional documents that are available on PROS Connect, our knowledge base of content for user education and support.  This particular Oct. 2019 Doc. relates to how an earlier version of Smart CPQ interacted with Dynamics and was sent to Genetec early in the pre-contract phase of the Parties' relationship.

99.     In a November 5, 2019 email, Ms. Daigle responded to receiving the Oct. 2019 Doc. by advising PROS that Genetec was "hoping for more detailed API documentation" without asking any follow-up questions regarding the contents of the Oct. 2019 Doc.  A true and correct copy of Ms. Daigle's November 5, 2019 email is annexed hereto as **Exhibit 19**.

### i.     The Flow Chart of The Sync Mechanism Is Not A Material Misrepresentation

100.     Below is the flow chart from the Oct. 2019 Doc. referenced in the Amended Complaint that depicts a conceptual configuration of Smart CPQ's synchronization or "sync" process with a CRM for generating quotes:



*See* Exhibit 19, p. 7 (emphasis added).

101.     As shown above, the first sentence below the chart explicitly provides that the "exact data synchronization process depends on the implementation designed according to your business requirements []", confirming the intent of the flow chart to be a conceptual representation of the sync mechanism.

102.    After receiving the Oct. 2019 Doc., Genetec never referenced the sync mechanism depicted on page seven therein or requested a specific configuration of the sync mechanism for the Smart CPQ implemented at Genetec during pre-contract negotiation with PROS.

103.    PROS likewise never represented to Genetec that the "sync mechanism" depicted in the Oct. 2019 Doc. would be the same sync mechanism configuration for the version of Smart CPQ implemented at Genetec.  In fact, the specific configuration of Smart CPQ used to customize the solution for a customer's specific business needs will inform the exact technical data exchange of the sync to clarify the generic green boxes in the conceptual flow chart, and the exact technical mechanism of data exchange will evolve based on how Smart CPQ and the Dynamics CRM respectively evolve.

104.    The flow chart depicts one of the configurations of Smart CPQ's sync mechanism with a CRM that was possible at the time the Oct. 2019 Doc. was created.  However, the sync mechanism process is flexible and it evolves as any microservice may evolve at a SaaS vendor's discretion to improve the security, technical or functional utility, and the diagram was intended to be illustrative using generic concept language like "Content In".

105.    Furthermore, Genetec's argument that the fact that the sync mechanism utilized for the Smart CPQ configured for Genetec did not have two separate pieces of software called "PROS Quote Content IN and PROS Quote Content OUT" "indicates a materially different software architecture" is simply incorrect.  These two software components were merely consolidated into a single software component, which performs the exact same function.  Moreover, they merely relate to the flow of data back and forth between Smart CPQ and CRM, and not the core function of processing the data performed by Smart CPQ.

ii.     **The Reference to the Dynamics Mobile App Is Not A Material Misrepresentation**

106.    Smart CPQ fully integrates with Dynamics.  Additionally, a person can access Smart CPQ through Dynamics on their mobile device through a web browser.  Rather than clicking on the Dynamics Mobile App, they simply click on the web browser, login to Dynamics and then they have access to Smart CPQ.  They can even save Dynamics as a favorite or short cut on their web browser to the extent they want to make the process even easier.  As such, from a user experience standpoint there is no material difference between accessing Smart CPQ using a web browser on a mobile device rather than from within the Dynamics App.

107.    However, in PROS' experience, its customers almost uniformly choose to view Smart CPQ on a screen larger than a phone because the software is complex and provides a large amount of data that is difficult to see on a small screen.  Genetec also terminated the Contract before its salespeople ever used Smart CPQ in the field.

## VIII.   Microsoft Updates the Dynamics Mobile App

108.    Smart CPQ and Dynamics communicate with each other through an application programming interface ("API").  An API is comprised of calls, or software endpoints, that enable a software system to interact programmatically with the capability of another software system. This method of using APIs is very typical of how two software applications interact and integrate in modern software architectures, as this allows both applications to evolve with mitigated risk of the interactivity being affected.  One way to think about an API is to imagine the buttons and menus on any desktop application being the interface through which a human interacts with the application, with the press of the button calling an underlying action.  Instead of a human pressing the button, a software application can use a programmatic mechanism to call the underlying action directly through the API.  Software vendors that support an API can vary an API at any time since

26

it is an integral part of their application functionality, but they are usually preserved for long periods to encourage use of an API as a preferred integration pattern.

109.    For many years, Microsoft provided a single sign-on API that enabled Smart CPQ to be authenticated from within the Dynamics Mobile App.   Once authenticated, Microsoft provided other APIs and integration constructs that would allow Smart CPQ to be launched from within the Dynamics Mobile App.

110.    Several months after the Contract was executed, PROS became aware for the first time that Microsoft changed its single sign-on API for the Dynamics Mobile App in a manner that caused the Dynamics Mobile App to no longer support the single sign-on API utilized by Smart CPQ.

111.    PROS was not aware of this change until at or around the time Genetec brought it to PROS' attention in June 2020 because the majority of PROS' customers that access Smart CPQ on mobile devices do so through a web browser on a tablet, rather than a CRM mobile app, because a web browser gives a larger form factor on a tablet and the visual representation of a quote is identical to what is shown on a desktop adjusted for screen size.

112.    As a result of Microsoft's deprecation of its old single sign-on API, no versions of Smart CPQ are able to be launched within the Dynamics Mobile App.

113.    PROS has tried to work with Microsoft to resolve this issue, but Microsoft has not been willing to take any action to restore the API.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on:   May 4, 2023

_____
Sunil John

#211831933_v5