UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GENETEC, Inc., | |
| Plaintiff, | Case No. 1:20-cv-07959 (JLR) |
| v. | |
| PROS, Inc., | |
| Defendant. | |

### DEFENDANT PROS, INC.'S RULE 56.1 STATEMENT OF MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Defendant PROS, Inc. ("Defendant" or "PROS"), by and through its counsel, Holland & Knight LLP, submits this statement of material facts in support of its motion for an order: (i) granting it summary judgment on its counterclaim for breach of contract against plaintiff Genetec, Inc. ("Plaintiff" or "Genetec"); (ii) summarily dismissing Genetec's sole remaining claim for misrepresentation; and (iii) granting it such other and further relief as the Court deems just and proper pursuant to Rule 56(c) of the Federal Rule of Civil Procedure ("FRCP") and Rule 56.1 of the Local Rules of the United States District Courts For the Southern and Eastern Districts of New York (the "Local Rules") (the "Motion").

## I.  Nature of the Action

1.      This action arises from Genetec's breach of the Contract, as defined herein, that it solicited, negotiated, executed and reaffirmed for (i) a three-year subscription to access PROS' proprietary configuration, pricing and quoting ("CPQ") software, known as PROS' Smart CPQ ("Smart CPQ"), and (ii) PROS' professional services and training for the implementation of Smart CPQ at Genetec, by unilaterally terminating the Contract in violation of the terms thereof and refusing to pay the outstanding subscription fees and invoices for professional services due

thereunder because Genetec wished to retain a different CPQ software vendor that it solicited prior to breaching the Contract and immediately retained after breaching the Contract.

## II.   The Parties

### A.   PROS

2.      PROS is a publicly traded company that is a leading provider of artificial intelligence-powered SaaS pricing, CPQ, revenue management, and digital marketing solutions. With over 30 years of industry expertise, PROS helps business-to-business and business-to-consumer companies across the globe, in a variety of industries, including airlines, manufacturing, distribution, and services, drive profitable growth. Declaration of Sunil John in Support of the Motion, dated May 4, 2023 (the "John Dec.") ¶ 4.

#### i.   Software-as-a-Service

3.      PROS sells and operates its software under what is known in the industry as a software-as-a-service ("SaaS") model.  John Dec. ¶ 5.

4.      Under a Software-as-a-Service or "SaaS" model, software vendors, such as PROS or Microsoft, sell rights to access the software primarily through a subscription or usage fee, and the software vendor provisions the software on their own hardware and network infrastructure, applies all software upgrades related to the SaaS application, and usually guarantees the availability of the SaaS application under a service level agreement ("SLA").  Access to the software is usually provided through a web browser.  John Dec. ¶ 6; Transcript of the Deposition of Andrew Elvish dated November 1, 2022 (the "Elvish Dep. Tr.")[1] 37:2-16.

---

[1] True and correct copies of the excerpts of the Elvish Dep. Tr. are collectively annexed as Exhibit E to the Declaration of John M. Doherty in Support of the Motion dated May 4, 2023 (the "Doherty Dec."). Mr. Elvish is the Vice President of Marketing at Genetec and the signatory to all of the contractual agreements that comprise the parties' Contract, as defined herein.  Mr. Elvish was deposed in this action in his personal capacity and his capacity as one of Genetec's corporate witnesses pursuant to FRCP 30(b)(6).  Genetec specifically designated Mr. Elvish as its corporate witness for the following topics: (1) Genetec's corporate structure and its employees and officers that worked with PROS; (2)

5.      Prior to the SaaS model becoming the prevalent standard for software sales and delivery, software vendors, especially those focused on B2B enterprises, typically would sell their solutions with a one-time software perpetual license fee and annual maintenance fees and deliver their software as installation packages.  John Dec. ¶ 6.

6.      These installation packages would be installed by the customer on their own hardware and network infrastructure using installation guides or professional service assistance. Because the installation package was installed on customer hardware, this model of software sales and delivery is often called some variation of "on-prem" software and is the dominant contrast with the SaaS business model.  John Dec. ¶ 6.

7.      By purchasing the subscription rather than the software itself, a company avoids the significant upfront costs associated with hosting and maintaining software on its premises, such as buying computer servers, employing IT staff and paying licensing fees.  John Dec. ¶ 7; Elvish Dep. Tr. 37:2-16.

8.      Similarly, a company purchasing SaaS does not need to purchase new versions of the software because SaaS is constantly being updated and automatically released to ensure companies are running the latest version.  John Dec. ¶ 8; Elvish Dep. Tr. 39-40.

**ii.      PROS' Suite of Software Solutions**

9.      PROS has a suite of software products that leverage artificial intelligence to provide real-time predictive insights that enable businesses to drive revenue and margin improvements and increase a corporation's efficiency, including, but not limited to, PROS Smart Price Optimization

---

Genetec's business practices, including, but not limited to, hiring and terminating vendors, and retention of corporate documents and communications; (3) Genetec's customer relationship management software, pricing software and/or product management software, including, but not limited to, Microsoft Dynamics 365; (4) Genetec's communications and negotiations with the "several vendors" from whom Genetec sought "quotes and demonstrations" as alleged in the Complaint, including Genetec's receipt and evaluation of proposals, demonstrations, quotes, and other marketing materials from the vendors; and (5) Genetec's solicitation, negotiations, communications, and retention of Experlogix, as defined herein, and all contractual and business relationships between Experlogix and Genetec.

and Management, Smart CPQ, PROS airline revenue optimization solutions, PROS airline distribution and retail solutions, and PROS digital offer marketing solutions.  John Dec. ¶ 9.

10.     Smart CPQ is PROS' proprietary configuration, pricing and quoting ("CPQ") software.  John Dec. ¶ 10.

11.     CPQ software, like Smart CPQ, enables companies to streamline and optimize the creation of quotes and orders for their products and services.  John Dec. ¶ 11.

12.     CPQ software is comprised of multiple sub-components relating to the various business services that it orchestrates together, including, but not limited to, catalog services, configurator services, quoting services, pricing services, document generation services, designer services and integration services.  John Dec. ¶ 12; Transcript of the Deposition of Sunil John dated January 5, 2023 (the "John Dep. Tr.")[2] 15:17-22.

13.     These business sub-services are further compromised of more than 100 micro-services.  John Dec. ¶ 12; John Dep. Tr. 20:13-24.

14.     As is the case with all modern SaaS solutions based on a microservice architecture, these sub-services and micro-services are constantly being updated and improved, whether for technical, security, or functional benefits.  John Dec. ¶ 12; *See* John Dep. Tr. 20:13-24.

15.     While PROS may highlight a certain upgrade to one of the services that comprises Smart CPQ, such as improved quoting services that can handle a higher volume of data, Smart CPQ is PROS' sole CPQ software product.  John Dec. ¶ 13.

16.     As is customary with SaaS, new customers are sold the current version of Smart CPQ generally available to the public at the time of their purchase to ensure they receive the latest and best version of the software.  John Dec. ¶ 14.

---

[2] True and correct copies of the excerpts of the John Dep. Tr. are collectively annexed as Exhibit H to the Doherty Dec.

17.     Likewise, updated versions of Smart CPQ are automatically released to PROS' existing customers.  John Dec. ¶ 14.

### iii.    CPQ Software Complements a Company's Customer Relationship Management Software

18.     CPQ software often works in tandem with a company's larger customer relationship management ("CRM") software platform, which is used to track and manage, among other things, sales, sales rep productivity, marketing, customer service and other interactions with customers and prospective customers.  John Dec. ¶ 15; John Dep. Tr. 24.

19.     Customers often have a direct contractual relationship with the CRM provider. John Dec. ¶ 15.

20.     The two leading providers of CRM software are Salesforce and Microsoft, whose CRM software is known as Microsoft's Dynamics 365 ("Dynamics").  John Dec. ¶ 16; John Dep. Tr. 16:17-21.

21.     CRM software is similarly comprised of sub-services and micro-services that are constantly being updated, changed and improved.  John Dec. ¶ 17.

### iv.    PROS Is a Leading Provider of CPQ Software

22.     PROS was originally founded in 1985.  John Dec. ¶ 18; John Dep. Tr. 14.

23.     In 2008, PROS expanded into the quoting solution market.  John Dec. ¶ 19; John Dep. Tr. 12.

24.     In 2014, PROS further expanded into the market by closing on its acquisition of Cameleon Software ("Cameleon"), a company that had been selling and implementing CPQ software since the late 1980s.  John Dec. ¶ 19; John Dep. Tr. 10, 20.

25.     Pursuant to the Cameleon acquisition, PROS acquired one hundred percent of Cameleon, including all of its intellectual property, employees and customers.  Indeed, PROS

5

retained nearly all of the former Cameleon employees, retained and improved the physical office space in Toulouse, France, and many of the former Cameleon employees remain PROS employees today.  John Dec. ¶ 20; John Dep. Tr. 20.

26.     After the Cameleon acquisition, PROS rebranded Cameleon's CPQ software as Smart CPQ and has continued to successfully implement and enhance it.  John Dec. ¶ 21; John Dep. Tr. 20.

### B.   Genetec

27.     Genetec is a sophisticated international company that primarily sells, *inter alia*, video surveillance and license plate recognition software under both a traditional on-prem model and SaaS model, as well as accompanying hardware, such as cameras, relating thereto.  *See* Elvish Dep. Tr. 26:4-27:4, 36:12-37:13; Amended Complaint (the "Compl.")[3] ¶¶ 2,7.

28.     Genetec has a sales department of approximately 550 employees, a marketing department of approximately 150 employees, a legal department with approximately twelve attorneys, and a digital business solutions department consisting of software engineers, architects and developers with certified expertise in Dynamics 365 and significant experience with CPQ software. Elvish Dep. Tr. 24:19-20, 16:18-20, 23:7-12; Transcript of the Deposition of Jordan Jaumeau dated November 3, 2022 (the "Jaumeau Dep. Tr.")[4] 10:10-15, 18:10-24:4, 43:5-47:5.

---

[3] A true and correct copy of the Amended Complaint is annexed as Exhibit A to the Doherty Dec.

[4] Jordan Jaumeau ("Mr. Jaumeau") is the Director of Digital Business Solutions at Genetec.  On November 3, 2022, Mr. Jaumeau was deposed in this action in his personal capacity and his capacity as one of Genetec's corporate witnesses pursuant to FRCP 30(b)(6).  Mr. Jaumeau was designated Genetec's corporate witness for, among other topics, Genetec's investigation regarding PROS' alleged misrepresentations at issue in this litigation.  Mr. Jaumeau's deposition transcript is defined herein as the "Jaumeau Dep. Tr." and the applicable excerpts from his deposition transcript are annexed as Exhibit G to the Doherty Dec

**III.  Genetec's Solicitation of a Cloud-Based CRM Vendor**

29.     In and around March 2019, Genetec decided to replace its on-premises CRM software with a cloud-based CRM software platform.  Elvish Dep. Tr. 48:3-7.

30.     On or about August 2019, Genetec narrowed the list of potential vendors for its new cloud-based CRM software to Salesforce and Microsoft.  Elvish Dep. Tr. 62:7-12.

31.     In September 2019, Genetec decided to use the cloud-based version of Dynamics as its new CRM platform.  Elvish Dep. Tr. 63:16-25, 74:17-23.

**IV.  Genetec's Solicitation of a Cloud-Based CPQ Vendor**

32.     In conjunction with transferring its CRM to the cloud-based version of Dynamics 365, Genetec also sought to replace its on-premises CPQ software, which Genetec's employees built, with cloud-based CPQ software.  Elvish Dep. Tr. 62:7-12.

33.     After Genetec limited its prospective cloud-based CRM vendors to Salesforce and Microsoft in or around August 2019, Genetec began conducting due diligence research on potential CPQ vendors with the goal of selecting a CPQ vendor by December 25, 2019.  Elvish Dep. Tr. 76:11-23; 84:14-85:11.

34.     Genetec's due diligence, included, but was not limited to, "looking at…customer reviews online, looking at websites, talking to tech partners, talking to concurrent technology companies in [its] space, seeing what they're using, generally looking at…what's going on out there in the world."  Elvish Dep. Tr. 76:11-23.

35.     Genetec's due diligence also included reviewing market research reports on the leading CPQ vendors at the time, including, but not limited to, the research report entitled "Magic Quadrant for Configure, Price and Quote Application Suites" released on October 28, 2019 by

Gartner, Inc. ("Gartner"), a technological research and consulting firm, (the "Gartner Report"). Doherty Dec. Ex. L (annexing the Gartner Report); Elvish Dep. Tr. 79:18-25, 108:19-22, Ex. 2.

36.     In September 2019, Genetec narrowed the list of potential CPQ vendors down to four (4) companies—Apttus, FPX, Experlogix and PROS.  Elvish Dep. Tr. 79:17-21.

37.     Genetec then contacted each of the aforementioned CPQ vendors to solicit proposals and demonstrations.  *Id.*

38.     In response to Genetec's request, on September 18, 2019, PROS virtually conducted, via Microsoft Teams, an initial presentation for Genetec that provided a general overview of PROS and its different software solutions, while focusing on Smart CPQ (the "September 2019 Presentation").  John Dec. ¶¶ 22, 24, Ex. 1 (annexing Microsoft PowerPoint slideshow of the presentation); Elvish Dep. Tr. Ex. 1.

39.     At an initial customer presentation, like the September 2019 Presentation, PROS uses a set of generic demonstrations that express the variety of ways that Smart CPQ can be configured because PROS only has limited information about the prospective client's operational needs and requirements.  To that end, such presentations are only meant to provide a high-level overview of a possible configuration of Smart CPQ and its major capabilities.  Smart CPQ, like nearly all CPQ solutions, is typically configured to better satisfy a given customer's unique business requirements through an implementation project.  To support configuration, Smart CPQ has been engineered with features and capabilities to allow configuration in a very specific way, in order to preserve the upgradeability of the core software without breaking any of the customized configurations.  Customers with knowledge and training on configuring Smart CPQ can perform the configuration on their own, but they can also choose to have trained PROS professionals configure the software.  When the latter approach is chosen by a customer, PROS and the customer

will contract for PROS to perform professional services via a work order.  Notably, the specific configuration of Smart CPQ is not determined until PROS meets with the customer's representatives during the solution design phase of the implementation, after the work order is signed, and memorializes their specific requirements in a Solution Design Document that the customer signs-off on.   John Dec. ¶ 23.

40.     Thereafter, PROS conducted several more pre-contract presentations for Genetec, including, but not limited to, presentations on October 11, 2019 and November 13, 2019, and provided Genetec with marketing materials and other information relating to Smart CPQ and other software solutions.  John Dec. ¶ 25.

41.     During this time period, Genetec continued to receive proposals and demonstrations from the other three CPQ vendors and engage in negotiations with them.  Elvish Dep. Tr. 79-205; John Dec. ¶ 26.

42.     In and around October 2019, Genetec further narrowed its list of CPQ vendors to Experlogix and PROS.  Elvish Dep. Tr. 199:11-24, 93:8-15.

43.     Throughout the last two months of 2019, Genetec continued to engage in negotiations with both Experlogix and PROS.  Elvish Dep. Tr. 190; John Dec. ¶ 26.

44.     With respect to PROS, Genetec's project leads continued to solicit information from PROS, negotiate the terms and conditions of Genetec's proposed subscription to access Smart CPQ, negotiate the scope of work and training services to be provided by PROS, and push for concessions on prices.  Contemporaneously, Genetec's in-house counsel heavily negotiated the legal provisions in the proposed Subscription and Service Agreement ("SSA"), Subscription Order Form ("Subscription Order") and Work Order and exchanged multiple redlines of the same with PROS' in-house counsel.  John Dec. ¶ 26.

45.     As part of its negotiations with PROS, Genetec provided PROS with an Excel spreadsheet listing Genetec's criteria and requirements for the CPQ project (the "Core Requirements List").  John Dec. ¶ 27, Ex. 3 (annexing the Core Requirements List); Elvish Dep. Tr. 180-182, Exs. 14-15.

46.     Nowhere in this Core Requirement List does it mention the Dynamics 365 mobile app. John Dec. ¶ 27, Ex. 3.

47.     On December 16, 2019, Michelle Daigle[5] sent an email to Mr. Elvish and Nadia Boujenoui[6] stating:

> We reviewed the **requirements spreadsheet** with PROS and there were no red flags from my perspective, nor Gurdeep's. I no longer am concerned that they do no[] understand their scope of work for portal integration, and as such am not longer concerned that there may be a high margin of error on the estimates for the same**….They will fire ou[r] spreadsheet back over to us with a y/n for which of our requirements they are able to meet, and a note for anything not met or partial.** (There were a couple of lower priority requirements that are on their roadmap for future.)…

Doherty Dec. Ex. M (emphasis added); Elvish Dep. Ex. 14.

48.     Shortly after Ms. Daigle's above-referenced email, Besma Alani of PROS emailed Ms. Daigle stating "[t]hank you so much for taking the time to meet with us this morning. I am attaching the spreadsheet with our notes. I have added few more columns to reflect SoW reference, scope, and dependencies…"  John Dec. ¶ 27, Exs. 2,3; Elvish Dep. Ex. 15.

---

[5] Michelle Daigle ("Ms. Daigle") was the Project Manager at Genetec responsible for managing Genetec's transition from on-premises to cloud-based CRM and CPQ software platforms.  Elvish Dep. Tr. 55, 76-77.

[6] Nadia Boujenoui ("Mrs. Boujenoui") is a Vice President of Customer Experience at Genetec.  She and Mr. Elvish were Genetec's executive sponsors for Genetec's cloud-based CPQ project.  Boujenoui Dep. Tr. 95.

49.     In his deposition, Mr. Elvish confirmed that the Core Requirement List was intended to "communicate with [Genetec's] partners what sort of -- you know, what items are in scope for the project."  Elvish Dep. Tr. 185:6-10.

50.     On December 23, 2019, the eve of Genetec's internal deadline to select a CPQ vendor, Claire Mazzini, Genetec's primary legal counsel negotiating with PROS, forwarded an email from Robin Wadsworth, a Vice President of Sales at PROS, to Mr. Elvish and Mrs. Boujenoui stating, in relevant part, as follows:

> Hi Andrew and Nadia,
>
> You'll find below a summary of what we were able to negotiate with PROS on this latest round of edits. This would seem to be their final concessions - see below Robin's email from this Saturday.
>
> . . .
>
> **(8.3) Termination for convenience**. Pros refuses to grant Genetec a right to terminate for convenience | ITEM CLOSED & RESOLVED TO GENETEC'S SATISFACTION
>
> . . .

Doherty Dec. Ex. O (annexing the December 23, 2019 Email Chain), pp. 2-4; Elvish Dep. Ex. 16.

51.     In that same December 23, 2019 email chain, Francois Touchette, Genetec's general counsel, wrote to Mr. Elvish, Mrs. Boujenoui and other Genetec employees, saying, in, relevant part, that:

> If you feel that this supplier's solution offers the best value for money on the market, and there aren't any alternatives, let's go ahead.
>
> If on the contrary we have alternatives, let's dig our heels.
>
> Please let us know.
>
> Regards
>
> Francois Touchette
> + 1 514 679 5997

11

Doherty Dec. Ex. O, pp. 1-2; Elvish Dep. Ex. 16.

In response thereto, Mr. Elvish stated:

> There is another much more expensive alternative or a less capable alternative at a similar price. And of course no guarantee that either would have better terms.
>
> A
>
> —
> Andrew Elvish
> Vice President, Marketing
>
> genetec.com

Doherty Dec. Ex. O, pp. 1-2 (emphasis added).; Elvish Dep. Ex. 16.

Thereafter, Mrs. Boujenoui added:

> Plus the less capable alternative at similar price had significant shortcomings from a security perspective - especially when compared to PROS.
>
> @Francois Touchette - Do you know if any legal claims/disputes were filed against PROS? in the past? Do they have a "clean" record? If so, right now this is by far our best (and main) option.
>
> Nadia

Doherty Dec. Ex. O, pp. 1-2 (emphasis added); Elvish Dep. Ex. 16.

52.     At his deposition, Mr. Elvish testified that the "much more expensive alternative" was FPX and Apttus and the "less capable alternative at a similar price" with "significant shortcomings from a security perspective" was Experlogix.  Elvish Dep. Tr. 199:3-200:24, 201:7-204:17.

53.     Mr. Elvish further testified that Genetec requires software to comply with a "rigorous cybersecurity audit" before it can be used on Genetec's network and, thus, Genetec cannot use software that has "significant shortcomings from a security perspective."  Elvish Dep. Tr. 202:4-204:17.

54.     With respect to Apttus and FPX, Mr. Elvish also testified that "one of them didn't even have support for Dynamics, period. So it was out of the running."  Elvish Dep. Tr. 200:19-24.

55.     The Gartner Report further clarifies that Apttus is not compatible with Dynamics 365.  It specifically provides that Apttus "has consolidated its efforts onto the Salesforce platform, including integration with Salesforce Sales Cloud. Companies running Microsoft Dynamics have the option of integrating with Apttus running on Salesforce, although few companies are doing this today."  Doherty Dec. Ex. L, p. 4.

## V.    The Terms and Conditions of the Parties' Contract

### A.    Genetec's Enters Into the Contract with PROS

56.     After completing the arms-length negotiations, Andrew Elvish ("Mr. Elvish"), Vice President of Marketing for Genetec, executed the SSA, the Subscription Order, and the Work Order on behalf of Genetec on December 24, 2019.  John Dec. ¶ 28, Exs. 4-6; Elvish Dep. Exs. 17-19.

57.     Approximately 6 months later, on June 4, 2020, Mr. Elvish, on behalf of Genetec, executed Change Order 1.1 to the Work Order, which had an effective date of April 27, 2020 (the "Change Order").  John Dec. ¶ 29, Ex. 7; Elvish Dep. Ex. 22.

58.     Mr. Elvish testified that he and his team, as well as Genetec's attorneys, reviewed the aforementioned agreements prior to his signing them and he was authorized to act on Genetec's behalf at the time he signed them.  Elvish Dep. Tr. 206:1-208:2, 214:21-216:7, 217:22-219:11, 231:21-235:13.

59.     Pursuant to Section 9.1 of the SSA, Genetec agreed that the SSA "together with all Orders…" constitutes the parties' "Agreement."  John Dec. ¶ 30, Ex. 4.

13

60.     The Subscription Order, the Work Order and the Change Order each likewise explicitly provide that they are "made part of the Agreement." John Dec. ¶ 31, Ex. 4-6.

61.     Section 9.14 of the SSA further provides that "[t]his Agreement constitutes the entire agreement between the Parties pertaining to the subject matter hereof and all other prior or contemporaneous agreements, understandings, representations, warranties, and writings are superseded hereby…" John Dec. ¶ 32, Ex. 4.

62.     The Subscription Order, the Work Order, and the Change Order each contain similar merger clauses:

> **THE PARTIES AGREE THAT THIS SUBSCRIPTION ORDER FORM IS AN "ORDER" AS DEFINED IN, AND IS SUBJECT TO, THE SUBSCRIPTION AND SERVICES AGREEMENT BETWEEN THE PARTIES REFERENCED ABOVE (THE "AGREEMENT"), AND UPON EXECUTION THIS SUBSCRIPTION ORDER FORM WILL BE MADE PART OF THE AGREEMENT. THE PARTIES AGREE TO BE BOUND BY THE TERMS AND CONDITIONS OF THE AGREEMENT. FURTHER, THE PARTIES AGREE THAT THE AGREEMENT (INCLUDING ALL EXECUTED ATTACHMENTS THERETO) IS THE COMPLETE AND EXCLUSIVE STATEMENT OF AGREEMENT BETWEEN THE PARTIES, WHICH SUPERSEDES ALL PROPOSALS OR PRIOR AGREEMENTS, ORAL OR WRITTEN, AND ALL OTHER PRIOR COMMUNICATIONS BETWEEN THE PARTIES RELATING TO THE SUBJECT MATTER HEREOF.**

John Dec. ¶ 33, Ex. 5.

> **THE PARTIES AGREE THAT THIS WORK ORDER IS SUBJECT TO THE SUBSCRIPTION AND SERVICES AGREEMENT BETWEEN THE PARTIES REFERENCED ABOVE (THE "AGREEMENT"), AND UPON EXECUTION THIS WORK ORDER WILL BE MADE PART OF THE AGREEMENT. THE PARTIES AGREE TO BE BOUND BY THE TERMS AND CONDITIONS OF THE AGREEMENT. FURTHER, THE PARTIES AGREE THAT THE AGREEMENT (INCLUDING ALL EXECUTED ATTACHMENTS THERETO) IS THE COMPLETE AND EXCLUSIVE STATEMENT OF AGREEMENT BETWEEN THE PARTIES, WHICH SUPERSEDES ALL PROPOSALS OR PRIOR AGREEMENTS, ORAL OR WRITTEN, AND ALL OTHER COMMUNICATIONS BETWEEN THE PARTIES RELATING TO THE SUBJECT MATTER HEREOF.**

John Dec. ¶ 33, Ex. 6.

> **THE PARTIES AGREE THAT THIS CHANGE ORDER IS SUBJECT TO THE AGREEMENT AND WORK ORDER BETWEEN THE PARTIES REFERENCED ABOVE, AND UPON EXECUTION THIS CHANGE ORDER WILL BE MADE PART OF THE AGREEMENT. THE PARTIES AGREE TO BE BOUND BY THE TERMS AND CONDITIONS OF THE AGREEMENT. FURTHER, THE PARTIES AGREE THAT THE AGREEMENT (INCLUDING ALL EXECUTED ATTACHMENTS THERETO) IS THE COMPLETE AND EXCLUSIVE STATEMENT OF AGREEMENT BETWEEN THE PARTIES, WHICH SUPERSEDES ALL PROPOSALS OR PRIOR AGREEMENTS, ORAL OR WRITTEN, AND ALL OTHER COMMUNICATIONS BETWEEN THE PARTIES RELATING TO THE SUBJECT MATTER HEREOF.**

John Dec. ¶ 33, Ex. 6.

63.     As such, the SSA, the Subscription Order, the Work Order and the Change Order collectively constitute Genetec's and PROS' "Contract."  John Dec. ¶ 34.

**B.   Genetec's Smart CPQ Subscription**

64.     Pursuant to Section 1.1 of the SSA, "PROS grant[ed] to Genetec and its Users web-based access to the Application for use for Genetec's own internal business purposes during the Subscription Term in accordance with the Scope." John Dec. ¶ 35, Ex. 4

65.     "Application" is defined as "PROS software-as-a-service platform specified in the applicable Order, together with the accompanying Documentation made available by PROS to Genetec pursuant to the subscription."  John Dec. ¶ 36, Ex. 4

66.     Pursuant to Section 9.1(e) of the SSA, the defined term "Documentation" explicitly excludes "any **marketing materials or demonstrations** of the Application."  John Dec. ¶ 37, Ex. 4 (emphasis added).

15

67.     The "applicable Order" setting forth the terms of Genetec's subscription is the Subscription Order, which provides that Genetec purchased a three-year subscription (the "Subscription Term") to access "PROS Smart CPQ."  John Dec. ¶ 38, Ex. 5.

68.     The annual subscription fee for the first year was $134,082.61. The annual subscription fee for the second and third years, respectively, was $174,481.12.  John Dec. ¶ 39, Ex. 5.

69.     The service-level agreement attached to the Subscription Order, provides, among other things, that PROS customers, such as Genetec, can find "technical documentation, knowledge base solutions, discuss issues within [PROS'] forums, and review technical guides" on PROS' customer portal, "PROS Connect."  John Dec. ¶ 39, Ex. 5.

70.     Mr. Elvish confirmed that Genetec was aware of and had access to PROS Connect after it became PROS' customer on December 24, 2019.  Elvish Dep. Tr. 178:23-179:10.

### C.  Genetec's Purchase of PROS' Professional Services

71.     Pursuant to Section 3.1 of the SSA, the professional services purchased by Genetec were set forth in the "applicable SOW," which as defined in Section 9.1(r), means the Work Order and the Change Order.  John Dec. ¶ 42, Ex. 4.

72.     Pursuant to the Work Order, Genetec purchased PROS' professional services to assist Genetec's employees with configuring and implementing Genetec's instance of Smart CPQ, which was estimated to cost $259,250.00, and provide Genetec's employees with training relating to Smart CPQ, which was estimated to cost $12,150.00 (the "Professional Services").  John Dec. ¶ 43, Ex. 6.

73.     Smart CPQ is a configurable platform and the default configuration may require additional modifications to suit a given customer's unique business needs.  PROS operates a multi-

16

tenant cloud environment whereby each customer, or tenant, of Smart CPQ has their own "instance" of the software deployed in the cloud.  This allows for several benefits: 1) security and governance of each customer's data, 2) customization of a customer's solution to their unique business needs, using standard configuration parameters and features of Smart CPQ, that preserves upgradeability without breaking any of the customizations, and 3) maintenance of service level agreements on availability.  PROS' professional services personnel, for a fee, are available to Smart CPQ customers to assist them with their configuration and implementation. Implementation, for example, can involve tasks such as assisting a customer with the data flow between Smart CPQ and the customer's CRM.  John Dec. ¶ 44.

74.     Pursuant to the Change Order, the Work Order's scope was expanded to include additional Professional Services estimated to cost $73,200.00.  John Dec. ¶ 45, Ex. 6.

75.     Exhibit A to the Work Order delineates the specific business and technical scope of the Professional Services and the deliverables to be provided by PROS.  John Dec. ¶ 46, Ex. 6.

76.     In the "Business Scope" section of the Work Order, it provides, in relevant part, that:

> deliverables in this Work Order will be confined to current out-of-the-box capabilities of [Smart CPQ]. The estimates and scope documented in this Work Order are based on PROS interpretation of the workflows presented in a **November 13, 2019, demo**. **Genetec understands this Work Order may not explicitly address all aspects of requirements for what was represented in the demo.**

John Dec. ¶ 47, Ex. 6.

77.     Under the "Integration Understandings" section of the Work Order, the parties agreed that "PROS is not responsible for programming or installing any interfaces, reporting

#211812595_v4

tools, or communication links between [Smart CPQ] and legacy **or third-party systems**." John Dec. ¶ 48, Ex. 6.

78.      Pursuant to the Work Order, the Parties agreed to participate in a planning or solution design phase to determine how to best configure Smart CPQ to meet Genetec's business requirements.  At the completion of the solution design phase, Genetec would execute a Solution Design Document setting forth the exact configuration of Smart CPQ that Genetec would receive within the parameters of the Work Order's Business and Technical scope.  John Dec. ¶ 49, Ex. 6.

79.      The Work Order, in relevant part, specifically provides:

> Each system will be comprised of a fixed package of base parts plus subsequently added related parts. **During the solution design phase, PROS will determine the feasibility of if systems may be implemented and managed within Smart CPQ**, either partially or in whole, as a configuration process in order to manage the interrelationship between parts. A system's base package and its additional parts may be added to a quote via a to-be-determined.
>
> . . .
>
> New subscriptions workflow: **Solution and feasibility to be determined by PROS during the solution design phase**.

John Dec. ¶ 50, Ex. 6.

80.      Under the "Business Understandings" section, the Work Order provides, in relevant part, that:

> . . .
>
> - **[o]nly the specific configurable elements within Smart CPQ which are listed in this exhibit are within the scope of this Work Order**. Any other configurable elements are out-of-scope, even if their configuration within Smart CPQ is possible. If the Parties wish to add any elements at a later date, such elements must be added through the change control process or through a separate Work Order.

- [m]aterial design changes, additional quote capabilities, or new requirements identified **post Solution Design** document delivery will result in a change order for additional Services fees.

John Dec. ¶ 51, Ex. 6.

81.     Under the "Technical Scope" section, the Work Order further provides, in relevant part, that "[i]f during the **solution design phase** of the Project it is determined that the business scope requires parameters in excess of those described in this section, a change order will be required to address the additional configuration."  John Dec. ¶ 52, Ex. 6 (emphasis added).

### D.   Payment Terms

82.     Section 2.1 of the SSA provides that:

Genetec will pay all fees for the subscription to the Application and Professional Services as set forth herein or on the applicable Order(s) and/or SOW(s), except for those disputed in good faith by Genetec which shall become payable solely after the resolution of such dispute by the Parties. **Payment obligations are irrevocable and non-cancellable, and any fees paid are nonrefundable, except as set forth in Sections 5.4 and 8.3.**

John Dec. ¶ 53, Ex. 4 (emphasis added).

83.     Section 2.2 provides that "PROS will invoice Genetec for Professional Services fees as set forth in the applicable SOW."  John Dec. ¶ 54, Ex. 4.

84.     Additionally, the Work Order and the Change Order each provide that the estimated fees therein may vary and PROS will provide Genetec with monthly invoices for fees actually incurred by PROS.  John Dec. ¶ 54, Ex. 6.

85.     Section 2.3, entitled "Payment," provides that:

[e]xcept for any invoiced amounts disputed in good faith by Genetec, invoices are payable upon receipt and are past due if not paid within sixty (60) days from the date of invoice. **Genetec will pay any reasonable legal fees or other costs incurred by PROS to collect any such undisputed delinquent amounts. Genetec may not withhold (except as a result of a reasonable and good**

19

**faith dispute of invoiced amounts communicated to PROS in writing prior to the due date) or offset fees due to PROS for any reason**.

John Dec. ¶ 55, Ex. 4 (emphasis added).

86.     Accordingly, Genetec was not entitled to withhold payment of PROS' invoices unless it communicated to PROS in writing prior to the due date of the applicable invoice a reasonable and good faith basis to dispute the amounts therein.  John Dec. ¶ 56.

### E.   Termination Terms

87.     As set forth above, the SSA does not contain a termination for convenience clause or any similar clause providing Genetec with the right to terminate the Contract at its sole discretion.  John Dec. ¶ 57.

88.     Section 8.1 of the SSA provides:

> [a]n Order or SOW issued hereunder will terminate if either Party (i) fails to perform any of its **material obligations** thereunder **and (ii) fails to cure such breach within thirty (30) days after written notice from the non-breaching Party** (or if such breach cannot be corrected through the exercise of reasonable diligence within such thirty (30)-day period, if the breaching Party does not commence to correct such failure within such thirty (30)-day period and thereafter diligently prosecute same to completion). **Such written notice shall specify in detail the alleged material breach. For the avoidance of doubt, any Order or SOW issued hereunder and not terminated pursuant to this Section 8.1 shall remain in full force and shall continue for the term stated therein** (unless otherwise terminated in accordance with this Agreement).

John Dec. ¶ 58, Ex. 4 (emphasis added).

89.     The Subscription Order adopts the termination terms set forth in Section 8 of the SSA.  Specifically, it provides that:

> [n]otwithstanding anything to the contrary in this Order or the Agreement, Genetec has the right to terminate the subscription for the Application documented by this Order **in accordance with Section 8 of the Agreement** if such Application is subject to a

> **Material Persistent Failure**; provided that Genetec must exercise
> such right within 30 calendar days after such Material Persistent
> Failure occurs. As used herein, "Material Persistent Failure" means
> the Monthly Uptime (as defined in the Service Level Agreement) is
> below 98% for three consecutive months or for four months within
> any 12-month period. …

John Dec. ¶ 59, Ex. 5 (emphasis added).

90.     While the Work Order has a termination for convenience clause, it requires 30 days

written notice and the payment of all Professional Services rendered through the termination date.

Specifically, it provides:

> Genetec may terminate this Work Order for convenience by
> **providing thirty (30) days advance written notice to PROS**. If so
> terminated, PROS will cease to perform all Professional Services
> under this Work Order and **will immediately invoice Genetec for
> all unbilled Professional Services performed through the
> effective date of termination**. Where Professional Services are
> billed on a fixed fee basis, such invoicing will include a prorated
> portion of the Professional Service fee representative of the unbilled
> work performed by PROS through the effective date of termination.

John Dec. ¶ 60, Ex. 6 (emphasis added).

## VI.   Genetec Signs-Off on the Solution Design Document

91.     In accordance with the Work Order, PROS conducted seven days of workshops

from February 21, 2020 through February 27, 2020 at Genetec's headquarters to understand

Genetec's specific requirements and configure Smart CPQ to meet those requirements, which

Genetec and PROS documented in the proposed Solution Design Document.  John Dec. ¶ 61.

92.     Thereafter, PROS continued to review and revise the proposed Solution Design

Document based on Genetec's feedback and comments.  John Dec. ¶ 62.

93.     On April 3, 2020, Ms. Daigle, Genetec' project manager for the PROS project, on

behalf of Genetec, signed-off on the Solution Design Document (the "Solution Design Document"

or "SDD").  Specifically, Ms. Daigle wrote:

> As discussed with Laurie yesterday we have some minor final edits in the comments of the attached document and are fine to consider the SDD signed off. If there are any additional edits we will encompass with the Advantage details that will be part of change order 2.
>
> Thank you to your entire team for leading us through this challenging exercise and getting us to a sign-off version. We are at your disposal to discuss the final comments if required.
>
> Kind Regards,
>
> **Michelle Daigle, PfMP, PgMP, PMP**

John Dec. ¶ 63, Ex. 8.

94.     Pursuant to the Solution Design Document, "after sign-off, any changes requested to [the] design may be subject to a change order at the discretion of the [PROS'] Project Lead or Delivery Executive." John Dec. ¶ 64, Ex 9.

95.     After April 3, 2020, PROS began configuring and implementing Smart CPQ for Genetec in accordance with the Solution Design Document.  John Dec. ¶ 65.

96.     Two months into this implementation process, on June 4, 2020, Genetec executed the Change Order pursuant to which it reaffirmed its satisfaction with PROS' work and requested additional professional services.  John Dec. ¶ 66, Ex. 7.

## VII.   Genetec Retroactively Seeks to Manufacture a Reason to Terminate the Contract And Conspires to Replace PROS With Experlogix

97.     Prior to executing the Change Order, on May 14, 2020, Mr. Elvish emailed Bill Norris at PROS to tell him how satisfied Genetec was with PROS and only providing minimal comments to the Change Order.  In the email, Mr. Elvish writes:

> Hi Bill,
>
> Hope that this email finds you and your family well!  Bit of a strange period of time, that's for sure.
>
> It seems like the whole Pros team have taken to the change really well - the project is moving along nicely.  The whole team has been great and it's very exciting to see the progress they're making.  I want to pass along kudos to the whole team especially Laurie, Tosh and Hernan - they are really delivering great service!
>
> Quick one, Nadia and I have a few concerns about the latest change order (1.1) and want to hop on a call with you to see if we can get it sorted.  We're mostly concerned with some significant rate jumps (Laurie and Hernan's rates stand out as the most concerning).
>
> Ideally, we would like to get all three change orders in place (1.1 - 1.3) so that we can pull together one requisition for Pros.  Knowing internal systems and approvals here at Genetec we're sure this will be the fastest way to get you approved and paid as quickly as possible.  But if that's not in the cards we'll need to dig into a few little tidbits that caught our legal teams' eye when we looked over CO1 - nothing major, just some odds and ends that we want to be sure we're fully aligned on.
>
> Let us know if you have time to jump on a call this week so that we can get this sorted an underway.
>
> And once again - really happy to see the progress we're making!
>
> Andrew & Nadia

John Dec. ¶ 67, Ex. 10; Elvish Dep. Ex. 23.

98.     On June 5, 2020, Michelle Daigle emailed Laurie Bonds, PROS' project manager, similarly complimenting all of PROS' hard work.  Specifically, she wrote:  "[t]hank you so very much to you and the team, and I'm grateful that Tosh continues to put in all the extra hours to get us there."  John Dec. ¶ 69, Ex. 11.

99.     However, unbeknown to PROS, Genetec had reengaged in communications with Experlogix, with whom it had a pre-existing relationship, around February 2020 in an effort to keep its options open, despite being under contract with PROS.  Elvish Dep. Tr., 243:2-20.

100.     Also unbeknown to PROS, Genetec had secretly decided to stop paying PROS for its services no less than a week after executing the Change Order.  Specifically, Mrs. Boujenoui testified as follows:

> **Q.**     Okay.  You testified earlier that sometime in early June Genetec made the decision to not pay PROS or at least put a hold on the payment of PROS for PROS' invoices, right?  Is that correct?
>
> **A.**     Correct.
>
> **Q.**     So is fair to say that sometime immediately after executing this change order Genetec decided to put a hold on all payments at PROS?
>
> **A.**     Within a week or two I believe, yes.
>
> **Q.**     Can you be more specific?  Was it a week or was it two?
>
> **A.**     Yes. It -- it was early -- early June so within a week probably. Yes.

Boujenoui Dep. Tr.[7] 50:14-50:6.

---

[7] On November 2, 2022, Mrs. Boujenoui was deposed in this action in her personal capacity and her capacity as one of Genetec's corporate witnesses pursuant to FRCP 30(b)(6).  Mrs. Boujenoui was designated Genetec's corporate witness for, among other topics, Genetec's payment or failure to pay PROS' invoices.  Mrs. Boujenoui's deposition transcript is defined herein as the "Boujenoui Dep. Tr." and the applicable excerpts from her deposition transcript

#211812595_v4

101.    In furtherance of its plan to terminate PROS, Genetec began combing through pre-contract presentations and materials.  For instance, on June 14, 2020, Michelle Daigle emailed Mr. Elvish, Mrs. Boujenoui and Mr. Hamzi stating:

> Hi All,
>
> Please find some answers and references below. Pending our discussion with legal tomorrow, I'd like to suggest we shift focus to proof that the product the demo'd and referenced in pre-sales is not what we were sold. I have found some evidence of that in the initial 2-hour demo, where they reference a case study for a British company that does business with 6M companies in 24 countries on the product.  Clearly not customer 1 on the managed package.  I've also sent the link and some screen shots to Karim to see if he can identify if the designer and UI we were shown might have been legacy vs managed package versions of the product.  That deception if we can prove it would be so much higher in priority than some of the others in my opinion.
>
> - Experlogix and Infosec – We're good on this front and were just about to button it up in the final legal version when we pulled the plug.  There were 4 key points for Marc-Andre all of which were addressed and/or Jeff was ok with legal adding to the final contract per some email trails I have:
>     - SOC2 with security, Confidentiality & Privacy principles; with a scope of applicable services and Tech Support.  (They were willing to commit to doing this in 2020 and were willing for us to put a
>
>         on month legal penalty in place if they did not, per the attached email.)
>     - External pentest/review of your product.  (They provided the 2019 results and were willing to commit to annual)
>     - Single Sign-On (SSO) support via Genetec or other 3rd party authentication platform (addressed)
>     - Security breach notification within 72h of detection (They were willing to agree and put it in the final version of the contract per the attached email).
> - CPQ vendor comparison spreadsheet here, which does not include mobile.  I can't find the cost comparison spreadsheet that David pulled together but I can pull one together from last year's quotes.  I do remember that Experlogix came in lowest price by quite a bit.
> - Mobile - I've listened to the original demo.  No dice.  ☹ I will listen to the on-site deep dive over the next couple of days which is our best bet.  I remember it coming up in Houston, but in 3-4 days of meetings and we weren't the ones recording, I'm not sure if we'll be able to find when they promised responsive design.
> - Prototype Scope document here.  As outlined in our session, we'll expand the scope if we go back to Experlogix.
>
> Best,
>
> **Michelle Daigle, PfMP, PgMP, PMP**

Doherty Dec. Ex. N.

102.    Two days later, on June 16, 2020, Mr. Elvish and Mrs. Boujenoui had one of several telephone calls with members of the PROS team, including, Matt McClung, during which the PROS team explained that Microsoft had changed its single sign-on API causing Smart CPQ to no longer be accessible from within the Dynamics 365 mobile application (the "Dynamics 365 App") Mr. McClung circulated an email after the call that provided as follows:

---

are annexed as Exhibit F to the Doherty Dec.

Hi All,

Thank you for the call today. To recap a couple key points on mobile:

- Unfortunately due to some limitations on the MS D365 side – specifically a feature to enable single sign on that will allow PROS to communicate with Dynamics through a service account – we do not support the dynamics app on any device
  - PROS wants to pursue supporting Dynamics app; however, we will be dependent on the Microsoft timeline for this feature and that is still not defined
- PROS supports Dynamics and CPQ on a tablet via the browser. This is the same experience as through a laptop or desktop and for Safari browser specifically the setting to allow cross site traffic must be enabled. This is a standard requirement for many applications and as of now this is required.
- For phones, we don't recommend CPQ on a phone as the screen size does not provide a good user experience.

There is more information on Connect https://connect.pros.com/products/pros-smart-cpq/help-topics/19001/m/all/v/12.5/119251

We definitely want to continue partnering with you post go-live on how we can enhance our product to get even more value for you and we will of course keep you posted on the status of any future D365 app.

We'll send out notes on the other topics as well, but I wanted to get this to you as discussed.

Doherty Dec. Ex. P.

103.    After several more subsequent email updates from Mr. McClung on the same June 16, 2020 email chain, Ms. Daigle again complemented the PROS team, writing:

Hi Matt,

Thank you so much for this update! Thanks to all of the team, as well for your ongoing efforts. This is all very promising, and we're optimistic along with you that we're getting closer. We are grateful for these extra steps on the QA side and it should help reduce the churn. I'll discuss the testing on dev with the team in the morning and report back to you.

Best,

Michelle

Doherty Dec. Ex. P.

104.    Three days later, on June 19, 2020, Ms. Daigle emailed Mr. Elvish and Mrs. Boujenoui continuing to plot to terminate PROS before phase two of the project, writing:

#211812595_v4

My concern is that since we gave them the final SDD edits last week, on more complex phase 2, anything we identify later (final UAT or during demos) that isn't covered, as the project progresses will be on us. They will say they built it based on the SDD which we signed off on. Else, there will be dual responsibility at best, as it's up to us to tell them if the SDD doesn't reflect our discussion, as much as it's on them to ensure it does when they author it.

Our position right now is super strong commercially as all issues are on their side. That window will close as we get into phase 2. I don't know if this factor will influence our strategy.

Some last ditch effot mitigation we could put in place is to pull Jason and Shubham to listen to two weeks of workshop recording, document everything and hold off on the SDD sign-off until then, telling them we're going another round on reviews. It's long, tedious and they have other priorities, but it's our best chance to proactively catch the rest of the PROS mess-ups before we get too deep into phase 2.

Thoughts?

PS - I wish I could be sunshine and rainbows for once. Le sigh.

Doherty Dec. Ex. Q.

105.     On June 25, 2020, Karim Hamzi, a software architect at Genetec and its technical lead for the PROS project, initiated and engaged in a series of email communications with Jeff Holway, a Vice President of Sales at Experlogix.  In the initial email, Mr. Hamzi inquired about Experlogix's CPQ software because Genetec "…wanted to explore the second vendor in the shortlist to see if it could still be an option, just in case."  At the end of the email, Mr. Hamzi asked Mr. Holway to "keep [the] exchange confidential."  Doherty Dec. Ex. S, p. 9; Elvish Dep. Ex. 25;.  Mr. Hamzi then sent a subsequent email stating, in relevant part, that:

The implementation with Pros is ok, maybe not at the top of our expectation, but we are working with them to try to make thing great. We wanted in parallel to have a sight on how things are going with Experlogix, which looks interesting.

Do you think if we need to build a new trial environment for Experlogix CPQ on our D365 instance to proof of concept some pieces, that would an option for you?

Thanks,

Karim Hamzi
Dynamics CRM/365 Solution Architect Lead

*Id.* at p. 8 (emphasis added).

Mr. Holway responded stating:

> I think that would be OK provided Pros wouldn't get access somehow. I wouldn't want the purpose of this environment to show Pros how to properly work with Dynamics. ☺
>
> Best regards,
>
> Jeff

*Id.* at p. 7 (emphasis added).

Mr. Hamzi replied:

> That environment wouldn't have anything to do or to show to pros. I's for us to confirm that challenges we had with Pros will not have them with EL in case we want to explore EL again.
>
> I totally understand if you don't feel comfortable providing that environment, we may have to ask you questions then if we need to confirm features with EL CPQ.
>
> Thanks a lot for you help, I'll share this thread with key people in Genetec.

*Id.* (emphasis added).  Mr. Holway replied:

> Yes, if you want to send us some scenarios that challenging Pros to prove we can handle them, we'd be happy to take the time to do it.
>
> Best regards,
>
> Jeff

*Id.* (emphasis added).

106.    On June 29, 2020, Mr. Holway replied to a list of questions that Mr. Hamzi sent regarding Experlogix's CPQ capabilities stating:

> Good morning Karim,
>
> Thanks for sending this over.  Is this the list of items Pros either can't do or can't do very well?'
>
> See answers inline below:
>
> Best regards,
>
> Jeff

*Id.* at p. 5 (emphasis added).

Mr. Hamzi replied:

> That's true. These are few important points that Pros has trouble with, or can't do.
>
> Interesting to know what Experlogix CPQ could cover just OOTB. I'll share with the internal team, and hope that your answers could help on the current reflection.
>
> I will follow up with you if needed,
>
> Best regards,
>
> **Karim Hamzi**

*Id.* at p. 4 (emphasis added).

107.    On July 7, 2020, Mr. Hamzi emailed Mr. Holway saying:

> Hello Jeff,
>
> To give you more lights, it's actually a disaster with PROS CPQ, and the whole Genetec team is frustrated about the quality of the product, the delays, business requirements understanding,... and personally, I'm more frustrated because of also other technical challenges, that are coming as part of phase 2 (portal integration, add-ons, guided selling, business rules, F&O integrations...). We are not live yet, even with an easy phase 1 parts picker (without rules).
>
> I personally voted for Experlogix last December, but unfortunately it went to differently. I'm actually trying, since few days, to convince the key player people on the team to consider again Experlogix CPQ. I forwarded your answers to my questions, that represent the most challenging points with Pros, but it did not help a lot, because it's kind of answers we usually get from CPQ vendors.
>
> I believe the best way to make people align with my idea, is to show them a real demo of the Experlogix CPQ that addresses the challenging points, with a real Genetec Products. If you are motivated to have Experlogix back to Genetec, I'll need your help on this. I want to show them :
> - CPQ configure quote,
> - Pricing based on base price list,
> - CPQ on a portal,
> - CPQ on Dynamics 365 app for Mobile,
> - Designer, load data, create rules,
> - And anything else that could help,
>
> I want also to show the possibility that we can be self sufficient driving the CPQ solution with minimum help from a professional service.
>
> I can provide a Dynamics 365 sandbox instance along with a portal instance if needed to install a trial version. This environment/demo will not be used to show anything to Pros, and I can sign a NDA if you want.
>
> Let me know how you can help on this,
>
> Regards,
>
> **Karim Hamzi**

*Id.* at p. 4 (emphasis added).

Mr. Holway responded:

> We are absolutely motivated to make this happen.  We can prove each of these points below with your data within your environment.  I get that the answers we provided weren't very in-depth but the proof would be in how quickly we can turn around evidence that we can support these pain points which are honestly, pretty basic CPQ functions.
>
> How do we get started?  If we do the work, what's the changes that the business would make a change even if we proved everything 100%?
>
> Happy to jump on a call if that's easier.
>
> Jeff

*Id.* at p. 3 (emphasis added).  Mr. Hamzi responded:

> If we prove it, the chance is very big. I was very close, but few influencer people are afraid to take this big turn and them to get to similar situation, which I understand. This why I believe a prove will change everything.
> I'm actually the Dynamics 365 Architect and Administrator, I can create a new Dynamics 365 DEV instance along with portal. I can provide you with a sys admin user access, so you can use it to install the CPQ package.
> I'll need then an access to the designer and a help from you to load few data for parts and pricing. Sooner is better than later, I want to prevent having to go live with Pros (which is already 6 weeks late, and no date yet).
>
> Let me know when we can start, and if you need anything else from me,

*Id.* at p. 3 (emphasis added).

108.    On July 7, 2020, Mr. Hamzi forwarded his above-referenced email chain with Mr. Holway to Mrs. Boujenoui and Mr. Elvish.  *Id.* at pp. 2-3.  In response thereto, Mrs. Boujenoui thanked Mr. Hamzi for "progressing the discussions" with Experlogix and advised him:

> One word of caution going forward: let's not paint too negative of a picture re PROS but rather focus on how from your personal perspective you have been disappointed and would like to switch solution. He needs to see you as an ally/mobilizer who is willing to help them get in and takeover this project. If they know we are all unhappy (at all levels) with PROS, he might think EL is our only option and we might lose some negotiating power with him (and end up with a higher quote than the original they submitted).

*Id.* at p. 2 (emphasis added).  In response to Mrs. Boujenoui's email, Mr. Elvish sarcastically wrote:

> Yes - paint Nadia and I as big Pros champions ☺ We're such jerks!

*Id.* at pp. 1-2.

109.    At his deposition, Mr. Elvish conceded that the above-referenced emails reflect Genetec's negotiations with Experlogix while still being under contract with PROS:

| Q. | So Nadia's e-mail and then your follow-up e-mail were, presumably, being sarcastic because you're positioning yourself in negotiations with Experlogix? |
|----|----|
| A. | Yes. But I think -- putting myself in the – |
| Q. | I'm just – that's it. That's all I'm asking. |
| A. | Yes, for sure. Yes. |

Elvish Dep. Tr. 266:12-20.

110.    While Genetec engaged in negotiations with Experlogix, it continued to press PROS to perform work and hid its intent to unilaterally terminate the Contract.  Indeed, on July 6, 2020, Ms. Daigle emailed the PROS team requesting PROS provide an agenda for the Web Service meeting that day and stating PROS was "driving the discussion" at the meeting.  John Dec. Ex. 13.

111.    On July 8, 2020, Mrs. Daigle circulated an email to her team at Genetec to start reviewing the "Experlogix documents where we left off" with the intent, as Mr. Elvish testified, to "revive [Genetec's] relationship with Experlogix as quickly as possible."  Elvish Dep. Tr. 269:8-10, Ex. 27; John Dec. ¶ 71, Ex. 14.

112.    Yet, later in the day on July 8, 2020, Mrs. Daigle responded to a PROS team member looking for her input on implementation issues by stating [l]et's reconvene tomorrow at our regularly scheduled time to cover the topics if that works."  John Dec. ¶ 71, Ex. 13.

## VIII.    Genetec Unilaterally Terminates the Contract Without Prior Notice

113.    On July 10, 2020, Genetec, through its counsel, sent PROS a letter unilaterally terminating the Contract because of purported "implementation problems" and stating that it had "determined to go with another vendor."  John Dec. ¶ 69, Ex. 12.

114.    On or prior to the July 10, 2020 letter, Genetec also revoked PROS' access to Genetec's system, which prevented PROS from implementing Smart CPQ solutions to resolve Genetec's purported "implementation problems."  John Dec. ¶¶ 69-70, Ex. 12.

115.    On July 20, 2020, PROS, through counsel, responded to Genetec's July 10, 2020 letter stating that all of Genetec's purported problems had been resolved or will be resolved in short order in the next version of Smart CPQ scheduled for release on July 24, 2020.  John Dec. ¶ 72, Ex. 15.

116.     In its July 20, 2020 letter, PROS also formally demanded, pursuant to Section 8.1 of the SSA, that Genetec restore PROS' access to Genetec's system to enable PROS to perform its obligations under the Contract.  John Dec. ¶ 73, Ex. 15.

117.    However, Genetec continued to deny PROS access to Genetec's system and then filed this litigation.  John Dec. ¶ 74.

## IX.  Outstanding Amounts Due and Owing Under the Contract

118.    As of the date hereof, there remains due and outstanding under the Contract $697,924.48, which represents $348,962.24 in outstanding subscription fees for the second and third years under the Subscription Order and $165,821.99 for professional services rendered prior to Genetec's illegal termination of the Contract, plus interest and attorneys' fees and costs. John Dec. ¶¶ 75-76, Ex. 16.

119.    Genetec does not dispute that it failed to pay the required subscription fees for the remaining two years under the Subscription Order totaling $348,962.24.  John Dec. ¶ 75, Ex. 5.

120.    PROS duly invoiced the professional services at issue pursuant to PROS' invoice numbers 34661, 34826, 34995 and 35136 (the "Invoices").  John Dec. ¶ 76, Ex. 16.

121.    With respect to PROS' invoice number 34661 in the amount of $43,420.34, dated

April 30, 2020, for Professional Services rendered between April 1, 2020 and April 30, 2020, Mrs.

Boujenoui testified as follows:

> **Q.**    Do you know if Genetec provided written notice to PROS as
> to why any portion of it or all of it wasn't paid?
>
> **A.**    I don't know.

Boujenoui Dep. Tr. 28:2-5.

> **Q.**    So sitting here today, you have no knowledge of any written
> notification to PROS as to payment -- as to nonpayment of
> any portion of this particular invoice, which is invoice --
> which is marked here as Exhibit 29; is that correct?
>
> **A.**    Correct.

Boujenoui Dep. Tr. 31:15-21.

122.    With respect to PROS' invoice number 34826 in the amount of $47,390.68, dated

May 31, 2020, for Professional Services rendered between May 1, 2020 and May 31, 2020, Mrs.

Boujenoui testified as follows:

> **Q.**    Do you have any reason to believe that Genetec did not
> receive this invoice?
>
> **A.**    No reason to believe that we didn't.
>
> **Q.**    In reviewing the individual entries in this invoice, do you
> have any reason to believe that the services were not actually
> performed by PROS?
>
> **A.**    No.
>
> **Q.**    Are you aware of Genetec providing written notice to PROS
> setting forth a reason for nonpayment of any portion or all of
> this invoice?
>
> **A.**    No.

#211812595_v4

> **Q.** And in reviewing your e-mails prior to today, are you aware of any internal communications stating the reason why this invoice was not paid?
>
> **A.** No.

Boujenoui Dep. Tr. 32:2-33:17.

123. With respect to PROS' invoice number 34995 in the amount of $60,292.22, dated June 30, 2020, for Professional Services rendered between March 20, 2020 and June 30, 2020, Mrs. Boujenoui testified as follows:

> **Q.** Do you have any reason to believe that this invoice was not actually received by Genetec?
>
> **A.** No.
>
> …
>
> **Q.** Going through the individual entries, which run from March 20, 2020 through to June 30, 2020, do you have any reason to believe that any of the specific entries were not actually performed by PROS?
>
> **A.** No.
>
> **Q.** Are you aware of any written notice being provided to PROS as to the nonpayment of all or any of the invoice entries in this particular invoice?
>
> **A.** I am not aware.

Boujenoui Dep. Tr. 40:1-21, 41:2-13.

124. With respect to PROS' invoice number 35136 in the amount of $14,718.75, dated July 31, 2020, for Professional Services rendered between July 1, 2020 and July 10, 2020, Mrs. Boujenoui testified as follows:

> **Q.** And looking through each individual entry, do you have any reason to believe that these services weren't actually performed?

**MR. UPTON:** Objection.

**A.** No.

**Q.** Are you aware of any written notice being provided to PROS advising them as to why you would not be paying, and by you I mean Genetec, any or all of a portion of this invoice?

**A.** No, but the invoice date shows that at that point we had already terminated the relationship.

**Q.** But do you dispute that the work was actually performed?

**A.** No.

Boujenoui Dep. Tr. 45:3-22.

125. Indeed, despite Genetec executing the Change Order on June 4, 2020 and pushing PROS to do work up to and including July 9, 2020, which is the day before Genetec terminated the Contract, Ms. Daigle circulated an internal email mocking PROS for seeking payment for the work it performed:

> **From:** Michelle Daigle <mdaigle@genetec.com>
> **Sent:** September 1, 2020 3:58 PM
> **To:** Andrew Elvish <aelvish@genetec.com>; Nadia Boujenoui <nboujenoui@genetec.com>
> **Subject:** FW: Genetec- PROS Invoices 35136
>
> PROS has sent a PS invoice for the portion of July that they worked 😊

126. Accordingly, Genetec owes PROS $697,924.48 plus interest and attorneys' fees under the Contract.

## X. Genetec Files this Strike Suit

127. On September 25, 2020, Genetec commenced this litigation by filing a Complaint (ECF 1, the "Complaint").  Doherty Dec. ¶ 3.

128. On November 6, 2020, PROS filed a motion to dismiss the Complaint (ECF 7). Doherty Dec. ¶ 4.

#211812595_v4

129.    In response to the aforesaid motion to dismiss, Genetec filed an Amended Complaint on November 27, 2020 asserting two claims against PROS—(1) a breach of contract claim and (2) a misrepresentation claim (ECF 10, the "Amended Complaint" or "Compl."). Doherty Dec. ¶ 5, Ex. A.

130.    On December 11, 2020, PROS filed a motion to dismiss the Amended Complaint (ECF 11, the "Dismissal Motion"). Doherty Dec. ¶ 6.

131.    On September 21, 2021, the Honorable Alison J. Nathan entered a Memorandum Opinion & Order (ECF 27, the "Dismissal Order") holding Genetec failed to state a claim for breach of contract and limiting Genetec's misrepresentation claim to five purported representations by PROS. Doherty Dec. ¶ 7, Ex. B.

132.    With respect to Genetec's breach of contract claim, Judge Nathan found the Amended Complaint is "devoid of the kind of allegations necessary to state a claim for breach." Dismissal Order, p. 20.  Judge Nathan further held that Genetec "simply does not identify any conduct PROS allegedly engaged in after the contract was executed that constitutes the sort of bad faith action necessary to sustain" a claim for breach of the implied covenant of good faith and fair dealing.  *Id.* at pp. 19-20.

133.    With respect to Genetec's misrepresentation claim, Judge Nathan found that Genetec was required to plead its misrepresentation claim with the heightened specificity required under FRCP 9(b) so as to give PROS "fair notice of what the plaintiff's claim is and the grounds upon which it rests."  *Id.* at pp. 6, 9.  Judge Nathan than struck Genetec's allegations that (1) PROS represented that Genetec would be able to modify and update the Smart CPQ software without ongoing help from PROS and (2) PROS estimated that the initial implementation period would take five months to complete as insufficient as a matter of law, even if assumed true, to support a

misrepresentation claim.  *Id.* at pp. 11-12.  Judge Nathan then limited Genetec's misrepresentation claim to the following five alleged pre-contract representations:

- During the September 2019 Presentation, PROS produced a slide referencing an unnamed UK-based company as a satisfied customer using Smart CPQ.

- During the September 2019 Presentation, PROS produced a slide referencing Honeywell as a satisfied customer.

- During the September 2019 Presentation, a PROS representative stated that PROS "had over 900 successful implementations."

- On or about October 17, 2019, PROS emailed Genetec a document entitled "Help Topic - Integration - Microsoft CRM | Pros Smart Cpq 12.2" (the "Oct. 2019 Doc."), that depicted Smart CPQ's synchronization process with CRM in a slightly different manner than the one set forth in the Contract.

- The Oct. 2019 Doc. contained a single reference to Smart CPQ being accessible from within the Dynamics 365 App.

*Id.* at pp. 10-20.

134.    On October 12, 2021, PROS filed an Answer to the Amended Complaint with Affirmative Defenses and a Counterclaim (the "Counterclaim") for breach of contract (ECF 35, the "Answer").  Doherty Dec. ¶ 8, Ex. C.

135.    On November 2, 2021, Genetec filed an Answer to PROS' Counterclaim with the following affirmative defenses: (1) failure to state a claim; (2) unclean hands; (3) PROS' negligence or malfeasance; and (4) failure to mitigate damages (ECF 28, the "Counterclaim Answer").  Doherty Dec. ¶ 9, Ex. D.

136.    The deadline to complete depositions expired on January 20, 2023 and the deadline to complete all other fact discovery was December 2, 2022 pursuant to the Court Order entered on September 22, 2022 (ECF 55, the "Sept. 2022 Order"), as modified by the Court Order entered on December 22, 2022 (ECF 62, the "Dec. 2022 Order").  Doherty Dec. ¶ 10.

137.     Genetec has not produced any experts in support of its misrepresentation claim and it has failed to notice any experts prior to the expiration of the February 3, 2023 deadline for conducting expert depositions set forth in the Sept. 2022 Order.  Doherty Dec. ¶ 11.

138.     Pursuant to Section 9.3 of the SSA, Genetec and PROS "waive[d] any right to jury trial in connection with any action or litigation in any way arising out of or related to [the Contract]."

## XI.   PROS Is Entitled to the Summary Dismissal of Genetec's Misrepresentation Claim

### A.   The September 2019 Presentation Contained No Material Misrepresentation

139.     Three of the five representations underlying Genetec's misrepresentation claim allegedly occurred during the September 2019 Presentation.  Specifically, Genetec alleges that as part of that presentation PROS showed (i) a slide referencing that PROS "had over 900 successful implementations of the product it was seeking to sell to Genetec," (ii) a slide referencing an unnamed UK-based company as a satisfied customer of the "the software that [PROS] proposed providing to Genetec," and (iii) a slide referencing Honeywell as a satisfied customer "using the product that [PROS] proposed selling to Genetec."  Genetec then alleges that it learned in June 2020 that "PROS had only one customer using the software that it was attempting to implement at Genetec (which, upon information and belief, was not Honeywell), and a second customer that was projected to 'go live' in June of 2020." John Dec. ¶ 78.

### i.   The "About PROS" Contains No Materially False Statements

140.     At the beginning of the September 2019 Presentation, the PROS representative gave a brief overview of PROS. John Dec. ¶ 79.

141.     The statement that PROS has "900+ implementations" was made as part of this introductory segment of the presentation and in connection with the below slide:

37



Compl., ¶ 9; John Dec. ¶ 80.

142.    As the title of the slide indicates, this slide is "About PROS", the company as a whole, and sets forth that PROS has "900+ Implementations" of its software without distinguishing between the various software solutions that it offers, including, but not limited to, Smart CPQ, or referencing any specific versions of software or past integrations thereof.  It goes on to state that PROS has "1,000+ professionals", a "95%+ renewal rate", "customers in 55+ countries", and "99%+ achieved application SLA." John Dec. ¶ 81.

143.    In his deposition, Mr. Elvish conceded that this slide is about PROS generally and does not specifically reference Smart CPQ or any PROS customers using Smart CPQ:

> **Q.**    What do you understand this slide to be of?
>
> **A.**    This slide is about the user base of PROS, generally, and the fact that they're publicly traded and they have an ISO certification.
>
> **Q.**    So on the top left-hand corner, the slide indicates that it's about PROS, right?
>
> **A.**    Yeah.
>
> **Q.**    And then below that it says, "900 plus implementations."
>
> **A.**    Correct.

38

> **Q.** What do you understand that to be implementations of?
>
> **A.** That's implementation of the PROS software.
>
> **Q.** And what do you understand PROS software to be?
>
> **A.** PROS software is a CPQ configure price quote.
>
> **Q.** Does it say that on there?
>
> **A.** It does not.
>
> **Q.** It only says, "900 plus implementations," correct?
>
> **A.** That is true.

Elvish Dep. Tr. 122:8-123:8.

. . .

> **Q.** But so, in the upper left-hand corner about PROS, you take that to mean CPQ?
>
> **A.** Yes.
>
> **Q.** Despite CPQ not being mentioned at all in this slide?
>
> **A.** That's true, yes.

*Id.* at 125:6-11.

. . .

> **Q.** Nowhere in this slide, on page 8, does it reference CPQ?
>
> **A.** No, it does not.
>
> **Q.** And nowhere in this slide does it reference a specific number of customers that use CPQ?
>
> **A.** No.
>
> **Q.** Nowhere in this slide does it reference a particular version of CPQ?

#211812595_v4

> **A.** No.

> **Q.** Nowhere in this slide is there a time limitation, meaning it can be from PROS' existence to the date of this presentation?

> **A.** Yeah, for sure.

*Id.* at 128:25-129:14.

144. During the presentation, the slide was shown for less than a minute and the PROS

representative's sole statement relating to it was as follows:

> So, my final slide is basically just kind of rounding it out, talking a little bit **about PROS** again, in terms of we have over 900 implementations, 95 percent renewal rate. We are a **publicly traded company**, **well over a thousand professionals in the organization**. We're spread out over 55 different countries and, I think, from a security standpoint, we are ISO 27001 certified…

Elvish Dep. Ex. 4 (Transcript Excerpt of Minute Markers 05:50 - 06:34) (emphasis added).

145. Furthermore, the "About PROS" slide was the final slide of the introductory

segment of the presentation.   Immediately before showing the slide to Genetec, the PROS

representative said the following:

> Yeah, so - **just kind of jumping into who PROS is**…We've been around and in this space for over 30 years. …

> Part of what I wanted to jump into, just as a **30 thousand foot overview** of the solution is that there is a lot more that we can do as you guys move forward and this sort of digital transformation posture…so, again - **primarily we'll be talking about CPQ today, but I wanted to make you aware of some of the other aspects of the platform**. …

> You can - sort of - this kind of represents our baseline of **different products**, obviously. Over there to the right, we've got Smart CPQ which is primarily what we're gonna be talking about today. You can sort of bifurcate those - the solutions - out into two areas, mainly. We've got strategy on the left side and execution on the right side. So, our control and guidance products are more on the Strategy side. Control would be more for price list management, business [[???]] management, things of that nature. And then our guidance product

typically works hand in hand with our CPQ as well in terms of pricing segmentation and things of that nature. So, that's just a **broad overview of our whole solution set**. …

Elvish Dep. Ex. 4 (Transcript Excerpt of Minute Markers 02:48 - 05:46) (emphasis added); John

Dec. ¶ 83.

146.    After reviewing the above-referenced excerpt and listening to the relevant portion

of the presentation, Mr. Elvish further conceded that the slide and statements related thereto were

about PROS and not Smart CPQ:

> **Q.**    So is it fair to say, knowing in context now, not only the slide, but Mr. Long is talking about PROS as a company?
>
> **A.**    Yes, for certain.
>
> **Q.**    Is there any reference in here to CPQ?
>
> **A.**    No.
>
> **Q.**    Is there any reference to versions of CPQ?
>
> **A.**    No, there isn't.
>
> **Q.**    When he's discussing PROS' customers, does he say customers that use CPQ?
>
> **A.**    No. It's inferred.
>
> **Q.**    I'm sorry?
>
> **A.**    It's inferred.
>
> **Q.**    How so?
>
> **A.**    The title of the presentation and the context in which he's delivering it.
>
> **Q.**    So your own specific interpretation of this document is an inference that the customers in 55 different countries are using specifically Smart CPQ?
>
> **A.**    Yes.

> **Q.** Okay. But, again, the slide itself doesn't say that?
>
> **A.** The slide itself does not say that.
>
> **Q.** And Mr. Long never said that?
>
> **A.** No, he did not.

Elvish Dep. Tr. 131:17-132:23.

147. After this slide was shown and the introductory segment of the presentation was completed, Genetec's employees did not ask any follow-up questions. John Dec. ¶ 84.

148. In the below excerpt from his deposition, Mr. Elvish conceded as much:

> **Q.** Okay. And, to your knowledge, did anyone ask that specific question?
>
> **A.** No, we did not.
>
> **Q.** Did anyone specifically ask that the 900 implementations related to Smart CPQ?
>
> **A.** Not in this meeting here, no.
>
> **Q.** Okay. Did anyone ask any questions following up to this slide?
>
> **A.** Not to this slide at this meeting, no.

Elvish Dep. Tr. 132:24-133:6.

**ii.**    **The Un-Named UK-Based Company Slide Contains No False Statements**

149. Below is a copy of the slide regarding the unnamed UK-based company:



Compl., ¶ 9, Ex. A.; John Dec. ¶ 85.

150.    The slide gives a general overview of the unnamed company, its challenges, PROS'

solutions for those challenges, and results therefrom. John Dec. ¶ 86.

151.    There are no references in the slide to the version of Smart CPQ being used by the

unnamed company.  Additionally, the slide does not state that the unnamed company accessed

Smart CPQ from within the Dynamics App. John Dec. ¶ 87.

152.    During the presentation, the slide was on the screen for approximately one minute

and the PROS' representative's only statement in connection with the slide was as follows:

> So yeah. This a, just bringing it all together. Right, this is a case
> study, where, very similar fragmented product lines, bad
> implementation, outdated catalogues, and then bad proposals. So,
> we unified everything into a single platform and we did use CRM,
> Dynamics, for this customer too. Centralized the product catalogue
> and then the result was it aligned all the product offerings across all
> the sales channels, which is what you guys would have when you
> have this ecommerce version or what have you, the internal version.
> Most importantly, reduced proposal time and then improved the
> time to market for new products, which is something that you guys
> were also concerned about. But, yeah, questions and answers,
> please, by all means. What can I answer for you.

Elvish Dep. Ex. 6 (Transcript Excerpt of Minute Markers 01:47:17-01:48:18); John
Dec. ¶ 88.

153.    As shown by the transcript excerpt, PROS never represented that the Smart CPQ being implemented at Genetec would be accessible directly from within the Dynamics App.  PROS further never discussed the version of Smart CPQ used by the unnamed company or represented that Genetec would receive the exact same version. John Dec. ¶ 89.

154.    After viewing this slide and hearing the above statement by PROS, Genetec's employees did not ask any follow-up questions.  Elvish Dep. Tr. 155:8-20.

155.    In the below excerpt from his deposition, Mr. Elvish conceded as much:

> **Q.**    Okay. Anywhere in the recording or in this excerpt does it mention the Dynamics 365 app?
>
> **A.**    It does not.
>
> **Q.**    Do they mention the sync mechanism used specifically in CPQ?
>
> **A.**    No, it does not.
>
> **Q.**    After this slide was presented, were any questions asked?
>
> **A.**    No.

*Id.*

156.    Additionally, PROS has established that Sage Software ("Sage"), the unnamed UK-based company discussed, in this slide was a PROS customer at the time of the presentation and remains a PROS' customer.  John Dec. ¶ 90.

### iii.    <u>The Honeywell Slide Contains No False Statements</u>

157.    Below is a copy of the slide regarding Honeywell:



Compl., ¶ 9, Ex. B.; John Dec. ¶ 91.

158.    As shown above, the slide, in its entirety, merely states that Honeywell has a "40% faster quote turnaround time." John Dec. ¶ 92.

159.    The slide contains no references to Smart CPQ, let alone the version of Smart CPQ being used by Honeywell.  Additionally, the slide contains no references to the Dynamics App. John Dec. ¶ 93.

160.    During the presentation, the slide was shown for approximately one minute and twelve seconds and the PROS representative's sole statement  in connection with the slide was as follows:

> Okay. A good example is Honeywell, right? Honeywell, they were struggling with their quoting process. And they got us on board, with CPQ, and they had errors. That was one of the biggest problems they had, was - that was slowing them down. That, and their approval process. And ever since they implemented and placed a Smart CPQ, resulted in a 40% faster quote turnaround time for them.

Elvish Dep. Ex. 5 (Transcript Excerpt of Minute Markers 01:10:26-01:11:38); John Dec. ¶ 94.

161.    As shown in the transcript excerpt, PROS never discussed the version of Smart CPQ used by Honeywell or represented that Genetec would receive the exact same version.  PROS further never represented that the Smart CPQ being implemented at Honeywell was accessible directly from within the Dynamics App.  John Dec. ¶ 95.

162.     In the below excerpt from his deposition, Mr. Elvish conceded as much:

> **Q.**     Does this slide specifically say that Honeywell uses Microsoft Dynamics?
>
> **A.**     No, it does not.
>
> **Q.**     Does it reference Honeywell using the D365 app?
>
> **A.**     No, it does not.
>
> **Q.**     Does it say that Honeywell uses a particular version of CPQ?
>
> **A.**     No.
>
> **Q.**     Does it even reference CPQ?
>
> **A.**     No.

Elvish Dep. Tr. 145:12-22.

163.     Indeed, Mr. Elvish explicitly conceded this slide does not contain any misrepresentations:

> **Q.**     What about this slide do you contend, if at all, is a misrepresentation?
>
> **A.**     I have no reason to contend it is a misrepresentation. I don't know.

Elvish Dep. Tr. 145:8-11.

164.     PROS has produced contractual agreements establishing that Honeywell was its customer at the time of the presentation, and it remains its customer.  John Dec. ¶ 96, Ex. 17.

165.     During his deposition, Mr. Elvish testified that Genetec was looking for companies that had comparable customers to Genetec and conceded that Honeywell was not a comparable company to Genetec.  Elvish Dep Tr. 151:2-152:6.

iv.   **PROS' Sole CPQ Software Product IS Smart CPQ**

166.   New customers are sold the current version of Smart CPQ generally available to the public at the time of their purchase to ensure they receive the latest and best version of the software.  Likewise, updated versions of Smart CPQ are automatically released to PROS' existing customers. John Dec. ¶ 14.

167.   The notion that each new version of Smart CPQ constitutes a different product is antithetical to SaaS.  Genetec is well aware of this fact as Mr. Elvish testified Genetec's SaaS products are "continually updated."  Elvish Dep. Tr. Dep. 39:19-24.   He further testified that Genetec's SaaS products are "…on a multiple release cycle, and there are many versions of that product[s] over time that sort of transparently flow to [Genetec's] customers."  *Id.*  He further testified that Genetec wants its customers to have the "latest and best version" of Genetec's SaaS products, so it sells new customers "the current shipping version of the product of the subscription." *Id.* at 40:10-22.

168.   Genetec has produced no evidence that PROS represented that Genetec would receive the same version of Smart CPQ that was demonstrated during the September 2019 Presentation.  To the contrary, the video recording of PROS' second presentation to Genetec on October 11, 2019 reveals that Genetec explicitly asked if PROS was going to show configurations of Smart CPQ that was more relevant to Genetec's business.

v.   **PROS' Extensive Customer Base for Smart CPQ Is Well-Established And Independently Verified**

169.   PROS, as successor-in-interest to Cameleon, has been selling and implementing CPQ software for well over 35 years. John Dec. ¶ 19.

170.   The Gartner Report, which was based on "extensive vendor surveys, publicly available financial data, a standardized software demonstration, surveying of more than 200

customer references and Gartner inquiry calls[,]" found that "PROS had some of the largest enterprise references of any vendor evaluated."  Elvish Dep., Ex. 2, pp. 11, 21.

171.    The Gartner Report further stated that all the vendors analyzed in the report, including PROS, "have customers that are using their products and services" and "[n]ew cloud solutions with fewer than 5,000 total users in production were also excluded." *Id.* at p. 24.

172.    Indeed, Gartner's strict criteria eliminated Experlogix, not PROS, on the grounds that Experlogix had too few customers, stating that "[its] criterion eliminated several strong contenders with offerings that run on the Microsoft platform (such as those from Cincom and **Experlogix**) and that have only recently begun selling their cloud solution to customers of Microsoft Dynamics 365." *Id.* at p. 24 (emphasis added).

173.    During the pre-contract negotiation, PROS also provided Genetec with customer references that Genetec could contact directly to discuss their experience with PROS and Smart CPQ.

**B.  <u>The Oct. 2019 Doc. Contains No Material Misrepresentations</u>**

174.    The Oct. 2019 Doc. is one of multiple instructional documents that are available on PROS Connect, our knowledge base of content for user education and support.  This particular Oct. 2019 Doc. relates to how an earlier version of Smart CPQ interacted with Dynamics and was sent to Genetec early in the pre-contract phase of the Parties' relationship.  John Dec. ¶ 98.

175.    In a November 5, 2019 email, Ms. Daigle responded to receiving the Oct. 2019 Doc. by advising PROS that Genetec was "hoping for more detailed API documentation" without asking any follow-up questions regarding the contents of the Oct. 2019 Doc.  John Dec. ¶ 99, Ex. 19.

176.    In response to receiving the Oct. 2019 Doc., Ms. Daigle stated that Genetec was "hoping for more detailed API documentation" and did not ask any follow-up questions regarding the information contained in the document. *Id.* Thereafter, no Genetec employee discussed the document with PROS during the pre-contract or solution design phase. *Id.*

177.    Mr. Elvish, Genetec's 30(b) witness for Genetec's evaluation of CPQ vendors and the Genetec employee responsible for substantive negotiations with PROS, testified that he never even reviewed the Oct. 2019 Doc. prior to signing the Contract with PROS. Specifically, he testified as follows:

> **Q.**    Do you know if anyone on your team reviewed this document?
>
> **A.**    I do not specifically know if anybody on my team reviewed this document.
>
> **Q.**    In making your decisions in connection with PROS, did you personally take into consideration this document?
>
> **A.**    I did not.

Elvish Dep. Tr. 166:3-10.

### i.    The Flow Chart of The Sync Mechanism Is Not A Material Misrepresentation

178.    Below is the flow chart from the Oct. 2019 Doc. referenced in the Amended Complaint that depicts a conceptual configuration of Smart CPQ's synchronization or "sync" process with a CRM for generating quotes:

49



The exact data synchronization process depends on the implementation designed according to your business requirements.

Compl., ¶ 10, Ex. C (emphasis added); John Dec. ¶ 100.

179.    As shown above, the first sentence below the chart explicitly provides that the "exact data synchronization process depends on the implementation designed according to your business requirements []", confirming the intent of the flow chart to be a conceptual representation of the sync mechanism. John Dec. ¶ 101.

180.    Mr. Elvish acknowledges that this language constituted a disclaimer regarding the precise configuration sync process for the Smart CPQ to be implement at Genetec, more specifically he stated that "I would say it is a qualification to say that it would be dependent on the sort of final implementation of both our CRM and the CPQ together."  Elvish Dep. Tr. 165:10-13.

181.    After receiving the Oct. 2019 Doc., Genetec never referenced the sync mechanism depicted on page seven therein or requested a specific configuration of the sync mechanism for the Smart CPQ implemented at Genetec during pre-contract negotiation with PROS. John Dec. ¶ 102.

182.    PROS likewise never represented to Genetec that the "sync mechanism" depicted in the Oct. 2019 Doc. would be the same sync mechanism configuration for the version of Smart CPQ implemented at Genetec.  In fact, the specific configuration of Smart CPQ used to customize the solution for a customer's specific business needs will inform the exact technical data exchange of the sync to clarify the generic green boxes in the conceptual flow chart, and the exact technical

50

mechanism of data exchange will evolve based on how Smart CPQ and the Dynamics CRM respectively evolve. John Dec. ¶ 103.

183.    The flow chart depicts one of the configurations of Smart CPQ' sync mechanism with a CRM that was possible at the time the Oct. 2019 Doc. was created.  However, the sync mechanism process is flexible and it evolves as any microservice may evolve at a SaaS vendor's discretion to improve the security, technical or functional utility, and the diagram was intended to be illustrative using generic concept language like "Content In".  John Dec. ¶ 104.

184.    Furthermore, Genetec's argument that the fact that the sync mechanism utilized for the Smart CPQ configured for Genetec did not have two separate pieces of software called "PROS Quote Content IN and PROS Quote Content OUT" "indicates a materially different software architecture" is simply incorrect.  These two software components were merely consolidated into a single software component, which performs the exact same function.  Moreover, they merely relate to the flow of data back and forth between Smart CPQ and CRM, and not the core function of processing the data performed by Smart CPQ.  John Dec. ¶ 105.

ii.    **The Reference to the Dynamics Mobile App Is Not A Material Misrepresentation**

185.    Smart CPQ fully integrates with Dynamics.  Additionally, a person can access Smart CPQ through Dynamics on their mobile device through a web browser.  Rather than clicking on the Dynamics Mobile App, they simply click on the web browser, login to Dynamics and then they have access to Smart CPQ.  They can even save Dynamics as a favorite or short cut on their web browser to the extent they want to make the process even easier.  As such, from a user experience standpoint there is no material difference between accessing Smart CPQ using a web browser on a mobile device rather than from within the Dynamics App. John Dec. ¶ 106.

186.    However, in PROS' experience, its customers almost uniformly choose to view Smart CPQ on a screen larger than a phone because the software is complex and provides a large amount of data that is difficult to see on a small screen.  Genetec also terminated the Contract before its salespeople ever used Smart CPQ in the field. John Dec. ¶ 107.

187.    Genetec's own Core Requirements List for the project is devoid of any reference to the Dynamics App, despite Genetec sending the Core Requirement List to PROS approximately two months after receiving the Oct. 2019 Doc.  Elvish Dep. Tr. 188:23-189:13, Ex. 15

188.    Genetec's internal analysis of the short list of CPQ vendors is similarly devoid of any references to the Dynamics App.  Elvish Dep. Tr. 112:2-113:6, Ex. 2.

189.    To the contrary, in the above-referenced internal Genetec email from Ms. Daigle on June 14, 2020 email, she states that she re-listened to PROS' initial September 2019 Presentation and confirmed that PROS never spoke about the Dynamics App. *See supra*, ¶ 94.

## VIII.   **Microsoft Updates the Dynamics Mobile App**

190.    Smart CPQ and Dynamics communicate with each other through an application programming interface ("API").  An API is comprised of calls, or software endpoints, that enable a software system to interact programmatically with the capability of another software system. This method of using APIs is very typical of how two software applications interact and integrate in modern software architectures, as this allows both applications to evolve with mitigated risk of the interactivity being affected.  One way to think about an API is to imagine the buttons and menus on any desktop application being the interface through which a human interacts with the application, with the press of the button calling an underlying action.  Instead of a human pressing the button, a software application can use a programmatic mechanism to call the underlying action directly through the API.  Software vendors that support an API can vary an API at any time since

it is an integral part of their application functionality, but they are usually preserved for long periods to encourage use of an API as a preferred integration pattern.  John Dec. ¶ 108.

191.    For many years, Microsoft provided a single sign-on API that enabled Smart CPQ to be authenticated from within the Dynamics Mobile App.  Once authenticated, Microsoft provided other APIs and integration constructs that would allow Smart CPQ to be launched from within the Dynamics Mobile App.  John Dec. ¶ 109.

192.    Several months after the Contract was executed, PROS became aware for the first time that Microsoft changed its single sign-on API for the Dynamics Mobile App in a manner that caused the Dynamics Mobile App to no longer support the single sign-on API utilized by Smart CPQ.  John Dec. ¶ 110.

193.    PROS was not aware of this change until at or around the time Genetec brought it to PROS' attention in June 2020 because the majority of PROS' customers that access Smart CPQ on mobile devices do so through a web browser on a tablet, rather than a CRM mobile app, because a web browser gives a larger form factor on a tablet and the visual representation of a quote is identical to what is shown on a desktop adjusted for screen size.  John Dec. ¶ 111.

194.    As a result of Microsoft's deprecation of its old single sign-on API, no versions of Smart CPQ are able to be launched within the Dynamics Mobile App.  John Dec. ¶ 112

195.    PROS has tried to work with Microsoft to resolve this issue, but Microsoft has not been willing to take any action to restore the API.  John Dec. ¶ 113.

Date: New York, New York
     May 4, 2023

Respectfully submitted,

HOLLAND & KNIGHT LLP


By: */s/ John M. Doherty*
    William M. Katz, Jr.
    John M. Doherty
    *Attorneys for Defendant*
    *PROS, Inc.*
    31 West 52nd Street, 12th Floor
    New York, New York 10019
    (212) 513-3200

#211812595_v4