UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GENETEC, Inc.,

                    Plaintiff,

          v.

PROS, Inc.,

                    Defendant.

Case No. 1:20-cv-07959 (JLR)

---

**DEFENDANT PROS, INC.'S MEMORANDUM OF LAW IN SUPPORT OF
ITS MOTION FOR AN ORDER GRANTING IT SUMMARY JUDGMENT ON ITS
BREACH OF CONTRACT COUNTERCLAIM AND DISMISSING PLAINTIFF
GENETEC, INC.'S MISREPRESENTATION CLAIM**

---

ORAL ARGUMENT REQUESTED

HOLLAND & KNIGHT LLP
William M. Katz, Jr., Esq.
John M. Doherty, Esq.
*Attorneys for Defendant
PROS, Inc.*
31 West 52nd Street, 12th Floor
New York, New York 10019
(212) 513-3200

# <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ........................................................................................................1

STATEMENT OF FACTS ...............................................................................................................2

ARGUMENT ....................................................................................................................................8

I.     Standard of Review ..............................................................................................................8

II.    PROS Is Entitled to Summary Judgment On Its Breach of Contract
Counterclaim ......................................................................................................................9

      A.    The Existence of the Contract And PROS' Performance of Its
Obligations Thereunder Is Undisputed ..................................................................9

      B.    Genetec Breached the Termination And Payment Provisions of the
Contract .................................................................................................................10

      C.    Genetec's Breach of the Contract Caused PROS to Sustain Damages ........12

      D.    Genetec's Affirmative Defenses Are Meritless ...........................................12

III.   PROS Is Entitled to the Summary Dismissal of Genetec's Misrepresentation
Claim ................................................................................................................................12

      A.    PROS Did Not Make Any False Statements...............................................13

          i.    The September 2019 Presentation Contained No Material
Misrepresentation.............................................................................13

             1.    The "About PROS" Slide...................................................14

             2.    The UK-Based Company Slide............................................15

             3.    The Honeywell Slide.............................................................15

          ii.   The Oct. 2019 Doc. Contains No Material Misrepresentations........16

             1.    The Sync. Mechanism Flow Chart.......................................16

             2.    The Dynamics App ............................................................16

      B.    Genetec Cannot Prove Knowledge of Falsity Or Scientier ..........................18

      C.    Genetec Cannot Prove Reasonable Reliance ...............................................18

          i.    Genetec Is Precluded By the Contract From Claiming
Reasonable Reliance ........................................................................18

          ii.   Genetec Did Not Rely On the Alleged Misrepresentations.............22

      D.    Genetec Cannot Prove PROS Had Special Or Peculiar Knowledge ...........23

CONCLUSION................................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abrahami v. UPC Constr. Co.*,
   638 N.Y.S.2d 11 (1996) .................................................................................13

*Allen v. Westpoint-Pepperell, Inc.*,
   11 F. Supp. 2d 277 (S.D.N.Y. 1997) .............................................................12

*Aspex Eyewear, Inc. v. Clariti Eyewear, Inc.*,
   531 F. Supp. 2d 620 (S.D.N.Y. 2008) ...........................................................12

*ATSI Communications, Inc. v. Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007) ......................................................................19, 20

*Batas v. Prudential Ins. Co. of Am.*,
   281 A.D.2d 260 (1st Dep't 2001) ..................................................................23

*Carlin Equities Corp. v. Offman*,
   2008 WL 4387328 (S.D.N.Y. Sept. 24, 2008) ..........................................18, 19

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) .......................................................................................8

*Century Pac., Inc. v. Hilton Hotels Corp.*,
   528 F. Supp. 2d 206 (S.D.N.Y. 2007) ...........................................................13

*Childers v. High Soc'y Magazine, Inc.*,
   557 F. Supp. 978 (S.D.N.Y. 1983) .................................................................8

*Citibank, N.A. v. Plapinger*,
   485 N.E.2d 974 (N.Y. 1985) ....................................................................19, 21

*Comfort Inn Oceanside v. Hertz Corp.*,
   2011 WL 5238658 (E.D.N.Y. Nov. 1, 2011) ..................................................9

*Diatraco Corp. v. Freeman*,
   568 F. Supp. 778 (S.D.N.Y. 1982) .................................................................9

*Dyer v. MacDougall*,
   201 F.2d 265 (2d Cir. 1952) ...........................................................................9

*Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.*,
   343 F.3d 189 (2d Cir. 2003) ......................................................................19, 20

ii

*Grumman Allied Indus., Inc. v. Rohr Indus., Inc.*,
748 F.2d 729 (2d Cir. 1984).............................................................20, 21, 23

*Hydro Invs., Inc. v. Trafalgar Power Inc.*,
227 F.3d 8 (2d Cir. 2000) .......................................................................12

*Koch v. Greenberg*,
2008 WL 4450273 (S.D.N.Y. Sept. 30, 2008)...........................................23

*Lantheus Med. Imaging, Inc. v. Zurich Am. Ins. Co.*,
255 F. Supp. 3d 443 (S.D.N.Y. 2015)........................................................8

*MBIA Ins. Co. v. GMAC Mortg. LLC*,
30 Misc. 3d 856 (Sup. Ct., NY Cnty. 2010) ..............................................23

*McPherson v. Husbands*,
864 N.Y.S.2d 444 (2d Dep't 2008).............................................................23

*Merrill Lynch & Co., Inc. v. Allegheny Energy, Inc.*,
500 F.3d 171 (2d Cir. 2007).......................................................................12

*Metro. Life Ins. Co. v. RJR Nabisco, Inc.*,
906 F.2d 884 (2d Cir. 1990)........................................................................9

*Morlee Sales Corp. v. Mfrs. Tr. Co.*,
9 N.Y.2d 16 (1961) ....................................................................................9

*Psenicska v. Twentieth Century Fox Film Corp.*,
409 F. App'x 368 (2d Cir. 2009) ...............................................................23

*Salahuddin v. Goord*,
467 F.3d 263 (2d Cir. 2006).......................................................................8

*Stamelman v. Fleishman-Hillard, Inc.*,
2004 WL 1719348 (S.D.N.Y. 2004)...........................................................13

*U.S. East Telecomms., Inc. v. US West Commc'ns Servs., Inc.*,
38 F.3d 1289 (2d Cir. 1994)........................................................................18

*Weiss v. La Suisse, Societe D'Assurances Sur La Vie*,
293 F. Supp. 2d 397 (S.D.N.Y. 2003)........................................................8

*Westinghouse Elec. Corp. v. New York City Tr. Auth.*,
82 N.Y.2d 47 (1993) ..................................................................................9

**Statutes and Rules**

Fed. R. Civ. P. 56(a) ....................................................................................1,8

iii

Defendant PROS, Inc. ("Defendant" or "PROS") respectfully submits this memorandum of law in support of its motion for an order, pursuant to Rule 56 of the Federal Rules of Civil Procedure ("FRCP"), (1) granting it summary judgment on its counterclaim for breach of contract against plaintiff Genetec, Inc. ("Plaintiff" or "Genetec"), (2) summarily dismissing Genetec's sole remaining claim for misrepresentation, and (3) granting it such other and further relief as the Court deems just and proper (the "Motion").

## PRELIMINARY STATEMENT

This is a straightforward breach of contract action.  Genetec admits that it executed the Contract (as defined herein) with PROS pursuant to which Genetec purchased a three-year subscription to access PROS' proprietary configuration, pricing and quoting ("CPQ") software, known as PROS Smart CPQ ("Smart CPQ") and PROS' professional services to assist Genetec with its configuration and implementation of its instance of Smart CPQ for Genetec and providing training to Genetec's employees on Smart CPQ.[1]  Under the clear and unambiguous language of the Contract, Genetec could only terminate its subscription to Smart CPQ if there was a material breach of the Contract and it provided PROS with written notice of the material breach, an opportunity to cure and PROS failed to do so.  In breach of these provisions, Genetec unilaterally terminated the Contract without providing PROS with any advance notice or an opportunity to cure.  Furthermore, this Court found that PROS did not materially breach the Contract.  Therefore, even if Genetec provided the requisite written notice, it would be deficient as a matter of law.  As such, Genetec breached the termination and payment provisions of the Contract.

---

[1] All capitalized terms not defined herein shall have the meaning ascribed to them in the SOF and all citations to "¶" shall refer to the SOF. Unless noted, (1) emphasis is added and internal citations and quotations are omitted and (2) references to "Section" or "Sections" are to the SSA.

In a blatant act of subterfuge to evade the repercussions of its breach of the valid Contract, including the payment of the remainder of its non-cancelable subscription fees and PROS' outstanding invoices for professional services, Genetec manufactured a misrepresentation claim against PROS.  Now having been put to its proofs, Genetec has failed to provide any evidence, let alone clear and convincing evidence, to support a single element of its misrepresentation claim.  To the contrary, the irrefutable evidence proves that none of the pre-contract representations at issue were  false, material, made with the intent to defraud or reasonably relied upon by Genetec.  Furthermore, Genetec's theory that PROS was using it as a "beta" tester of a new product is not only entirely unsupported but patently ridiculous.  As an initial matter, Genetec, by its own admission, solicited PROS, not the other way around.  Notwithstanding this fact,  PROS' sole CPQ software product is Smart CPQ.  As is customary with all SaaS products, PROS provides its new customers, like Genetec, with the latest version of Smart CPQ, which is exactly what happened here.  There is absolutely no evidence that PROS had an ulterior motive.  The same cannot be said of Genetec, whose records and testimony show its employees spent months attempting to create a basis to terminate the Contract and secretly engaged in negotiations with another CPQ vendor, despite being under Contract with PROS.

Consequently, the Court should grant PROS' Motion for the reasons set forth herein.

## STATEMENT OF FACTS

For a complete recitation of the relevant facts, PROS respectfully refers the Court to the SOF.[2]  In brief, PROS sells a suite of software products under a software-as-a-service ("SaaS") model that enables companies to manage and sell their products more efficiently.  ¶¶2-26.  At the

---

[2] All capitalized terms not defined herein shall have the meaning ascribed to them in PROS' Rule 56.1 Statement of Material Facts in Support of the Motion (the "SOF") and all citations to "¶" shall refer to the SOF.  Unless noted, (1) emphasis is added and internal citations and quotations are omitted and (2) references to "Section" or "Sections" are to the SSA.

#215700425_v1

end of 2019, Genetec, a sophisticated international company in the software industry, sought to transition its on-premises customer relationship management ("CRM") software and CPQ software to a cloud-based system.  ¶¶27-35.  After researching various CPQ vendors, including reviewing an independent analysis of the leading CPQ vendors by the consulting firm, Gartner, Inc. ("Gartner"), Genetec created a short list of CPQ vendors, including: (1) Apttus, (2) FPX, (3) Experlogix and (4) PROS.  ¶36.  Genetec quickly ruled-out Apttus and FPX because, *inter alia*, they were significantly more expensive and not right for the project.  ¶36.  Genetec then solicited presentations and information from PROS and Experlogix and dual tracked negotiations with both. ¶¶37-51. Ultimately, Genetec determined that Experlogix was a "less capable alternative" with "significant shortcomings from a security perspective."  ¶¶52-55  Thus, on December 24, 2019, Genetec executed a Subscription and Services Agreement ("SSA"), which incorporated a Subscription Order Form ("Subscription Order") and a Work Order ("Work Order") after the Parties' legal teams turned multiple redlines of the underlying contracts.  ¶¶44-48,52.

The SSA sets forth the master terms and conditions of the Parties' relationship.  ¶¶56-90 Pursuant to Section 1.1, "PROS grant[ed] to Genetec and its Users web-based access to the Application" for the "Subscription Term in accordance with the Scope" as defined in the Subscription Order.  ¶64.  Section 9.1(a) defines the "Application" that Genetec purchased access to as the "[Smart CPQ], together with the accompanying Documentation made available by PROS to Genetec pursuant to the subscription." ¶65 Pursuant to Section 9.1(e), the defined term "Documentation" explicitly excludes "any **marketing materials or demonstrations** of [Smart CPQ]."  ¶66.

Pursuant to the Subscription Order, Genetec purchased a three-year subscription (the "Subscription Term") for the annual subscription fee of $134,082.61 for the first year and

3

$174,481.12 for each of the second and third years. ¶¶67-68.  The annual fees were discounted based on Genetec's purchase of a multi-year subscription.  *Id.*  In accordance with Section 9.1(s) and the Subscription Order, Genetec's Subscription Term started on December 24, 2019. *Id.*

Pursuant to the Work Order, Genetec separately purchased PROS' professional services to assist Genetec's employees with configuring and implementing Genetec's instance of Smart CPQ (the "Professional Services").  ¶¶71-81.  In doing so, Genetec agreed that:

- The Work Order was "based on PROS interpretation of the workflows presented in a November 13, 2019, demo []" and "may not explicitly address all aspects of requirements for what was represented in the demo";  ¶76

- Smart CPQ was "confined to [its] current out-of-the box capabilities," and "[o]nly the specific configurable elements within Smart CPQ which [were] listed in [Exhibit A to the Work Order] [were] within the scope of [the] Work Order"; ¶¶75-76

- "PROS is not responsible for programming or installing any interfaces, reporting tools, or communication links between [Smart CPQ] and legacy or third-party systems"; ¶77 and

- Immediately after executing the Work Order, the Parties would conduct a solution design phase during which "PROS [would] determine the feasibility of if systems may be implemented and managed within Smart CPQ, either partially or in whole, as a configuration process in order to manage the interrelationship between parts." "If during the solution design phase of the Project it is determined that the business scope requires parameters in excess of those described in [the Work Order], a change order will be required to address the additional configuration." ¶79-81.

The SSA and Work Order provide that PROS would invoice Genetec for Professional Services fees. ¶¶82-84.  Pursuant to Section 2.1, Genetec's payment obligations under the Contract were "irrevocable and non-cancellable."  ¶82.  Section 2.3 further requires:

> [e]xcept for any invoiced amounts disputed in good faith by Genetec, invoices are payable upon receipt and are past due if not paid within sixty (60) days from the date of invoice. Genetec will pay any reasonable legal fees or other costs incurred by PROS to collect any such undisputed delinquent amounts. Genetec may not withhold (except as a result of a reasonable and good faith dispute of invoiced amounts communicated to PROS in writing prior to the due date) or offset fees due to PROS for any reason.

¶85.

4

The SSA does not contain a termination for convenience clause and Genetec's own pre-contract records reflect that such a clause was explicitly not incorporated into the agreement.  ¶87. Rather, the SSA provides that it may only be terminated for cause. ¶¶88-89.  Specifically, Section 8.1 provides that:

> [a]n Order or SOW issued hereunder will terminate if either Party (i) fails to perform any of its **material obligations** thereunder **and (ii) fails to cure such breach within thirty (30) days after written notice from the non-breaching Party**... **Such written notice shall specify in detail the alleged material breach. For the avoidance of doubt, any Order or SOW issued hereunder and not terminated pursuant to this Section 8.1 shall remain in full force and shall continue for the term stated therein**...

¶88.  The Subscription Order incorporates Section 8 by reference and provides that:

> …Genetec has the right to terminate the subscription for the Application documented by this Order **in accordance with Section 8 of the Agreement** if such Application is subject to a **Material Persistent Failure**…

¶89.

While the Work Order, which only applies to the Professional Services, does contain a termination for convenience clause, it requires that Genetec provide "thirty (30) days advance written notice to PROS." ¶90.  Upon receiving such a termination notice, the effective termination date would not be until after the expiration of the 30-day notice period.  *Id.*  The Work Order further makes clear that PROS would "invoice Genetec for all unbilled Professional Services performed through the effective date of termination." *Id.*  There is nothing in the Work Order that permits Genetec to refuse to pay PROS because Genetec, in its sole discretion, determines that it is not satisfied with PROS' work.

After executing the aforementioned contractual agreements, PROS conducted seven days of workshops from February 21, 2020 through February 27, 2020 at Genetec's headquarters to document the planned configuration of Genetec's instance of Smart CPQ within the scope of the

Work Order. ¶91.  Thereafter, the solution design phase of the project continued. ¶92.  Ultimately, Genetec signed-off on the configuration of Smart CPQ set forth in the Solution Design Document ("SDD") on April 3, 2020. ¶¶93-95.  Approximately two months later, on June 4, 2020, Genetec executed Change Order 1.1 to the Work Order (the "Change Order") providing for, among other items, a four-month extension to the project timeline. ¶96.

Genetec agreed that the SSA along with the aforementioned orders "constitutes the entire agreement between the Parties…and all other prior or contemporaneous agreements, understandings, representations, warranties, and writings are superseded…" ¶61. Genetec further agreed in bold and capitalized letters in each of the Subscription Order, the Work Order and the Change Order, which was executed six months after the other agreements, that the Contract constitutes the Parties "**COMPLETE AND EXCLUSIVE STATEMENT OF AGREEMENT**" and "**SUPERSEDES ALL PROPOSALS OR PRIOR AGREEMENTS, ORAL OR WRITTEN, AND ALL OTHER COMMUNICATIONS BETWEEN THE PARTIES RELATING TO THE SUBJECT MATTER HEREOF**."  ¶¶62-63.

Within a week of executing the Change Order, Genetec decided to stop paying PROS in contravention of the Contract and without, by its own admission, advising PROS or disputing PROS' Outstanding Invoices.  ¶100.  At the same time, Genetec's records show its employees launched a campaign to review pre-contract presentations and materials from PROS in an attempt to create a basis for terminating the Contract. ¶¶97-112.  Genetec then entered into negotiations with another CPQ vendor, Experlogix, in and around June 25, 2020, despite still being under Contract with PROS.  *Id.*  In furtherance of Genetec's scheme to replace PROS, Karim Hamzi ("Mr. Hamzi"), Genetec's technical lead for the PROS project, emailed Jeff Holway, a Vice

President of Sales at Experlogix, on July 7, 2020, that he "want[s] to prevent having to go live with Pros…" ¶¶105-09.

Three days after Mr. Hamzi's July 7, 2020 email, Genetec sent PROS a letter on July 10, 2020 advising it had unilaterally terminated the Contract and "determined to go with another vendor" (the "July 10, 2020 Letter"). ¶113.  The July 10, 2020 Letter did not allege a material breach of the Contract but rather asserted that Genetec was terminating the Contract because the Smart CPQ it received was allegedly "not the product" that it was "demonstrated and sold." *Id.* Contemporaneously with the July 10, 2020 Letter, Genetec revoked PROS' access to Genetec's network and Microsoft environment, including access to Genetec's CRM, which prevented PROS from curing Genetec's purported "implementation problems." ¶114.  Genetec never thereafter restored PROS' access. ¶¶115-17.

On September 25, 2020, Genetec commenced this litigation by filing a Complaint, which it thereafter amended, asserting claims for breach of contract and misrepresentation.  ¶127.  On September 21, 2021, Judge Nathan dismissed Genetec's breach of contract claim finding the Amended Complaint is "devoid of the kind of allegations necessary to state a claim for breach" and "simply does not identify any conduct PROS allegedly engaged in after the contract was executed that constitutes the sort of bad faith action necessary to sustain a claim for breach of the implied covenant of good faith and fair dealing." ¶¶131-132.  Judge Nathan then limited Genetec's misrepresentation claim to five alleged pre-contract representations.  ¶133.

Three of these representations allegedly occurred during PROS' initial presentation to Genetec on September 18, 2019 (the "September 2019 Presentation"). *Id.*  Specifically, Genetec alleges that as part of that presentation PROS showed (i) a slide referencing that PROS "had over 900 successful implementations of the product it was seeking to sell to Genetec," (ii) a slide

7

referencing an unnamed UK-based company as a satisfied customer of "the software that [PROS] proposed providing to Genetec," and (iii) a slide referencing Honeywell as a satisfied customer "using the product that [PROS] proposed selling to Genetec." *Id.* The other two remaining alleged misrepresentations are excerpts from a 128-page document from PROS entitled "Help Topic - Integration - Microsoft CRM | Pros Smart Cpq Version 12.2," that was sent to Genetec at the onset of the Parties' pre-contract discussions on or about October 17, 2019 (the "Oct. 2019 Doc."). *Id.* Specifically, Genetec alleges (1) page seven of this document showed Smart CPQ as having a different "sync mechanism" for inputting and exporting data than the sync mechanism in the Smart CPQ that it received and (2) contained a single reference to Smart CPQ being accessible from within the Microsoft Dynamics 365's ("Dynamics") mobile application ("Dynamics App"). *Id.* As set forth below, none of these purported representations support a misrepresentation claim.

Following the Dismissal Order, PROS filed an Answer with a breach of contract counterclaim. ¶134. Issue has now been joined, fact discovery is complete and the Parties are not relying on expert witnesses. ¶¶135-37. Furthermore, pursuant to the SSA, the Parties waived their right to a jury trial. ¶139.

## ARGUMENT

### I.   Standard of Review

A party moving for an order granting it summary judgment on its claim must show that there is "no genuine dispute as to any material fact" and it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). When a party seeks the summary dismissal of a cause of action, it demonstrates the absence of a genuine issue of material fact by showing the nonmoving party failed to establish an essential element of the nonmoving party's claim. *Lantheus Med. Imaging, Inc. v. Zurich Am. Ins. Co.*, 255 F. Supp. 3d 443, 451 (S.D.N.Y. 2015). If the movant satisfies its initial burden, "the burden shifts to the

non-movant to point to record evidence creating a genuine issue of material fact." *Salahuddin v. Goord*, 467 F.3d 263, 273 (2d Cir. 2006).  In its opposition, the non-movant cannot rely solely on its pleadings but "must lay bare his proof in evidentiary form." W*eiss v. La Suisse, Societe D'Assurances Sur La Vie*, 293 F. Supp. 2d 397, 408 (S.D.N.Y. 2003); *Childers v. High Soc'y Magazine, Inc.*, 557 F. Supp. 978, 985 (S.D.N.Y. 1983).

Additionally, where, as here, the parties waived their right to a jury trial and the record includes all of the evidence that can be offered at trial, it is proper for the Court, as trier of fact and in light of burden of proof rules, to decide the motion on summary judgment rather than "dragg[ing] the parties down to the courthouse for a trial that would not add to the Court's ability to decide the motion."  *See Diatraco Corp. v. Freeman*, 568 F. Supp. 778, 780 (S.D.N.Y. 1982); *Dyer v. MacDougall*, 201 F.2d 265 (2d Cir. 1952).

## II.      PROS Is Entitled to Summary Judgment On Its Breach of Contract Counterclaim

To establish its *prima facie* right to recover for breach of contract, PROS must prove, by preponderance of the evidence, that (1) it entered into a contract with Genetec, (2) it performed its obligation under that contract, (3) Genetec breached the contract and (4) Genetec's breach of the contract caused PROS to sustain damages.  *See Comfort Inn Oceanside v. Hertz Corp.*, 2011 WL 5238658, *3 (E.D.N.Y. Nov. 1, 2011).  PROS satisfied each of these elements.

### A.      The Existence of the Contract And PROS' Performance of Its Obligations Thereunder Is Undisputed

Genetec concedes that it duly executed the SSA, Subscription Order, Work Order and Change Order. ¶¶56-57.  As such, it is undisputed that these contractual agreements collectively constitute the Parties' "Contract."  It is similarly indisputable that PROS complied with its obligations under the Contract and, as this Court previously held, the Amended Complaint is "devoid of the kind of allegations necessary to state a claim for breach" against PROS.  ¶32.

**B.**      <u>**Genetec Breached the Termination And Payment Provisions of the Contract**</u>

Under New York law, clear and unambiguous "termination for cause" provisions are routinely enforced on the grounds that the parties' written agreement defines their rights and obligations, including their right to terminate their agreement. *See Westinghouse Elec. Corp. v. New York City Tr. Auth.*, 82 N.Y.2d 47, 55 (1993); *Morlee Sales Corp. v. Mfrs. Tr. Co.*, 9 N.Y.2d 16, 19 (1961). Provisions requiring notice and an opportunity to cure are similarly enforced. *See e.g.*, *Metro. Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir. 1990).

The SSA and Subscription Order clearly and unambiguously provide that Genetec could only terminate its three-year subscription to Smart CPQ if (1) PROS materially breached the Contract, (2) Genetec provided PROS with a written notice specifically detailing the alleged material breach, (3) Genetec provided PROS with an opportunity to cure the alleged material breach, and (4) PROS failed to do so within 30 days of receiving the notice. ¶¶87-89.

Genetec's unilateral termination of the Contract pursuant to the July 10, 2020 Letter constitutes a breach of the Contract for multiple reasons. ¶¶113-17. First, the July 10, 2020 Letter fails to specify in detail the alleged material breach of the Contract. Second, as this Court already determined, PROS did not breach the Contract and, thus, PROS did not fail to perform a material obligation under the Contract as a matter of law. Third, Genetec failed to provide PROS with thirty-days advance notice of its intention to terminate the Contract. Fourth, Genetec not only failed to provide PROS with an opportunity to cure the purported "implementation problems" but it also actively prevented PROS from accessing Genetec's system.

In light of the foregoing, Genetec's purported termination of the Contract, particularly its 3-year subscription to Smart CPQ, was ineffective and triggered its liability for all damages due and owing thereunder. This includes payment for years 2 and 3 of the subscription totaling $348,962.24 plus interest and attorneys' fees. ¶¶118-19.

Additionally, the Work Order clearly provides that Genetec shall remain liable for all Professional Services rendered through the effective termination date, which is 30 days after the written notice of intent to terminate the Work Order is provided.  ¶90.  As the July 10, 2020 Letter was the first, and only, written notice that PROS received of Genetec's intent to terminate the Work Order, the effective termination of the Work Order was not until August 9, 2020. Furthermore, in accordance with Section 2.3, each invoice for professional services was required to be paid within 60 days of its date.  ¶85.  Yet, Genetec has failed to pay four (4) separate invoices totaling $165,821.99 for Professional Services rendered prior to July 10, 2020 and dated well over 60 days ago.  ¶¶120-126.

While Plaintiff anticipates that Genetec will argue that the July 10, 2020 Letter constituted written notice of a "reasonable and good faith dispute of the invoiced amounts,"  this argument is unavailing.  The July 10, 2020 Letter cannot be construed as reasonable notice because it is devoid of any reference to the applicable invoices or the specific work performed pursuant to them. ¶¶113-26.  Likewise, the July 10, 2020 Letter does not provide a good faith basis for not paying the invoices because it is solely based on Genetec's misrepresentation claim, which is meritless for the reasons set forth below.  *Id.*  The July 10, 2020 Letter was also sent after the 60-day deadline to pay the first invoice in the amount of $43,420.34, which is dated April 30, 2020.  *Id.*

In her deposition, Mrs. Boujenoui, Genetec's Rule 30(b)(6) witness with respect to Genetec's failure to pay the invoices, testified that Genetec has no reason to believe that the services delineated in the invoices were not actually performed and that Genetec never notified PROS in writing that it was withholding payment of any of the invoices based on a "reasonable and good faith" dispute relating to a specific invoiced amount or service.  *Id.* Mrs. Boujenoui further testified that Genetec decided to withhold all payments to PROS in the first week of June

11

2020, which it never communicated to PROS.  ¶100.  Instead, it executed the Change Order on June 4, 2020 requesting that PROS perform more work and extending the overall project timeline by four additional months. ¶57.  Such duplicitous behavior is the opposite of good faith. Accordingly, the irrefutable evidence proves that Genetec breached the Work Order by failing to pay the invoices without a good faith basis for doing so.

### C.    Genetec's Breach of the Contract Caused PROS to Sustain Damages

Genetec's breach of the Contract directly caused PROS to sustain damages in the amount of $697,924.48, comprising $348,962.24 for the two years of unpaid subscription fees and $165,821.99 for unpaid Professional Services fees duly performed and invoiced, as well as interest and attorneys' fees under the Contract, which entitles PROS to collect reasonable legal fees and other costs incurred collecting the delinquent amounts owed by Genetec. ¶¶118-126.

### D.    Genetec's Affirmative Defenses Are Meritless

Genetec asserts the following four affirmative defenses in response to PROS' counterclaim for breach of contract (1) failure to state a claim, (2) unclean hands, (3) PROS' negligence or malfeasance and (4) failure to mitigate damages.  ¶135.  These affirmative defenses are facially deficient because they are alleged in conclusory fashion without any supporting facts.  *See Aspex Eyewear, Inc. v. Clariti Eyewear, Inc.*, 531 F. Supp. 2d 620, 622 (S.D.N.Y. 2008).  Furthermore, Genetec's meritless misrepresentation claim is not a valid defense of its breach of the Contract.

### III.    PROS Is Entitled to the Summary Dismissal of Genetec's Misrepresentation Claim

An intentional misrepresentation claim requires proof that a defendant made (1) a material misrepresentation (2) with knowledge of its falsity and (3) the intent to defraud plaintiff, and (4) plaintiff reasonably relied on the misrepresentation (5) to its determent.  *Merrill Lynch & Co., Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 181 (2d Cir. 2007).  Negligent misrepresentation requires proof that (1) a defendant had a duty, as a result of a special relationship, to give correct

12

information; (2) it made a false representation that he or she should have known was false; (3) defendant knew the plaintiff desired the information for a serious purpose; and (4) plaintiff reasonably relied on the information (5) to its detriment.  *See Hydro Invs., Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 20 (2d Cir. 2000).

Both intentional and negligent misrepresentation claims must be proven by "clear and convincing" evidence.  *Allen v. Westpoint-Pepperell, Inc.*, 11 F. Supp. 2d 277, 284-85 (S.D.N.Y. 1997); *Century Pac., Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 219 (S.D.N.Y. 2007).[3] "This evidentiary standard demands a high order of proof…and forbids the awarding of relief whenever the evidence is loose, equivocal or contradictory."  *Abrahami v. UPC Constr. Co.*, 638 N.Y.S.2d 11, 13 (1996).  Thus, the evidence presented by the non-moving party in opposition to summary judgment must be enough to make any inference of fraud "unequivocal."  *Id.*  Genetec cannot satisfy this high evidentiary burden.

## A.     PROS Did Not Make Any False Statements

PROS never made a false representation to Genetec, and any mistaken impression or assumption by Genetec regarding Smart CPQ does not transform PROS' true statements into misrepresentations.  *See Stamelman v. Fleishman-Hillard, Inc.*, 2004 WL 1719348, at *4 (S.D.N.Y. 2004).

### i.     The September 2019 Presentation Contained No Material Misrepresentation

Genetec's allegations as to what PROS presented and said at the September 2019 Presentation are outright fabrications that are demonstrably false.  Critically, this is not a standard misrepresentation case wherein the Court must evaluate the believability of the parties' testimony

---

[3] This Court has already determined that Genetec's negligent misrepresentation claim is also subject to the heightened fraud pleading standard because it "relies on the same facts and is nearly identical to the Complaint's intentional misrepresentation[.]"

as to what statements were made because the entire September 2019 Presentation was conducted and recorded on Microsoft Teams.  Accordingly, there is no issue of fact as to what was actually said or shown at the presentation.  PROS addresses and conclusively refutes each of the alleged misrepresentations from the September 2019 Presentation in kind below.

       1.    **The "About PROS" Slide**

At the onset of the presentation, Brad Long, who was then an account manager at PROS, provided a "30,000 foot overview" of "who PROS is" and PROS' "baseline of different products," including, but not limited to, Smart CPQ, before handing the presentation off to another PROS employee, Jorge Garza, to conduct the product demonstration.  ¶¶ 140-148.  This slide, entitled "About PROS," was the last slide in Mr. Long's opening segment of the presentation.  *Id.*

As the title of the slide indicates, it is "About PROS," the company as a whole, and sets forth that PROS has "900+ Implementations" of its software without distinguishing between the various software solutions that it offers, including, but not limited to, Smart CPQ, or referencing any specific versions of software or past integrations thereof.  ¶142.  It goes on to state that PROS has "1,000+ professionals," "a 95%+ renewal rate," "customers in 55+ countries," and "99%+ achieved application SLA."  *Id.*  After being confronted with the slide and the recording of the opening segment of the presentation, Andrew Elvish ("Mr. Elvish"), conceded that (1) this slide is about PROS generally and does not specifically reference Smart CPQ or any PROS customers using Smart CPQ, (2) it is not "unreasonable to imagine" that PROS has had 900 implementations of its products or customers in over 55 countries, (3) Genetec had no reason not to believe the other representations were untrue and (4) Genetec asked no follow-up questions about this slide. ¶¶ 142-147.  Furthermore, Genetec proffered absolutely no evidence to support even an inference that PROS does not have over 1,000 employees, 900 implementations of its suite of software products or customers in over 55 countries, or that any of the other representations are false.

14

Thus, Genetec's allegation that PROS represented it had over 900 successful implementations of the "product" it sold Genetec, which was Smart CPQ, is simply a fabrication because no such statement was made as a matter of fact.

### 2. The UK-Based Company Slide

The next slide at issue is the slide containing a case study of an unknown UK-based company.  ¶¶149-156.  On its face, this slide merely gives a general overview of the unnamed company, its challenges, PROS' solutions for those challenges, and results therefrom. ¶¶150-156. After being confronted with the slide and the Recording, Mr. Elvish conceded that (1) neither the slide nor the statements made by PROS in connection with the slide discuss the version of Smart CPQ used by the unnamed company and (2) no Genetec employees asked follow-up questions about the slide.  Thus, any allegation that PROS represented that Genetec would receive the exact same version of Smart CPQ that the UK-based company was using at that time is objectively false. Finally, Sage Software ("Sage"), the unnamed UK-based company discussed, in this slide was a PROS customer at the time of the presentation and remains a PROS' customer.  *Id*.

### 3. The Honeywell Slide

The last slide at issue merely states, in its entirety, that "Honeywell" has a "40% faster quote turnaround time." ¶¶157-159. The Recording also proves that PROS never discussed the version of Smart CPQ used by Honeywell or represented that Genetec would receive the exact same version or represented that Honeywell used the same CRM as Genetec. ¶¶159-165. Mr. Elvish conceded as much and stated that he has "no reason to contend [this slide] is a misrepresentation."  ¶ 163. Thus, any allegation that PROS represented that Genetec would receive the same version of Smart CPQ being used by Honeywell at that time is also objectively false.  *Id*. Finally, like with Sage, PROS produced contractual agreements establishing that Honeywell was

its customer at the time of the presentation, and it remains its customer. ¶164.   Accordingly, PROS

accurately represented that Honeywell was a client. *Id*.

### ii.   The Oct. 2019 Doc. Contains No Material Misrepresentations

#### 1.   The Sync. Mechanism Flow Chart

The synchronization mechanism depicted on page 7 of the Oct. 2019 Doc. was a possible

configuration for Smart CPQ's "sync" mechanism with a company's CRM when the document

was created. ¶¶178-184.   However, it was not the sole configuration that was possible.  *Id*.   This

point is made clear by the explicit disclaimer on page 7 that the "exact data synchronization process

depends on the implementation designed according to your business requirements." ¶179.  Thus,

the representation of the sync mechanism is not false.  *Id*.   And, Genetec failed to produce any

facts, let alone admissible evidence, showing that PROS represented that the Smart CPQ that

Genetec received would be configured with the exact same "sync mechanism" depicted in the

document.  ¶184.  Nor has Genetec produced any evidence that the design of the sync mechanism

has a material impact on Smart CPQ's function, which it does not.  *Id*.

#### 2.   The Dynamics App

Genetec failed to proffer any evidence that the single reference in the Oct. 2019 Doc. to

the Dynamics App was false when the document was created.  ¶¶185-191.  Nor can Genetec show

that this representation was material to its decision to enter into the Contract with PROS.  *Id*.

Genetec concedes that the Dynamics App was never discussed in the September 2019 Presentation.

*Id*.  It is also beyond dispute that the Oct. 2019 Doc. was sent to Genetec on or about October 17,

2019.  *Id*.  Yet, Genetec never discussed the Dynamics App with PROS in any of the subsequent

pre-contract presentations and negotiations that continued for more than two months or the post-

Contract solution design phase that lasted for another four months after that.  *Id*.  Furthermore,

Genetec created a list of core "criteria/requirement[s]" for its CPQ project, which Mr. Elvish

testified was intended to "communicate with [Genetec's] partners what sort of -- you know, what items are in scope for the project" (the "Core Criteria List"). ¶ ¶45-47.   None of the multiple line items in the Core Criteria List concern the Dynamics App., despite the fact that Genetec shared the Core Criteria List with PROS two months after receiving the Oct. 2019 Doc. *Id.*   Likewise, Genetec's internal analysis of its short list of CPQ vendors is devoid of any references to the Dynamics App. *Id.*   Finally, Mr. Elvish, the Genetec employee responsible for substantive negotiations with PROS and the signatory to the Contract, explicitly admitted that he never read the Oct. 2019 Doc. prior to signing the Contract.  ¶191.  Accordingly, Genetec's own records and testimony establish that accessing CPQ software from within the Dynamics App was not material and it never communicated any such requirement to PROS in the pre-contract or the post-contract solution design phase.  *Id.*

The fact that Smart CPQ currently cannot be accessed from within the Dynamics App also does not mean that Smart CPQ is incompatible with Dynamics or cannot be accessed through Dynamics on a mobile device.  It is undisputed that Smart CPQ fully integrates with Dynamics. ¶¶185-186.  Likewise, a person can access Smart CPQ through Dynamics on their mobile device through a web browser.  *Id.*  Rather than clicking on the Dynamics App, they simply click on the web browser, login to Dynamics and then they have access to Smart CPQ.  *Id.*  They can even save Dynamics as a favorite on their web browser to make the process even easier.  *Id.*  However, in PROS' experience, its customers almost uniformly choose to view Smart CPQ on a screen larger than a phone because the software is complex and provides a large amount of data and is therefore difficult to see on a small screen. *Id.* Outside of its own self-serving statements, Genetec has utterly failed to provide any evidence showing that accessing Smart CPQ through the Dynamics webpage rather than from within the Dynamics App on mobile devices had a material impact on its ability

to use the software.  ¶187.  Genetec also terminated the Contract before its salespeople ever used Smart CPQ in the field.  *Id.*  This is yet another reason that Genetec cannot prove the reference to the Dynamics App in the Oct. 2019 Doc. was material.

**B.**      **Genetec Cannot Prove Knowledge of Falsity Or Scienter**

While Genetec was able to rely on a favorable inference to survive the motion-to-dismiss stage of this litigation, it cannot do so now.  Rather, it must prove with clear and convincing evidence that PROS knew the information was false and intended to misrepresent it.  *See U.S. East Telecomms., Inc. v. US West Commc'ns Servs., Inc.*, 38 F.3d 1289, 1302 (2d Cir. 1994).

As set forth above, none of the five pre-contract representations at issue were actually false.  Moreover, even assuming, *arguendo*, Genetec proved that the Oct. 2019 Doc.'s reference to the Dynamics App was false, which it has not done, this allegation is still fatally deficient because PROS did not become aware of the incapability issue with the Dynamics App until well after the Contract was signed.  Indeed, it was previously possible to access Smart CPQ from within the Dynamics App.  ¶¶192-193.  However, Microsoft changed its single sign-on API for the Dynamics App in a manner that caused the Dynamics App to no longer support the single sign-on API utilized by Smart CPQ.  ¶¶194-196.  PROS did not become aware of Microsoft's change until around the time that Genetec brought it to PROS' attention in June 2020.  ¶¶195-197.

**C.**      **Genetec Cannot Prove Reasonable Reliance**

**i.**      **Genetec Is Precluded By the Contract From Claiming Reasonable Reliance**

Genetec cannot establish by clear and convincing evidence that it reasonably relied on the alleged representations at issue.  In assessing the reasonableness of a party's reliance, the Court must consider "the entire context of the transaction," taking into account such factors as (1) the complexity and size of the deal, (2) the parties' sophistication, (3) the context of any agreements

18

between the parties, (4) whether the deal was negotiated at arms-length and (5) whether the parties were advised by sophisticated counsel during the negotiations.  *Carlin Equities Corp. v. Offman*, 2008 WL 4387328, at *5 (S.D.N.Y. Sept. 24, 2008).

In the Dismissal Order, the Court suggested that the merger provisions in the Contract were insufficient at the preliminary stage in the litigation to preclude Genetec's reliance on pre-contract statements because there were "no facts in the complaint to support that any of the misrepresentations…were specifically disclaimed."  However, it is well established that "[w]here the plaintiff is a sophisticated investor and an integrated agreement between the parties does not include the misrepresentation at issue, the plaintiff cannot establish reasonable reliance on that misrepresentation."  *ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 105 (2d Cir. 2007); *Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 195 (2d Cir. 2003); *In re Vivendi Universal, S.A.*, 2004 WL 876050, at *3 (S.D.N.Y. Apr. 22, 2004).

When a contract is between two sophisticated parties, such as those here, "reliance is unreasonable not merely on expressly disclaimed representations, but also on representations that a knowledgeable party should have insisted on including in the agreement but that were not included."  *Vivendi*, 2004 WL 876050, at *3.  As the Second Circuit and this Court have held, this rule is sensible because a merger clause "should alert a sophisticated party represented by sophisticated counsel that it cannot rely on representations that are not included in the final contract."  *Carlin*, 2008 WL 4387328 at *6.  To permit otherwise, "would in effect condone [plaintiff's] own fraud in deliberately misrepresenting [its] true intention."  *Citibank, N.A. v. Plapinger*, 485 N.E.2d 974, 976 (N.Y. 1985).

Here, there is no question that Genetec is a sophisticated party.  Mr. Elvish testified that Genetec has a massive sales department that includes, but is not limited to, over 500 salespersons,

a marketing department with over 150 employees, an in-house legal department that is larger than many small law firms, and a business solutions department consisting of, but not limited to, software engineers, architects and developers.  ¶28.  Furthermore, Genetec's software engineers and architects were responsible for creating and maintaining Genetec's prior CPQ software platform and many of them hold certificates of expertise from Microsoft evidencing their proficiency with Dynamics.  *Id.*  For instance, Genetec testified that Mr. Hamzi had a "deep understanding of what the new Microsoft Dynamics CRM online platform entailed" as well as an understanding of the "core modules and functions of CPQ" software, and it was Mr. Hamzi's responsibility to ensure that Smart CPQ fit within Genetec's overall software architecture.  *Id.* Additionally, Genetec, like PROS, sells many of its software products under a software-as-a-service model.  ¶¶27, 167.  Therefore, Genetec should understand that purchasers of SaaS do not actually purchase the software but rather access, through the internet, to the software that is hosted on the cloud by the seller, which maintains and continually updates the software to ensure that the purchasers are using the latest and greatest version of the software.

Accordingly, through its executives, attorneys and software engineers, Genetec had the necessary business, legal, and technical expertise to negotiate and review the Contract with PROS to make sure that it incorporated any representations or commitments that Genetec believed were material.  Yet, Genetec did not include any provisions in the Contract relating to accessing Smart CPQ from within the Dynamics App or receiving an older version of Smart CPQ.  Nevertheless, Genetec executed three separate contractual agreements with merger and non-reliance clauses.  ¶¶ 60-63.  Then, six months later, re-affirmed the Parties' contractual agreement by executing the Change Order, which also contained a merger and non-reliance clause.  *Id.*  Given Genetec's level of sophistication, the fact that it was represented by counsel during negotiations, the clarity of the

20

merger clause and the arm's length nature of the negotiations, this case falls squarely within the *ATSI*, *Emergent Cap.*, *Vivendi* line of cases.

The Contract also contains specific disclaimers that vitiate Genetec's allegation that it relied on the pre-contract representations at issue.  To begin with, the "substance of…disclaimer provisions" need only "track[] the substance of the alleged misrepresentations, notwithstanding semantical discrepancies."  *Grumman Allied Indus., Inc. v. Rohr Indus., Inc.*, 748 F.2d 729, 734 (2d Cir. 1984).  There need not be "precise identity between the misrepresentation and the particular disclaimer."  *Id.*  "The specificity requirement is further relaxed when the contracting parties are sophisticated businesspeople, and the disclaimer clause is the result of negotiations between them." *Plapinger*, 495 N.Y.S.2d at 311-12.  Here, the contractual provisions closely track the substance of the alleged misrepresentations.

Section 9.1(a) defines the "Application" that Genetec purchased access to as the "PROS software-as-a-service platform specified in the applicable Order, together with the accompanying Documentation made available by PROS to Genetec pursuant to the subscription."   ¶¶64-67. Pursuant to Section 9.1(e), the defined term "Documentation" explicitly excludes "any **marketing materials or demonstrations** of [Smart CPQ]."  *Id.*  Accordingly, reading these two sections in tandem, as one must do so as to not render the latter meaningless, Genetec specifically disclaimed any reliance on pre-contract demonstrations, such as the September 2019 Presentation, and marketing materials or other pre-contract documents not provided pursuant to Genetec's Smart CPQ subscription, such as the slides from the September 2019 Presentation or the Oct. 2019 Doc.

Additionally, the Work Order provides, in relevant part, that it is based on "PROS interpretation of the workflows presented in a November 13, 2019, demo []" and "Genetec understands this Work Order may not explicitly address all aspects of requirements for what was

represented in the demo." ¶¶ 75-76.  Thus, the Work Order plainly states that it is not based on the September 2019 Presentation and did not include all of PROS' representations from the applicable presentation.  The Work Order further provides that Smart CPQ was "confined to [its] current out-of-the box capabilities" and "PROS is not responsible for programming or installing any interfaces, reporting tools, or communication links between [Smart CPQ] and legacy or third-party systems." ¶¶ 75-77.  These squarely cover any ability or inability of Smart CPQ's single sign-on software to communicate with the API for the Dynamics App.

Critically, Genetec also specifically agreed that "[o]nly the specific configurable elements within Smart CPQ which [were] listed in [Exhibit A to the Work Order] [were] within the scope of [the] Work Order."  *Id.*  Then, throughout the Work Order, Genetec repeatedly acknowledged that it would participate in a solution design phase that would culminate in Genetec executing a Solution Design Document setting forth the configuration, functions and capabilities of the Smart CPQ that Genetec would receive within the parameters of the Work Order's Business and Technical scope.  ¶¶79-81.  Thus, Genetec agreed that the elements of Smart CPQ that it purchased were set forth in the Work Order and the Solution Design Document reflected the final configuration of Smart CPQ that it purchased.

At bottom, Genetec's allegations that it relied on pre-contract representations relating to functionality or capability of Smart CPQ made by PROS during its initial September 2019 Presentation and attempt to hold PROS liable for Microsoft's changes to the Dynamics App are precluded by the plain and unambiguous provisions of the Contract.

**ii.      <u>Genetec Did Not Actually Rely On the Alleged Misrepresentations</u>**

The evidence also establishes that Genetec did not actually rely on any of the representations at issue in deciding to retain PROS as its CPQ provider.  In a subsequent presentation to Genetec on October 11, 2019, Genetec employees explicitly asked if PROS was

22

going to show configurations of Smart CPQ that were more relevant to Genetec's business.  ¶168.

In this same vein, Mr. Elvish conceded that Honeywell was not a comparable company to Genetec.

¶165.  Thus, it is clear that Genetec did not rely on the case studies shown at the September 2019

Presentation.  Likewise, as set forth above, Mr. Elvish, testified that he never read the Oct. 2019

Doc. prior to signing the Contract and, thus, could not have relied on it. ¶177.

Finally, Mr. Elvish's testimony and Genetec's internal communications show that Genetec

initially considered four vendors to provide CPQ software—Apttus, FPX, Experlogix and PROS.

Genetec quickly ruled-out Apttus and FPX because, *inter alia*, they were significantly more

expensive and not right for the project.  ¶¶51-54.  It then determined that Experlogix was a "less

capable alternative" with "significant shortcomings from a security perspective." *Id.*  Thus,

Genetec's decision to retain PROS was not due to the purported representations at issue but was

instead based on PROS' superior product and price when compared to the alternatives.

### D.  Genetec Cannot Prove PROS Had Special Or Peculiar Knowledge

Generally, the requisite "special relationship" for a negligent misrepresentation claim does

not exist between sophisticated commercial entities that enter into an agreement through an arm's

length business transaction. *MBIA Ins. Co. v. GMAC Mortg. LLC*, 30 Misc. 3d 856, 863 (Sup. Ct.,

NY Cnty. 2010).  However, a special relationship may also exist when one party has specialized

knowledge, thereby justifying reliance on the knowledgeable party. *Id.*  Notwithstanding this fact,

a company's "knowledge of the particulars of its own business is not the type of unique or

specialized knowledge" contemplated by this exception. *Id.*; *Batas v. Prudential Ins. Co. of Am.,*

281 A.D.2d 260, 264 (1st Dep't 2001).  Moreover, peculiar or special knowledge arguments are

inapplicable where, as here, a sophisticated plaintiff fails "to make use of" available means of

learning the truth. *See McPherson v. Husbands*, 864 N.Y.S.2d 444, 445-46 (2d Dep't 2008);

*Psenicska v. Twentieth Century Fox Film Corp.*, 409 F. App'x 368, 371 (2d Cir. 2009); *Grumman*, 748 F.2d at 738; *Koch v. Greenberg*, 2008 WL 4450273, at *3 (S.D.N.Y. Sept. 30, 2008).

Here, Genetec's allegation that PROS had unique knowledge of PROS' customers and products is insufficient as a matter of law to create a special relationship or trigger the peculiar knowledge exception because it is "knowledge of the particulars of its own business." Additionally, to the extent Genetec misunderstood the slides in the September 2019 Presentation or the information in the Oct. 2019 Doc., it could have easily obtained clarification from a number of sources. For starters, it could have simply asked PROS for additional information. In fact, PROS provided Genetec with multiple customer referrals in pre-contract negotiations and openly shared documents relating to Smart CPQ's capabilities. Genetec could have also used PROS' customer portal, known as PROS Connect, which contains not only all the relevant technical documentation relating to Smart CPQ but also a community forum for PROS customers to pose questions. ¶¶69-70, 174. Indeed, Mr. Elvish confirmed that Genetec received access to PROS Connect six months prior to signing the Change Order. *Id.* Yet, it never raised any of the concerns herein in the Change Order. Additionally, there was nothing preventing Genetec from contacting PROS' customers, like Honeywell, to ask questions about PROS and/or Smart CPQ. Finally, Genetec testified that it has a good relationship with Microsoft. Thus, it could have asked Microsoft whether Smart CPQ could be accessed from within the Dynamics App.

The public availability of this relevant information is evidence by the Gartner research report, which Genetec concedes it reviewed prior to executing the Contract. ¶¶ 35-36. In that report, Gartner found that "PROS had some of the largest enterprise references of any vendor evaluated" based on "extensive vendor surveys, publicly available financial data, a standardized software demonstration, surveying of more than 200 customer references and Gartner inquiry

calls." ¶¶170-173.  Gartner further verified that PROS had at least 5,000 total users actually using its products and services. *Id.* Finally, Gartner verified that Smart CPQ was compatible with "Salesforce or Microsoft Dynamics platform." *Id.* Thus, the Gartner Report conclusively establishes that all the relevant information regarding PROS' customers and Smart CPQ was available to Genetec from alternative sources and that the information PROS provided Genetec was accurate.

In light of Genetec's sophistication and access to all the relevant information, it cannot be found as a matter of law or fact that PROS possessed peculiar or special knowledge that prevents the enforcement of the Parties' Contract herein.

## **CONCLUSION**

For the foregoing reasons, Defendant PROS, Inc. respectfully requests that this Court enter an Order granting its Motion in its entirety.

Date: New York, New York
　　　May 4, 2023

Respectfully submitted,

HOLLAND & KNIGHT LLP


By: */s/ John M. Doherty*　　　　　　　　
　　William M. Katz, Jr.
　　John M. Doherty
　　*Attorneys for Defendant*
　　*PROS, Inc.*
　　31 West 52nd Street, 12th Floor
　　New York, New York 10019
　　(212) 513-3200

25