UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GENETEC, INC.,

                              Plaintiff,

                -against-

PROS, INC.,

                              Defendant.

Case No. 1:20-cv-07959 (JLR)

**OPINION AND ORDER**

JENNIFER L. ROCHON, United States District Judge:

After contracting to purchase software from PROS, Inc. ("Defendant" or "PROS"),

Genetec, Inc. ("Plaintiff" or "Genetec") sued Defendant for negligent and intentional

misrepresentation and breach of contract. The Court previously dismissed Plaintiff's breach-of-

contract claims, and Defendant now moves for summary judgment on Plaintiff's surviving

misrepresentation claims and its own breach-of-contract counterclaim.[1] *See* ECF Nos. 73

("Br."), 78 ("Opp."), 82 ("Reply"). As explained below, Defendant's motion is GRANTED.

## BACKGROUND

### I.    Facts

Except where noted, the following facts are undisputed. The Court draws "all justifiable

inferences" in favor of Plaintiff as the party opposing summary judgment. *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 255 (1986).

---

[1] In support of its motion, PROS submitted a joint Local Civil Rule 56.1 statement of material
facts (ECF No. 72 ("JSOF")); its own Rule 56.1 statement (ECF No. 71); a declaration from
Sunil John with attached exhibits (ECF No. 69 ("John Decl.")); and a declaration from PROS's
counsel John M. Doherty with attached exhibits (ECF No. 70). In opposition to Defendant's
motion, Genetec submitted a declaration from Michelle Daigle with attached exhibits (ECF
No. 76 ("Daigle Decl.")); and a Rule 56.1 counterstatement (ECF No. 77 ("CSOF")), which
included a response to Defendant's Rule 56.1 statement and a supplemental statement of material
facts. Defendant submitted a response to the latter (ECF No. 81 ("RSOF")).

**A.  The Parties**

Genetec is an international company that primarily sells, among other things, video surveillance software and license plate recognition software.  CSOF ¶ 27.  PROS is a software company that sells, among other products, proprietary configuration, pricing, and quoting ("CPQ") software that it calls "Smart CPQ," which helps companies generate quotes for their products and services.  *See id.* ¶¶ 2, 10-11.  PROS also sells software products for pricing, revenue management, and digital marketing.  *Id.* ¶ 2; *see id.* ¶ 9.

PROS sells and operates its software as a software-as-a-service ("SaaS") model, under which customers pay a subscription fee to access the software.  *Id.* ¶¶ 3-4.  Under this model, PROS maintains the software on its own infrastructure, updates the software itself, and guarantees the availability of its software, which customers usually access through a web browser.  *Id.* ¶ 4.  By contrast, "on-premises" software refers to a business model by which customers pay the software vendor a one-time perpetual license fee and receive the software in the form of installation packages that they install themselves on their own hardware.  *Id.* ¶¶ 5-6.  By purchasing a subscription to the software rather than the software itself, a company avoids the upfront costs associated with hosting the software itself, such as buying computer servers, hiring IT staff, and paying licensing fees.  *Id.* ¶ 7.  Under the SaaS model, the company also does not need to purchase new versions of the software, which is constantly updated and automatically released.  *Id.* ¶ 8.  CPQ software works in tandem with a company's larger customer relationship management ("CRM") software, which the company uses to manage, among other things, its sales, marketing, customer service, and other interactions with existing and prospective

customers.  *Id.* ¶ 18.

## B.  Pre-Contract Negotiations

In March 2019, Genetec decided to replace its on-premises CRM software with a cloud-based platform.  *Id.* ¶ 29.  Genetec also sought to transition from on-premises to cloud-based CPQ software.  *Id.* ¶ 32.  In August 2019, Genetec narrowed its potential CRM vendors to Salesforce and Microsoft, the latter of which offers CRM software known as Dynamics 365 ("Dynamics").  *Id.* ¶¶ 20, 30.

Genetec began researching CPQ vendors.  *Id.* ¶ 33.  Its due diligence included "looking at customer reviews online, looking at websites, [and] talking to concurrent technology companies in its space."  *Id.* ¶ 34 (ellipses, further brackets, and citation omitted).  Genetec also reviewed market-research reports on the leading CPQ vendors, including an October 2019 report by Gartner, Inc.  *Id.* ¶ 35; *see* ECF No. 70-2.  In September 2019, Genetec decided to use the cloud-based version of Dynamics as its new CRM platform.  CSOF ¶ 31.  Genetec also narrowed its CPQ search to four companies, one of which was PROS, from which it solicited proposals and demonstrations.  *Id.* ¶¶ 36-37.

As part of its pitch, PROS virtually conducted, via Microsoft Teams, an initial presentation on September 18, 2019 (the "September 2019 Presentation"), which provided a general overview of its different software offerings, focusing on Smart CPQ.  *Id.* ¶ 38.  PROS conducted at least two other presentations for Genetec on October 11, 2019 and November 13, 2019.  *Id.* ¶ 40.  PROS also provided Genetec with marketing materials about its products and customer references.  *Id.* ¶¶ 40, 173.  PROS emailed Genetec several instructional documents, including one entitled "Help Topic – Integration – Microsoft CRM | Pros Smart Cpq Version 12.2," which described how an earlier version of Smart CPQ interacted with Dynamics.  *Id.* ¶ 174; Br. at 8; *see* ECF No. 76-1 (the "October 2019 Document").

In October 2019, Genetec further narrowed its CPQ search to two vendors, Experlogix and PROS.  CSOF ¶ 42.  Through the end of 2019, Genetec continued to negotiate with both companies.  *Id.* ¶ 43.  As part of its negotiations with PROS, Genetec provided an Excel spreadsheet listing its criteria and requirements for the new CPQ software.  *Id.* ¶ 45; *see* ECF No. 69-1, Ex. 3 (the "Core Requirements List").

### C.  The Parties' Contract

Ultimately, Genetec decided that Experlogix was a "less capable alternative" with "significant shortcomings from a security perspective."  CSOF ¶ 52 (citation omitted).  On December 24, 2019, Genetec executed a Subscription and Services Agreement with PROS to implement the Smart CPQ software into its system.  *Id.* ¶ 56; *see* ECF No. 69-1, Ex. 4 (the "SSA").[2]  This agreement incorporated a Subscription Order Form and a Work Order.  ECF No. 69-2, Exs. 5 (the "Subscription Order"), 6 (the "Work Order").

Under the SSA, "PROS grant[ed] to Genetec and its Users web-based access to the Application" for the "Subscription Term in accordance with the Scope" as defined in the Subscription Order.  SSA § 1.1.  The SSA defines the "Application" to which Genetec purchased access as the "[Smart CPQ], together with the accompanying Documentation made available by PROS to Genetec pursuant to the subscription."  *Id.* § 9.1(c).

Pursuant to the Subscription Order, Genetec purchased a three-year subscription for a net fee of $134,082.61 for the first year and a combined net fee of $174,481.12 for the second and third years.  *See* Subscription Order at 1-2.  The service-level agreement attached to the Subscription Order states, among other things, that PROS customers could find "technical

---

[2] Certain pages of the SSA attached to Sunil John's declaration are indecipherable.  *See* SSA at 2, 5, 8.  Where necessary, the Court refers to the copy of the SSA previously filed at ECF No. 18-2.

documentation, knowledge base solutions, discuss issues within [PROS's] forums, and review technical guides and notes" on PROS's customer portal, "PROS Connect." *Id.* at 5.

Pursuant to the Work Order, Genetec separately purchased PROS's services to assist Genetec in configuring and implementing the Smart CPQ software. *See* Work Order at 1 (estimating $259,250 in professional service fees to implement Smart CPQ and $12,150 to train Genetec's employees in how to use the software); CSOF ¶¶ 39, 73 (describing the work involved with configuration and implementation). Upon executing the Work Order, the parties would first participate in a "solution design phase" to determine how best to configure Smart CPQ for Genetec. Work Order at 3; CSOF ¶ 78. At the end of this phase, Genetec would sign off on a Solution Design Document specifying the precise configuration of Smart CPQ, within the scope of the Work Order, that Genetec would receive. CSOF ¶ 78; *see* ECF No. 69-3, Ex. 9 (the "SDD"). From that point, implementation was expected to take approximately five months. *See* Work Order at 7-8.

The Work Order contains several disclaimers. For example, the Work Order states that it is "based on PROS['s] interpretation of the workflows presented in a November 13, 2019, demo" and that it "may not explicitly address all aspects of requirements for what was represented in the demo." Work Order at 3. It also states that Smart CPQ is "confined to current out-of-the-box capabilities," *id.*, and that "[o]nly the specific configurable elements . . . listed" in the Work Order are within its scope, *id.* at 4. The Work Order adds that "PROS is not responsible for programming or installing any interfaces, reporting tools, or communication links between [Smart CPQ] and legacy or third-party systems." *Id.* at 7.

The parties also agreed that "Genetec will pay all fees for the subscription to the Application and Professional Services as set forth herein or on the applicable Order(s) and/or

[work order](s), except for those disputed in good faith by Genetec which shall become payable solely after the resolution of such dispute by the Parties." SSA § 2.1. These payment obligations under the SSA were "irrevocable and non-cancellable." *Id.* Genetec also agreed to "pay any reasonable legal fees or other costs incurred by PROS to collect any such undisputed delinquent amounts." *Id.* § 2.3.

The SSA contains a termination clause, permitting termination "if either Party (i) fails to perform any of its material obligations thereunder and (ii) fails to cure such breach within thirty (30) days after written notice from the non-breaching Party." *Id.* § 8.1. The Subscription Order incorporates this clause. *See* Subscription Order at 2. The Work Order, however, allows Genetec to terminate it "for convenience by providing thirty (30) days advance written notice to PROS." Work Order at 2.

### D. The Parties' Post-Contract Activities

On April 3, 2020, Genetec approved PROS's proposed SDD. CSOF ¶ 93; *see* ECF No. 69-3, Ex. 8 (email from Daigle). On June 4, 2020 – two months into the implementation process – the parties executed a change order, which ordered additional professional services estimated to cost another $73,200 and extended the project's overall timeline by four months. CSOF ¶¶ 57, 74, 96; *see* ECF No. 69-3, Ex. 7 (the "Change Order") at 1. The parties dispute whether Genetec was satisfied with PROS's work up to this point. PROS points to two emails it received from Genetec around this time. CSOF ¶¶ 97-98. The first, sent on May 14, 2020 by Andrew Elvish, Genetec's vice president of marketing, stated that "the project is moving along nicely" and that Genetec was "really happy to see the progress we're making." ECF No. 69-3, Ex. 10. The second, sent on June 5, 2020 by Michelle Daigle, Genetec's project manager responsible for its transition to cloud-based CRM and CPQ platforms, thanked the PROS team for its work. *See* ECF No. 69-3, Ex. 11; *see also* CSOF ¶ 47 n. 5. Genetec claims that it sent

these emails "to foster a positive working relationship" with PROS, CSOF ¶ 97-98, and that it ultimately agreed to the Change Order because PROS "was seriously behind schedule and failing in its efforts to implement a functional CPQ product," *id.* ¶¶ 74, 96.

The parties also dispute whether, around this time, PROS had one or two distinct CPQ products. *Id.* ¶ 15. PROS claims that it has only one CPQ product, Smart CPQ, which PROS has continuously updated. *Id.*; *see id.* ¶¶ 166-167. Genetec argues that PROS used its deal with Genetec to beta test a new "Performance Quoting" product at Genetec's expense. *See* Opp. at 15. As Genetec sees it, Performance Quoting was not "a simple upgrade to its existing CPQ product" but an entirely "new and distinct product." CSOF ¶ 15; *see id.* ¶¶ 166-167. Genetec notes that, during this time, PROS offered separate training classes for users of Smart CPQ and users of Performance Quoting; that the offerings had different internal components and user interfaces; and that PROS's engineers referred to Smart CPQ as the "legacy" product and to Performance Quoting as something "new" that they were trying to implement. *Id.* ¶¶ 15, 167, 207.

On June 16, 2020, PROS representatives explained over the telephone that Genetec would not be able to access Smart CPQ through the Dynamics 365 mobile application. *Id.* ¶ 102. Instead, a person could access Smart CPQ via Dynamics through a web browser (on their phone or laptop). *Id.* ¶ 193. PROS attributes this development to the fact that Microsoft had updated its single sign-on API for the Dynamics app, such that the app no longer supported the single sign-on API used by Smart CPQ.[3] *Id.* ¶¶ 102, 192-195. Genetec, however, argues that PROS

---

[3] "An API, or application programming interface, is a set of rules or protocols that let software applications communicate with each other to exchange data, features[,] and functionality." *What is an API?*, IBM, https://www.ibm.com/topics/api [https://perma.cc/UFP3-6UUK]. APIs allow "developers to integrate data, services[,] and capabilities from other applications, instead of developing them from scratch." *Id.*; *see* CSOF ¶¶ 190-191.

knew before executing its contract with Genetec that its product was incompatible with the Dynamics app. *Id.* ¶ 102. Genetec also claims PROS admitted during this call (or another one around this time) that it had only one customer using the new "Performance Quoting" product. Daigle Decl. ¶ 29.

### E.  Genetec Terminates the Contract

Genetec claims that it decided to terminate its relationship with PROS (and start a new relationship with Experlogix) after this telephone call. RSOF ¶ 213. On July 10, 2020, Genetec informed PROS through counsel that it was unilaterally terminating their contract because of "implementation problems," and that it had "determined to go with another vendor." CSOF ¶ 113; *see* ECF No. 69-4, Ex. 12 at 1-2. Genetec simultaneously revoked PROS's access to Genetec's system. CSOF ¶ 114.

PROS responded to Genetec's letter on July 20, 2020, stating that each of Genetec's concerns either had been resolved or would be addressed in the next version of Smart CPQ, scheduled for release on July 24, 2020. *Id.* ¶ 115; *see* ECF No. 69-4, Ex. 15 (the "July 20 Response") at 1. PROS also invoked Section 8.1 of the SSA, requesting access to Genetec's system to perform its obligations under their contract. CSOF ¶ 116; July 20 Response at 2. Genetec did not restore PROS's access to its system. CSOF ¶ 117.

## II.  Procedural History

Genetec brought this suit against PROS on September 25, 2020. ECF No. 1. In its operative Amended Complaint, Genetec alleges claims for breach of contract and misrepresentation. *See* ECF No. 10 (the "Amended Complaint" or "Am. Compl.").

On September 21, 2021, the Court dismissed Genetec's claims for breach of contract and breach of good faith and fair dealing. *See Genetec, Inc. v. PROS, Inc.*, No. 20-cv-07959 (AJN), 2021 WL 4311208, at *9-10 (S.D.N.Y. Sept. 21, 2021) (ECF No. 27). As for Genetec's

intentional and negligent misrepresentation claims, the Court first held that Genetec's negligent misrepresentation claim relied on the same facts as its intentional misrepresentation claim and was therefore subject to Federal Rule of Civil Procedure ("Rule") 9(b)'s heightened pleading standard. *Id.* at \*3.  The Court next summarized that Genetec's complaint specifically alleged the following seven misrepresentations:

> #1. A slide deck provided at the September 18, 2019 presentation stated that PROS had numerous satisfied customers using the software, including a case study of an unnamed company that had 6,000 customers in 24 countries.  It was later revealed that PROS only had one customer that had used the software and one customer that was soon to "go live" with the software.

> #2. A document provided at the September 18, 2019 presentation stated that the company Honeywell was a satisfied customer.  It was later revealed that PROS only had one customer that [had] gone live with the software, which was not Honeywell.

> #3. Mr. Garza, a representative of PROS, stated at the September 18, 2019 presentation that PROS had over 900 successful implementations of the software.  It was later revealed that PROS only had one customer that had used the software and one customer that was soon to "go live" with the software.

> #4. A document entitled "Help Topic" provided on October 17, 2019 stated that the sync mechanism for processing data would involve the PROS Quote Content IN and PROS Quote Content OUT entities.  It was revealed a year later that the software that was provided to Genetec did not have these entities.

> #5. The "Help Topic" document provided on October 17, 2019 stated that the software could be used on a mobile device using the Dynamics 365 app.  It was later revealed that software could not be used through the Dynamics 365 app.

> #6. Mr. Garza stated at an October 17, 2019 meeting that it would be easy for Genetec to maintain the software without ongoing help from PROS and that PROS was in the business of selling software, not professional services.  It was later revealed that Genetec would have to continue to pay PROS on a frequent and extensive basis in

order to maintain and update the software.

#7. The contract between the parties estimated that implementation
would take five months to complete the implementation process.
After five months, implementation was nowhere near finished.

*Id.* at *3-4.  The Court found that, for the first five of these seven specific statements, "Genetec

has plead with particularity that PROS made material false or misleading representations about

either its track record with implementing the software or the functional capabilities of the

software." *Id.* at *9.  The Court also held that Genetec had plausibly alleged the other elements

of its intentional and negligent misrepresentation claims as to those five statements. *Id.*  The

Court found that the other two statements were unactionable statements of opinion regarding

future events. *Id.* at *6.

On October 12, 2021, PROS answered the Amended Complaint and asserted a breach-of-

contract counterclaim against Genetec.  ECF No. 35.  As the case proceeded through discovery,

it was reassigned to the undersigned on September 26, 2022.  *See* ECF No. 56.

On May 5, 2023, PROS moved for summary judgment on both Genetec's remaining

misrepresentation claims and its breach-of-contract counterclaim.  *See* Br.; Reply.  Genetec

opposes the motion.  *See* Opp.  Defendant's summary judgment motion is thus fully briefed and

presently before the Court.[4]

## III.    Applicable Legal Standard

Under Rule 56, a moving party is entitled to summary judgment if, on any claim or

defense, that party demonstrates from the admissible evidence and pleadings "that there is no

---

[4] PROS requested oral argument on the motion via notations on its briefs.  *See* Br.; Reply.  In an
exercise of its discretion, the Court denies that request because oral argument would not be
helpful to the Court.  *See AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 226
(2d Cir. 1999) (noting that "a district court's decision whether to permit oral argument rests
within its discretion").

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A "genuine" dispute over an issue of material fact is one in which "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *accord Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim."  *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (citing *Celotex*, 477 U.S. at 322-23).

In ruling on a motion for summary judgment, the court must view all evidence "in the light most favorable to the non-moving party," *Overton v. N.Y. State Div. of Mil. & Naval Affs.*, 373 F.3d 83, 89 (2d Cir. 2004), and "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought," *Est. of Gustafson ex rel. Reginella v. Target Corp.*, 819 F.3d 673, 675 (2d Cir. 2016) (quoting *Stern v. Trs. of Columbia Univ.*, 131 F.3d 305, 312 (2d Cir. 1997)).  To defeat a motion for summary judgment, the non-moving party must advance more than "a scintilla of evidence," *Anderson*, 477 U.S. at 252, and demonstrate more than "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rule 56 "does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute."  *Amnesty Am. v. Town of West Hartford*, 288 F.3d 467, 470 (2d Cir. 2002).  It is instead the parties' responsibility to "point out" contested facts for the Court, and "to clarify the elements of the substantive law which remain at issue because they turn on contested facts."

*Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 292 (2d Cir. 2000) (citation omitted).

## DISCUSSION

**I.   Plaintiff's Misrepresentation Claims**[5]

To prevail on an intentional-misrepresentation claim under New York law, a plaintiff

must show by clear and convincing evidence: "(1) a material misrepresentation or omission of

fact (2) made by a defendant with knowledge of its falsity (3) and intent to defraud;

(4) reasonable reliance on the part of the plaintiff; and (5) resulting damage to the plaintiff."

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 13 F.4th 247, 259 (2d Cir. 2021)

(brackets and citation omitted); *accord Ambac Assurance Corp. v. Countrywide Home Loans,*

*Inc.*, 106 N.E.3d 1176, 1182 (N.Y. 2018).

To establish negligent misrepresentation under New York law, the plaintiff must

similarly show: (1) a material misrepresentation or omission, (2) reasonable reliance, and (3)

resulting damages.  *See Hydro Invs., Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 20 (2d Cir. 2000).

While the plaintiff need not show that the defendant had knowledge of the falsity and an intent to

defraud, negligent misrepresentation requires that the defendant should have known that the

information was false.  *Id.*  The defendant also must have "had a duty, as a result of a special

relationship, to give correct information" to the plaintiff.  *Id.*

In opposition to the summary judgment motion, Genetec claims that PROS made several

misrepresentations during the pre-sale process, namely that: (1) PROS had only one CPQ

product, Smart CPQ; (2) multiple satisfied customers used Smart CPQ; and (3) Smart CPQ was

---

[5] Both parties assume that Genetec's claims are governed by New York law, which is sufficient
for choice-of-law purposes in this diversity action.  Br. at 12-13; Opp. at 10-11; *see Alphonse
Hotel Corp. v. Tran*, 828 F.3d 146, 152 (2d Cir. 2016) ("implied consent" is "sufficient to
establish choice of law" under New York choice-of-law rules in diversity cases (brackets and
citation omitted)); *N.Y. Wheel Owner LLC v. Mammoet Holding B.V.*, 481 F. Supp. 3d 216, 229
(S.D.N.Y. 2020) (same).

"out-of-the-box" compatible with the Dynamics CRM platform and compatible with the Dynamics mobile app.  Opp. at 11; *see* CSOF ¶ 139.  The Court addresses each theory of liability in turn.

### A.  Sole Product

Genetec argues that PROS misrepresented that Smart CPQ was its sole CPQ product. *See* Opp. at 11.  Genetec claims that "PROS led Genetec to believe that only one version [of Smart CPQ] existed," *id.* at 12, by failing to disclose "that it had just developed a new product . . . that PROS intended to try to implement should Genetec choose PROS as its CPQ vendor," Daigle Decl. ¶ 22.

Genetec, however, did not plead this omission with particularity in its Amended Complaint.  The Court previously identified seven alleged representations that were sufficiently particularized to satisfy Rule 9(b).  *See Genetec*, 2021 WL 4311208, at *5 ("The complaint informs PROS of the nature of the[se] misrepresentations, the exact date and occasion those misrepresentations were allegedly made, the alleged speaker of the statement or document which contained the misrepresentation, and why Genetec believes it was fraudulent.").  The five statements that survived Defendant's motion to dismiss concerned PROS's "track record with implementing the software or the functional capabilities of the software."  *Id.* at *9.  Despite mention in the Amended Complaint of different versions of the software, the Court did not identify a separately alleged, particularized misrepresentation that PROS had two different CPQ products.  *Id.* at *3-4; *see* Am. Compl. ¶ 10 ("PROS repeatedly represented that the version of the software that it demonstrated during the pre-sale due diligence phase was the same version that would be implemented at Genetec.").

Insofar as Genetec alleges a new specific misrepresentation or omission here, it cannot do so for the first time in its summary judgment opposition brief.  *See N. Fork Partners Inv.*

*Holdings, LLC v. Bracken*, No. 20-cv-02444 (LJL), 2023 WL 3871903, at *12 (S.D.N.Y. June 7, 2023) (rejecting the plaintiff's attempt, in opposing summary judgment, "to base its fraud claim on . . . allegedly false statements" not pleaded in the operative complaint); *Bank of Am., N.A. v. Bear Stearns Asset Mgmt.*, 969 F. Supp. 2d 339, 352 (S.D.N.Y. 2013) (holding that new theory of liability, raised for the first time in an opposition brief to the summary-judgment motion, "was not pled as required by Rule 9(b) and is therefore waived"); *S.E.C. v. Lyon*, 605 F. Supp. 2d 531, 550 (S.D.N.Y. 2009) (same); *Enzo Biochem, Inc. v. PerkinElmer, Inc.*, No. 03-cv-03817 (RJS), 2013 WL 5943987, at *4 (S.D.N.Y. Oct. 28, 2013) (rejecting on summary judgment new breach-of-contract claims that were first raised in an opposition brief and not alleged in the complaint).

Even if the Court considers the claims raised in its opposition brief, Genetec fails to identify a particular misrepresentation or omission about a new CPQ product by PROS that would support this new alleged claim. When "premised on an omission, a plaintiff must specify the person responsible for the failure to speak, the context of the omission, and the manner in which the omission misled the plaintiff." *Pan-Am. Life Ins. Co. v. Antarctica Cap. Mgmt., LLC*, No. 20-cv-09236 (ALC), 2022 WL 992840, at *8 (S.D.N.Y. Mar. 31, 2022) (citation omitted). Genetec suggests in its opposition brief in a conclusory fashion that, at some time during the pre-sale process, in some unspecified manner, PROS failed to disclose that it was working on a new CPQ product that it intended to test on Genetec. Opp. at 6-7. It points only to Daigle's declaration that "[a]ll of the pre-sale demonstrations made by PROS to Genetec were of the legacy product, Smart CPQ, and not the new product, Performance Quoting." Daigle Decl. ¶ 28; *see id.* ¶ 22 ("At no time during the pre-sale process did PROS disclose that it had just developed a new product which it separately branded as 'Performance Quoting.'"). But the failure to discuss Performance Quoting is a material misrepresentation or omission only if the pre-sale

demonstrations were meant to detail the precise product that would be delivered to Genetec.  Yet those were not demonstrations of a particular product; rather, Genetec understood and admits that the pre-sale presentations provided "a general overview of PROS and its different software solutions," including "generic demonstrations" meant only "to provide a high-level overview of . . . Smart CPQ and its major capabilities."  CSOF ¶¶ 38-39.  Genetec identifies no part of those presentations where PROS described the specific elements of the software configuration that Genetec would receive.  The parties were to agree on those details later when drafting the Solution Design Document.  Therefore, insofar as Plaintiff's misrepresentation claims are based on Defendant's failure to disclose a separate Performance Quoting product during its pre-sale demonstrations, the Court grants summary judgment to Defendant.

### B.  Satisfied Customers

The Court next turns to Genetec's claim that PROS misrepresented that it had many long-time satisfied users of Smart CPQ.  *Id.* ¶ 139; Opp. at 11.  Genetec suggests this statement was false because none of these customers was using the version of Smart CPQ that Genetec ultimately received.  *See* Opp. at 12-13.  The only relevant statements (that the Court has held were pleaded with particularity) in the Amended Complaint are those made during the September 2019 Presentation about PROS's customer base.  *See Genetec*, 2021 WL 4311208, at *5.

None of the alleged statements from this presentation was false.  One alleged statement concerns an introductory slide titled "About PROS."  It provides an overview of the company, stating that PROS has "900+ implementations" of its software, a "95% renewal rate," "1,000+ professionals," "customers in 55+ countries," and that ">99%+ achieved application SLA."  CSOF ¶ 142.



*Id.* ¶ 141; *see* ECF No. 69-1 ("PowerPoint") at 8.  During the presentation, this slide was shown

for less than a minute.  CSOF ¶ 144.  The PROS representative's only comment on the slide was:

> So, my final slide is basically just kind of rounding it out, talking a
> little bit about PROS again, in terms of we have over 900
> implementations, 95 percent renewal rate.  We are a publicly
> traded company, well over a thousand professionals in the
> organization.  We're spread out over 55 different countries and, I
> think, from a security standpoint, we are ISO 27001 certified . . . .

*Id.* (emphasis omitted).

The slide and corresponding remarks confirm that PROS was speaking broadly about the

company's overall performance.  The introductory slide was not false because it stated only that

PROS had multiple satisfied customers in general.  At no point did PROS state – in the slide or

in connection with the slide – that it had customers in 55 countries using a particular product.

Without more, Genetec cannot read in the additional representation that many satisfied

customers were using the same software that PROS was trying to sell to Genetec.

Another allegedly misleading statement comes from a slide describing a case study of an

unidentified UK-based company.  *See id.* ¶ 149.  The slide gives a general overview of the

unnamed company, its challenges, PROS's general solutions for those challenges, and the

subsequent results.  *See id.* ¶¶ 149-150.  At no point does the slide disclose whether the customer

was using Smart CPQ or Performance Quoting.  *Id.* ¶ 151.



*Id.* ¶ 149; PowerPoint at 35.

During the September 2019 Presentation, this slide was shown for about a minute, during which the PROS representative made no reference to which CPQ product the unnamed company was using.  *See* CSOF ¶ 152.  As with the "About PROS" slide, Genetec cannot reasonably glean from this slide or PROS's corresponding remarks a representation that Genetec would receive the same product (or any version thereof) that the UK-based company was using at the time.

The final alleged statement from the September 2019 Presentation concerns a slide stating that "Honeywell" has a "40% faster quote turnaround time."



*Id.* ¶ 157; PowerPoint at 25.

During the September 2019 Presentation, this slide was shown for a little over a minute, during which the PROS representative never discussed the version of Smart CPQ used by

Honeywell or represented that Genetec would receive the same version.  CSOF ¶ 161.  During

his deposition, Elvish, Genetec's vice president of marketing, conceded that he had "no reason to

contend [this slide] is a misrepresentation."  *Id.* ¶ 163.  As with the other slides discussed above,

this slide contains no representation that a satisfied customer (here, Honeywell) was using the

same software that Genetec would receive.  These slides amounted to "generic demonstrations"

meant only "to provide a high-level overview . . . of Smart CPQ and its major capabilities."  *Id.*

¶ 39.  Therefore, despite representing that PROS generally had multiple satisfied customers in

the September 2019 Presentation, PROS did not represent that Genetec would receive precisely

the product used by those customers.  Thus, none of those statements from the presentation was

false.

       Genetec does not identify any other statements beyond those made during the September

2019 Presentation as the basis for its claim that PROS misrepresented customer satisfaction for

the CPQ product that Genetec received.  *See* Opp. at 11 (citing CSOF ¶ 203; Daigle Decl. ¶ 9).

Genetec offers only a bald statement from Daigle that "PROS represented [in its pre-sale

presentations] that its CPQ product, which it identified as 'Smart CPQ,' had many longstanding

satisfied customers using that product."  Daigle Decl. ¶ 9.  Even if this statement refers to

PROS's representations during subsequent presentations, Genetec has not pointed the Court to

any evidence of a particular misrepresentation in any subsequent presentation.  Therefore, insofar

as Plaintiff's misrepresentation claims are based on statements about PROS's customers, the

Court grants summary judgment to Defendant.

    **C.  Compatibility with Dynamics**

       Finally, the Court turns to Genetec's claims that PROS misrepresented that Smart CPQ

was "out-of-the-box" compatible with the Dynamics CRM platform and compatible with the

Dynamics mobile app.

1.   "Out-of-the-box" Compatibility with Dynamics

Genetec claims it "specifically was assured by PROS" of Smart CPQ's "out-of-the-box"

compatibility with Dynamics, meaning that "its CPQ product was compatible with Dynamics

365 <u>without</u> extensive additional engineering and development work, which turned out to be

false."  CSOF ¶ 185; *see* Daigle Decl. ¶ 6 (defining "out-of-the-box" compatibility as "meaning

that it should be capable of being implemented with only reasonable and non-complex

configuration and no customization").

However, the document on which Genetec relies to assert this misrepresentation is

unavailing.  Genetec focuses on the October 2019 Document, which PROS emailed to Genetec

during the pre-sale period.  Opp. at 8; *see* Daigle Decl. ¶¶ 10, 32 (citing this document).  While

the document suggests that users could access Smart CPQ from the Dynamics app or a web

browser, it says nothing about whether that compatibility is "out-of-the-box."  *See* October 2019

Document at 116 ("It is possible to access Smart CPQ from MSCRM (D365 app or browser)

with a quote and theme that are specific to your device.").

Genetec points to no other relevant statements by PROS in this regard that could be false.

The Court previously held that PROS's alleged statement during a pre-sale demonstration that

Genetec could "easily maintain the software without ongoing help from PROS [i]s a predictive

statement of opinion regarding future events, and therefore [could not] be literally false."

*Genetec*, 2021 WL 4311208, at *6.  Genetec relies on the release notes for Version 12.0, dated

March 22, 2019, which highlight "Out-of-the-Box Integration" with Salesforce's CRM software,

but say nothing about out-of-the-box integration with Dynamics.  *See* Opp. at 7 (citing ECF No.

76-4 at 5).  Even accepting Genetec's suggestion that PROS would have touted Smart CPQ's

out-of-the-box compatibility with Dynamics had such compatibility existed, the release notes do

not suggest that PROS ever made a false representation about that compatibility to Genetec in the October 2019 Document or anywhere else.

Indeed, Daigle's assertion that integrating Smart CPQ into Genetec's system would be "non-complex" contradicts Genetec's acknowledgement in its Amended Complaint that such a task "was understood . . . to be a complex and time-consuming undertaking."  Am. Compl. ¶ 13. As Genetec conceded elsewhere, "[a]ll software is ultimately compatible with all other software as long as sufficient engineering work is done to make it compatible."  CSOF ¶ 185 (emphasis omitted).  Even if PROS represented Smart CPQ as compatible with Dynamics, the Court finds no evidence of a representation that this compatibility would be "out-of-the-box" or readily achievable with little extra work.

### 2.  Compatibility with Dynamics Mobile App

Genetec also claims that PROS misrepresented in the October 2019 Document that its CPQ product was compatible with the Dynamics mobile application.  *See* Opp. at 11; Daigle Decl. ¶ 10.  While Smart CPQ remained compatible with Dynamics on mobile devices via *web browser*, Genetec could not access the software through the Dynamics *mobile application*.  *See* CSOF ¶ 185.  The October 2019 Document indeed represents that users could access Smart CPQ through the Dynamics mobile application.  *See* October 2019 Document at 116.  However, Genetec offers no evidence that this statement was false at the time that the document was given to Genetec (in October 2019).  *See Rombach v. Chang*, 355 F.3d 164, 172 (2d Cir. 2004) (misstatements are actionable under Rule 9(b) only if they were "false when made").  Genetec's falsity argument relies on a release note for Version 12.4 of Smart CPQ, dated December 20, 2019, stating that "Smart CPQ is compatible with mobile devices . . . , *with the condition that they run a supported web browser version*."  ECF No. 76-5 at 7; *see* Daigle Decl. ¶ 31 (relying on this document); CSOF ¶¶ 192, 225 (same).  Both statements could have been true at the time

they were made; in other words, the latter document does not prove that the former was a

misrepresentation.  As PROS explains, Microsoft had changed its single sign-on API for the

Dynamics mobile app, such that the app no longer supported Smart CPQ.  CSOF ¶¶ 102, 192.

Even if there were a fact issue as to whether PROS knew of issues with Smart CPQ's

mobile-app compatibility before executing its agreement with Genetec on December 24, 2019,

and failed to disclose those issues to Genetec, the Court finds that any such omission was

immaterial.  When weighing its short list of CPQ vendors, Genetec noted no reference to the

Dynamics app in its internal analysis.  *Id.* ¶ 188.  The parties did not discuss mobile-app

compatibility during the September 2019 Presentation.  *See id.* ¶ 189.  Genetec's Core

Requirements List, the Excel spreadsheet intended to "communicate . . . what items are in scope

for the project," *id.* ¶ 49, also did not mention the Dynamics mobile app, *id.* ¶¶ 46, 187.  After

receiving the October 2019 Document, Genetec did not ask any follow-up questions about the

information in the document.  *Id.* ¶ 176.  Nor did Genetec discuss the document with PROS

during its negotiations or subsequent solution design phase.  *Id.*  In fact, Elvish, who headed

Genetec's negotiations with PROS and signed the agreements on Genetec's behalf, testified that

he never reviewed or considered the October 2019 Document before selecting PROS and signing

the agreements.  *Id.* ¶ 177.  In opposition, Genetec claims that mobile-app compatibility was

important because using Smart CPQ through an application was "much easier" than using it

through a web browser on a mobile device.  Daigle Decl. ¶ 8.  But the Court cannot square this

post hoc asserted importance with Genetec's complete failure to raise the issue during its

negotiations and subsequent solutions design phase.  No reasonable factfinder, upon reviewing

the evidence in the record, would conclude that Smart CPQ's mobile-app compatibility with

Dynamics was material to Genetec.  Therefore, Genetec cannot stake its misrepresentation claims on this particular representation.

In short, because PROS made no material misrepresentation or omission to Genetec, the Court grants summary judgment to Defendant on Plaintiff's intentional and negligent misrepresentation claims.

## II.   Defendant's Breach-of-Contract Claim

Having dismissed Plaintiff's misrepresentation claims, the Court addresses Defendant's counterclaim for breach of contract.  To establish a claim for breach of contract under New York law, a plaintiff must show: (1) the existence of an agreement; (2) the plaintiff's adequate performance of the contract; (3) the defendant's breach of contract; and (4) damages.  *34-06 73, LLC v. Seneca Ins. Co.*, 198 N.E.3d 1282, 1287 (N.Y. 2022); *accord Martinez v. Agway Energy Servs., LLC*, 88 F.4th 401, 409 (2d Cir. 2023).

The Court holds that each of these elements is satisfied.  The parties agree that they entered into the SSA, the Subscription Order, and the Work Order after arms-length negotiations.  CSOF ¶ 56.  The Court has already dismissed Genetec's breach-of-contract claim, finding no "plausibly alleged facts demonstrating that PROS breached any provision of the agreement." *Genetec*, 2021 WL 4311208, at *9.  As for whether Genetec itself breached, Genetec could terminate the SSA only if PROS failed to perform any of its material obligations and failed to cure its breach within 30 days of written notice from Genetec.  *See* SSA § 8.1.  Neither condition was satisfied before Genetec terminated the SSA.  As previously discussed, PROS did not breach its contract with Genetec, materially or otherwise.  Genetec also terminated the agreement without providing PROS the agreed-upon time to cure.  "[A] party's termination is ineffective where the relevant contract provides for a notice-to-cure and notice is not provided." *E. Empire Constr. Inc. v. Borough Constr. Grp. LLC*, 156 N.Y.S.3d 148, 152 (1st Dep't 2021); *see Point*

*Prods. A.G. v. Sony Music Ent., Inc.*, No. 93-cv-04001 (NRB), 2000 WL 1006236, at *3 (S.D.N.Y. July 20, 2000) ("Generally, a party asserting nonperformance must afford a defaulting party any contractually-secured opportunity to cure prior to terminating a contract." (quotation marks and citation omitted)).  Genetec terminated the agreement and revoked PROS's access to Genetec's system on July 10, 2020.  CSOF ¶¶ 113-114.  Even after PROS requested access to cure the claimed breaches within 30 days of this notice, Genetec did not restore access.  *Id.* ¶¶ 116-117.  Therefore, Plaintiff breached its contract with Defendant.

In connection with this breach, PROS seeks $697,924.48 in damages, consisting of two years of unpaid subscription fees, unpaid professional services, attorneys' fees, and interest.  Br. at 12; *see* SSA § 2.1 (Genetec's payment obligations under the SSA are "irrevocable and non-cancellable"); *id.* § 2.3 (agreement to "pay any reasonable legal fees or other costs incurred by PROS to collect any such undisputed delinquent amounts").

Absent its fraudulent-inducement claim, Genetec opposes neither PROS's breach-of-contract claim under New York common law nor PROS's argument that Genetec's affirmative defenses are unsubstantiated.  *See* Br. at 12; *see generally* Opp.  Rather, Genetec argues only that New York's Uniform Commercial Code ("U.C.C.") governs its contract with PROS, under which it could reject nonconforming goods.  *See* Opp. at 24-25.

Genetec's argument fails for two reasons.  First, Genetec forfeited this affirmative defense by failing to raise it in either its Amended Complaint or in response to PROS's motion to dismiss.  *See Fed. Deposit Ins. Corp. v. Murex LLC*, 500 F. Supp. 3d 76, 97 (S.D.N.Y. 2020) (defendant waived affirmative defense not raised in answer or three motions to dismiss); *Sompo Japan Ins. Co. of Am. v. Norfolk S. Ry. Co.*, 762 F.3d 165, 176 (2d Cir. 2014) ("[G]enerally,

failure to plead an affirmative defense in the answer results in the waiver of that defense and its exclusion from the case." (further brackets, quotation marks, and citation omitted)).

Second, Genetec's reliance on the Uniform Commercial Code is inapplicable in this case. New York's U.C.C. applies to contracts for the "present or future sale of goods." *See* N.Y. U.C.C. § 2-106(1). "Goods" are defined as "all things . . . which are movable at the time of identification to the contract for sale." *Id.* § 2-105(1). Here, the parties' contract did not concern the sale of a tangible good; rather, PROS sold Genetec a service. *See* CSOF ¶ 3 (no dispute that "PROS sells and operates its software under what is known in the industry as a software-as-a-*service* ('SaaS') model" (emphasis added)). Under the SSA, Genetec purchased three years of "web-based access to the Application." SSA § 1.1 PROS sold and operated Smart CPQ as a software-as-a-service model, under which customers like Genetec paid a subscription fee to access the software. CSOF ¶¶ 3-4. Genetec did not purchase any hardware from PROS, which maintained the software on its own infrastructure, updated the software itself, and allowed its customers access to the software through a web browser. *Id.* ¶ 4. "[S]ervice predominates" the parties' contract, distinguishing this transaction from those in Genetec's cited cases. *Alessi Equip., Inc. v. Am. Piledriving Equip., Inc.*, 578 F. Supp. 3d 467, 492 (S.D.N.Y. 2022) (citation omitted); *see Triangle Underwriters, Inc. v. Honeywell, Inc.*, 457 F. Supp. 765, 767 (E.D.N.Y. 1978) (involving sale of "hardware," including "the computer, printer, collator and other equipment"), *aff'd in part, rev'd in part*, 604 F.2d 737 (2d Cir. 1979); *Commc'ns Grps., Inc. v. Warner Commc'ns Inc.* 527 N.Y.S.2d 341, 344 (Civ. Ct. 1988) (transaction "clearly provide[d]" for "identifiable and movable" computer-software equipment); *Confer Plastics, Inc. v. Hunkar Lab'ys Inc.*, 964 F. Supp. 73, 75 (W.D.N.Y. 1997) (involving sale of industrial-grade computer and multiple machine monitor terminals). Therefore, the Court concludes that New York

common law – not New York's U.C.C. – governs the parties' contract, and grants summary judgment to Defendant on its breach-of-contract counterclaim.

## CONCLUSION

For the foregoing reasons, the Court GRANTS Defendant's motion for summary judgment.  Judgment is granted in favor of PROS on Genetec's misrepresentation claims.  PROS is also granted summary judgment as to its counterclaim against Genetec for breach of contract. The Clerk of Court is respectfully directed to terminate the motion at ECF No. 68 and to close this case.

Dated: March 21, 2024
      New York, New York

SO ORDERED.

_Jennifer Rochon_

JENNIFER L. ROCHON
United States District Judge